No. 22-12041

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

BRANDON FULTON,

*Plaintiff-Appellant*,

*v.*

FULTON COUNTY BOARD OF COMMISSIONERS,

*Defendant-Appellee*,

PAUL L. HOWARD, JR., ESQ., IN HIS INDIVIDUAL CAPACITY, ET AL.,

*Defendants*.

On Appeal from the United States District Court
for the Northern District of Georgia, No. 1:20-cv-01936-SCJ
Before the Honorable Judge Steve Jones

## BRIEF FOR AMICI CURIAE PROFESSOR JAMES W. ELY, JR., PROFESSOR JULIA D. MAHONEY, AND THE BUCKEYE INSTITUTE IN SUPPORT OF NEITHER PARTY

THOMAS G. SAUNDERS
DONNA M. FARAG
DOUGLAS W. GATES
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
December 19, 2024                    (202) 663-6000

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, the undersigned hereby certify that Amici Curiae Professor James W. Ely, Jr., Professor Julia D. Mahoney, and The Buckeye Institute are aware of no additional attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case on appeal other than those listed in the parties' and other amici's certificates.[1]

Amici Curiae further certify that Professors Ely and Mahoney are natural persons and that The Buckeye Institute is not a publicly held corporation, does not have a parent corporation, and has not issued stock.  Therefore, no publicly traded corporation owns ten percent or more of stock of any of the undersigned.

/s/ THOMAS G. SAUNDERS
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC  20037
(202) 663-6000

*Counsel for Amici Curiae Professor James W. Ely, Jr., Professor Julia D. Mahoney, & The Buckeye Institute*

---

[1]  No counsel for a party authored this brief in whole or in part, and no entity or person, other than amici curiae, its members, and its counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT ...........................................................................1

TABLE OF AUTHORITIES ........................................................................... iii

IDENTITY AND INTEREST OF AMICI CURIAE ................................................1

STATEMENT OF ISSUES ................................................................................2

SUMMARY OF ARGUMENT ...........................................................................3

ARGUMENT ...................................................................................................5

I.    THE FIFTH AMENDMENT CODIFIED A LONGSTANDING NATURAL RIGHT .........5

    A.    Just Compensation Was A Common Law Principle Rooted In
        Natural Law And The English Tradition ...............................................6

    B.    The Colonies Recognized The Just Compensation Requirement .........7

    C.    The Revolutionary War And Founding Era Yielded Enhanced
        Property Protections, Including The Codification Of The Just
        Compensation Principle ......................................................................9

II.    THE JUST COMPENSATION REQUIREMENT WAS RECOGNIZED AS
    ESSENTIAL BY STATES AT THE RATIFICATION OF THE FOURTEENTH
    AMENDMENT .........................................................................................12

    A.    State Courts Recognized the Fundamental Nature of Just
        Compensation ....................................................................................13

    B.    Many State Courts Required Compensation For Takings Before
        Ratification .......................................................................................15

    C.    The Supreme Court Acknowledged The Role Of Common Law
        Principles And State Constitutions Before Incorporating The
        Just Compensation Requirement ........................................................18

III.    THE FIFTH AND FOURTEENTH AMENDMENTS REQUIRE SOME
    SUFFICIENT REMEDY FOR A TAKING .....................................................20

    A.    Just Compensation Is Necessary To Fulfill The Takings
        Clause's Protective Function Of Ensuring Individual Property
        Owners Do Not Bear Public Costs .....................................................21

B.     Courts Have Enforced The Just Compensation Requirement Against the Federal Government Without An Implied Constitutional Cause Of Action ........................................................23

C.     Nearly Every State Has Provided Express Procedures to Vindicate the Just Compensation Principle.........................................26

D.     It Is Not Clear Whether An Implied Cause of Action Against Georgia Is Necessary In The Present Case ........................................28

E.     Whether A Cause Of Action Lies Against Municipalities Is Available Is Relevant To Assessing Whether An Implied Cause Of Action May Be Required ...............................................................32

CONCLUSION ...................................................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*ALA Management, LLC v. Hall County, Georgia*, No. 24-10618, 2024
WL 4449752 (11th Cir. Oct. 9, 2024) ...........................................................28

*Alloway v. City of Nashville*, 13 S.W. 123 (Tenn. 1890)........................................17

*Bay Point Properties, Inc. v. Mississippi Transportation Commission*,
937 F.3d 454 (5th Cir. 2019) .......................................................................31

*Block v. North Dakota ex rel. Board of University & School Lands*,
461 U.S. 273 (1983)................................................................................24, 25

*Boston Chamber of Commerce v. City of Boston*, 217 U.S. 189 (1910) .................22

*Brown v. Huger*, 62 U.S. (21 How.) 305 (1858)...................................................24

*Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003)..........................21

*Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ............................................21

*Chicago, Burlington & Quincy Railroad Co. v. Chicago*, 166 U.S. 226
(1897)...................................................................................18, 19, 20, 32

*City of Atlanta v. Penosky*, 856 S.E.2d 762 (Ga. Ct. App. 2021)...........................28

*City of Chicago v. Taylor*, 125 U.S. 161 (1888)....................................................19

*DeVillier v. Texas*, 601 U.S. 285 (2024)................................................................30

*Doral 10, LLC v. City of Doral*, No. 20-13528, 2023 WL 6891270
(11th Cir. Oct. 19, 2023)..............................................................................28

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) ..........................................26, 31

*Eaton v. Boston, Concord & Montreal Railroad*, 51 N.H. 504 (1872).............15, 16

*Egbert v. Boule*, 596 U.S. 482 (2022)...................................................................28

*First English Evangelical Lutheran Church of Glendale v. County of
Los Angeles*, 482 U.S. 304 (1987).......................................4, 21, 29, 30, 32

*Gardner v. Village of Newburgh*, 2 Johns. Ch. 162 (N.Y. Ch. 1816) ...............13, 14

*Grand Rapids Booming Co. v. Jarvis*, 30 Mich. 308 (1874)...................................16

*Ham v. City of Salem*, 100 Mass. 350 (1868) ........................................................17

*Henry v. Dubuque & Pacific Railroad Company*, 10 Iowa 540 (1860)..................16

*Hollingsworth v. Parish of Tensas*, 17 F. 109 (C.C.W.D. La. 1883) ................17, 29

*Hooker v. New Haven & Northampton Company*, 14 Conn. 146 (1841)..................................................................................................................15

*Horne v. Department of Agriculture*, 576 U.S. 350 (2015)................................9, 10

*Knick v. Township of Scott*, 588 U.S. 180 (2019)........................4, 14, 23, 27, 28, 32

*Ladd v. Marchbanks*, 971 F.3d 574 (6th Cir. 2020) ...............................................31

*Lathrop v. Deal*, 301 Ga. 408 (2017)......................................................................28

*Library of Congress v. Shaw*, 478 U.S. 310 (1986)................................................24

*Marvin M. Brandt Revocable Trust v. United States*, 572 U.S. 93 (2014)....................................................................................................................1

*Meigs v. McClung's Lessee*, 13 U.S. (9 Cranch) 11 (1815) ...................................24

*Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978)..................................................................................................................33

*O'Connor v. Eubanks*, 83 F.4th 1018 (6th Cir. 2023) .......................................33, 34

*Philip O'Dell v DeKalb County BA*, No. 13A48030 (Decatur Cnty. Ct. May 20, 2015).................................................................................................28

*Polack v. Mansfield*, 44 Cal. 36 (1872) .................................................................24

*Proprietors of Piscataqua Bridge v. New Hampshire Bridge*, 7 N.H. 35 (1834)...................................................................................................14

*Pumpelly v. Green Bay Company*, 80 U.S. (13 Wall.) 166 (1872)..........................19

*Robinson v. Georgia Department of Transportation*, 966 F.2d 637 (11th Cir. 1992) ..................................................................................31

*Ruckelshaus v. Monsanto Co.*, 467 U. S. 986 (1984) ................................................25

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco, California*, 545 U.S. 323 (2005)..................................................................................26

*Sheetz v. County of El Dorado*, 601 U.S. 267 (2024)...................................................1

*Speed v. Mills*, 919 F. Supp. 2d 122 (D.D.C. 2013) ...................................................33

*Stanley v. Schwalby*, 147 U.S. 508 (1893)..................................................................24

*Sterling Hotels, LLC v. McKay*, 71 F.4th 463 (6th Cir. 2023) ...................................33

*Stone v. Fairbury, Pontiac & Northwestern Railroad Co.*, 68 Ill. 394 (1873)......................................................................................................16

*Sveen v. Melin*, 584 U.S. 811 (2018) ............................................................................1

*United States Forest Service v. Cowpasture River Preservation Ass'n*, 590 U.S. 604 (2020)....................................................................................1

*United States v. Causby*, 328 U. S. 256 (1946) ..........................................................25

*United States v. Great Falls Manufacturing Co.*, 112 U.S. 645 (1884)...................25

*United States v. Lee*, 106 U.S. 196 (1882)..................................................................24

*United States v. Russell*, 80 U.S. (13 Wall.) 623 (1871) ...........................................25

*Watson Memorial Spiritual Temple of Christ v. Korban*, 387 So. 3d 499 (La. 2024) ......................................................................................27

*Wilcox v. Jackson ex dem. McConnel*, 38 U.S. (13 Pet.) 498 (1839)......................24

*Williams v. Utah Department of Corrections*, 928 F.3d 1209 (10th Cir. 2019) ................................................................................................30, 31

*Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985) ..........................................................28

*Yates v. City of Milwaukee*, 77 U.S. (10 Wall.) 497 (1871) ......................................18

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).............................21

*Ziglar v. Abbasi*, 582 U.S. 120 (2017).......................................................................29

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Fundamental Consts. of Carolina art. 44 (1669)........................................................8

Ga. Const. art. I, § III, ¶ I.............................................................................27

Mass. Body of Liberties ¶ 1 (1641) ....................................................................8

Mass. Decl. of Rights art. X (1780) ..................................................................10

Vt. Const. ch. I, art. II (1786).......................................................................10

Va. Decl. of Rights § 6 (1776).........................................................................9

28 U.S.C.
      § 1346 ......................................................................................25
      § 1391 ......................................................................................25
      § 2409a.....................................................................................26

42 U.S.C.
      § 1983 .........................................................................4, 27, 28, 33
      § 1988 .......................................................................................34

I.R.C. § 501 ...........................................................................................2

1778 N.Y. Laws ch. 29 ................................................................................10

1779 S.C. Acts § 4 .....................................................................................9

1777 Va. Acts ch. XII ..................................................................................9

Northwest Ordinance of 1787 art. II...................................................................11

Magna Carta (1215) .....................................................................................6

## OTHER AUTHORITIES

1 Blackstone, *Commentaries on the Laws of England* (1765) ...............................7

*The Book of the General Lawes and Libertyes Concerning the*
*Inhabitants of the Massachusetts* (Thomas G. Barnes ed., 1975)...................8

Brauneis, Robert, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 57 (1999) ...................................................................14

Ely, James W., Jr., *The Contract Clause: A Constitutional History* (2016)..................................................................................................1

Ely, James W., Jr., *The Guardian of Every Other Right: A Constitutional History of Property Rights* (3d ed. 2008) .......................................................... 1, 5, 6, 7, 9, 10, 11, 23

Ely, James W., Jr., *The Law of Easements and Licenses in Land* (revised ed. 2021) .......................................................................1

Ely, James W., Jr., "*That Due Satisfaction May be Made:*" *The Fifth Amendment and the Origins of the Compensation Principle*, 36 Am. J. Legal Hist. 1 (1992) ...............................................6, 8, 11, 22

Ely, James W., Jr., *Railroads and American Law* (2001) .......................................1

Leong, Nancy, et al., *Pleading Failures in* Monell *Litigation*, 73 Emory L.J. 801 (2024).................................................................34

Locke, John, *Second Treatise on Government* (Peter Laslett ed., Cambridge Univ. Press 1988) (1690)............................................7

Mahoney, Julia D., Ann Woolhandler & Michael G. Collins, *Takings and Implied Causes of Action*, 2023-2024 Cato Sup. Ct. Rev. 249 (2024)................................................. 2, 14, 15, 29, 31, 32, 34

Mahoney, Julia D., Cedar Point Nursery *and the End of the New Deal Settlement*, 11 Brigham-Kanner Prop. Rts. J. 43 (2022) .................................2

Mahoney, Julia D., Kelo's *Legacy: Eminent Domain and the Future of Property Rights*, 2005 Sup. Ct. Rev. 103 (2006) .......................................1

Nichols, Philip, *The Power of Eminent Domain* § 259 (1909)................................20

14 *The Papers of James Madison* (William T. Hutchinson et al. eds., 1962) ................................................................................12

12 *The Papers of James Madison* (Robert A. Rutland & Charles F. Hobson eds., 1979) .......................................................11

2 Pufendorf, Samuel, Freiherr von, *De Jure Naturae et Gentium Libri Octo* 1285 (C.H. Oldfather & W.A. Oldfather trans., 1934).....................7, 22

2 Story, Joseph, *Commentaries on the Constitution of the United States* (1830) ...................................................................................................20

Treanor, William Michael, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782 (1995)...........................................................................................................8

Treanor, William Michael, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale L.J. 694 (1985)...........................................................................................10

Woolhandler, Ann & Julia D. Mahoney, *Federal Courts and Takings Litigation*, 97 Notre Dame L. Rev. 679 (2022) ..........................................1, 18

**IDENTITY AND INTEREST OF AMICI CURIAE**

James W. Ely, Jr., is the Milton R. Underwood Professor of Law, Emeritus, and Professor of History, Emeritus, at Vanderbilt University. Professor Ely is a renowned property law expert and legal historian who has written extensively about the Takings Clause and just compensation requirement. He is the co-author of *The Law of Easements and Licenses in Land* (revised ed. 2021), and the author of *The Guardian of Every Other Right: A Constitutional History of Property Rights* (3d ed. 2008), *Railroads and American Law* (2001), and *The Contract Clause: A Constitutional History* (2016). The Supreme Court and twenty-one other federal courts have relied upon Professor Ely's scholarship. *See, e.g.*, *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 96 (2014); *United States Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 613 (2020); *Sheetz v. County of El Dorado*, 601 U.S. 267, 277 (2024); *Sveen v. Melin*, 584 U.S. 811, 830 (2018) (Gorsuch, J., dissenting). Courts in forty-one states and territories have cited Professor's Ely's work, including twenty-nine state supreme courts.

Julia D. Mahoney is the John S. Battle Professor of Law and the Joseph C. Carter, Jr. Research Professor of Law at the University of Virginia School of Law, where she teaches courses in property and constitutional law. Her scholarly articles include Kelo's *Legacy: Eminent Domain and the Future of Property Rights*, 2005 Sup. Ct. Rev. 103 (2006); *Federal Courts and Takings Litigation*, 97 Notre Dame

L. Rev. 679 (2022) (with Ann Woolhandler); Cedar Point Nursery *and the End of the New Deal Settlement*, 11 Brigham-Kanner Prop. Rts. J. 43 (2022); and *Takings and Implied Causes of Action* (with Ann Woolhandler & Michael G. Collins), 2023-2024 Cato Sup. Ct. Rev. 249 (2024).

The Buckeye Institute was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy in the states. The staff at The Buckeye Institute accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policy solutions, and marketing them for implementation in Ohio and replication nationwide. The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. § 501(c)(3). The Buckeye Institute files and joins amicus briefs that are consistent with its mission and goals and has been active in defending private property rights in both state and federal courts.

## STATEMENT OF ISSUES

In response to the Court's November 12, 2024 order inviting Amici to file a brief, Amici's brief principally addresses the following issues:

1. Whether the Takings Clause provides a cause of action directly against the federal government under the Fifth Amendment.

2.      Whether the Fourteenth Amendment extends a direct cause of action for takings against state governments.

3.      How the availability of remedies for takings by municipalities affects whether courts should imply a cause of action.

## SUMMARY OF ARGUMENT

The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation."  Its ratification codified a natural law principle that was reflected in the English tradition, colonial charters, and the earliest state constitutions.  By the time the Fourteenth Amendment was ratified, that principle was so deeply rooted in American society, and considered so fundamental to justice, that state courts implied causes of action to decide takings cases even when state law did not explicitly provide one.  When the Supreme Court ruled at the turn of the twentieth century that the just compensation requirement was made binding on the states through the Fourteenth Amendment, states had long been awarding damages for takings under states' own eminent domain powers.  The guarantee predates the Constitution and is a necessary shield against government abuse.

The fundamental nature of the just compensation guarantee is reflected in state and federal practice today.  Nearly every state has provided for a state-law cause of action to adjudicate takings claims for money damages against the state, its officials,

or its local governments.  Furthermore, 42 U.S.C. § 1983 makes available a federal cause of action against state officials and municipalities for certain takings.  And the federal government can be sued through the Tucker Act and other statutes.

The history of takings litigation under common law, statutes, and implied causes of action in both federal and state court underscores what the Supreme Court has often repeated: The Takings Clause is "self-executing."  *Knick v. Township of Scott*, 588 U.S. 180, 192 (2019) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987)).  In other words, the Constitution requires that claimants have effective access to a remedy, so the focal point of the inquiry is whether existing procedures are sufficient to vindicate that mandate.

But legislatures may regulate the forms and procedures that govern the remedy.  Where adequate procedures exist to enforce the just compensation guarantee, federal courts need not imply a new, direct cause of action—particularly where Congress has not abrogated states' sovereign immunity.  If a state—or the federal government—were to abrogate all access to a remedy or make recourse impracticable, it would vitiate the Constitution's express condition for seizing property and frustrate the Takings Clause's purpose of protecting liberty.  In such cases, courts may need to imply a constitutional cause of action to effectuate the Fifth Amendment's guarantee.

Amici take no position on whether a meaningful remedy was available to the plaintiff in this case but write to inform the Court of the considerations that are relevant to assessing whether it should imply a cause of action. Among these considerations are the type of property taken, the nature of the taking, and the specific governmental authority (state, municipality, or individual official) that committed the taking, each of which implicate different remedial procedures with their own limitations and benefits. By examining available remedies and procedures with care, the Court gives due respect to both states' sovereignty and Congress's prerogatives, while remaining a vigilant guardian of individual rights.

## ARGUMENT

### I.    THE FIFTH AMENDMENT CODIFIED A LONGSTANDING NATURAL RIGHT

The principle that just compensation is required for a taking was rooted in natural law, articulated in early English law, and shaped by jurists and philosophers across Europe in the seventeenth and eighteenth centuries. The principle carried over to the American colonies, where it became entrenched in society and codified in law. State constitutions and legislation drew on natural law principles to safeguard property rights and adopted compensation provisions that were ultimately "forerunners of the takings clause of the Fifth Amendment." Ely, *The Guardian of Every Other Right* 31 (2007). And since the earliest days after the Fifth Amendment's ratification, courts have enforced the just compensation requirement

against the federal government through common law and implied statutory causes of action.

### A. Just Compensation Was A Common Law Principle Rooted In Natural Law And The English Tradition

The English constitutional tradition safeguarded property rights. Notably, Magna Carta prohibited constables or other royal officials from "tak[ing] corn or other chattels of any man without immediate payment, unless the seller voluntarily consent[ed] to postponement of payment." Magna Carta ch. 28 (1215). It further provided, "No free man shall be seized or imprisoned, or stripped of his rights or possessions … except by the lawful judgment of his equals or by the law of the land." *Id.* ch. 39. Together, these provisions "secured the rights of owners against arbitrary deprivation of property without due process of law" and affirmed that when the government seizes private property, it must compensate the owner. Ely, *The Guardian of Every Other Right* 13.

Natural law jurists across Europe affirmed the need for compensation. Acknowledging the principle of eminent domain and authority of "the supreme sovereignty … to seize [a] thing for the necessities of the state," German jurist Samuel Pufendorf wrote that any such seizure must be "on condition" of the owner receiving a refund "by … other citizens." Ely, "*That Due Satisfaction May be Made:*" *The Fifth Amendment and the Origins of the Compensation Principle*, 36

Am. J. Legal Hist. 1, 16 (1992) (quoting 2 Pufendorf, *De Jure Naturae et Gentium Libri Octo* 1285 (Oldfather & Oldfather trans., 1934)).

John Locke espoused a similar natural-law-based theory of property rights. According to Locke, government exists to protect natural property rights and preserve "'Lives, Liberties and Estates.'" Ely, *The Guardian of Every Other Right* 17 (quoting Locke, *Second Treatise on Government* 350 (Laslett ed., Cambridge Univ. Press 1988) (1690)). Given this charge, any seizure of property or levy of taxes without popular consent "invades the Fundamental Law of Property, and subverts the end of Government." *Id.* (quoting Locke, *Second Treatise* 362). This philosophy was instrumental in shaping English common law. Blackstone relied on Locke's thesis in defining property rights, *id.*: "So great … is the regard of the law for private property," Blackstone wrote, that although the legislature could take private property, the owner was entitled to "a full indemnification and equivalent for the injury thereby sustained." 1 Blackstone, *Commentaries on the Laws of England* 135 (1765). This conception of property rights and the need for compensation carried over to the colonies and became integral to American jurisprudence.

**B.    The Colonies Recognized The Just Compensation Requirement**

The colonies drew on these natural and common law principles, regarding just compensation in particular as fundamental to property rights and liberty. For example, the 1669 Fundamental Constitutions of Carolina (which Locke himself

drafted in part) reflected the compensation mandate.  *See* Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 785-786 (1995).  Even though the Fundamental Constitutions were ultimately not enacted, they remain illustrative:  They set forth the eminent domain powers of the high steward's court while specifying that damage "shall be valued, and satisfaction made."  Fundamental Consts. of Carolina art. 44 (1669).

To the north, Massachusetts formally affirmed principles of just compensation in its earliest legal code.  It declared in 1641 that "no mans goods or estaite shall be taken away from him … unlesse it be by the vertue or equitie of some expresse law of the Country."  Mass. Body of Liberties ¶ 1 (1641).  It also contemplated the need for eminent domain, authorizing towns to develop highways but requiring them to make "reasonable satisfaction" if "any man be thereby damaged in his improved ground."  Ely, 36 Am. Legal Hist. at 4 (quoting *The Book of the General Lawes and Libertyes Concerning the Inhabitants of the Massachusetts* 25 (Barnes ed., 1975)).

Massachusetts was not alone.  Several colonies enacted statutes providing for compensation for certain kinds of takings.  In 1752, Rhode Island required payment for the use of eminent domain to obtain land for pest houses, and in 1755, New York enacted a statute directing juries to assess the amount of money to be paid to lot owners whose property was used to place fortifications.  *Id.* at 5-6.  Some New England colonies and North Carolina awarded compensation when land was taken

for a highway, while South Carolina and Pennsylvania awarded compensation for taking "improved" land. Ely, *The Guardian of Every Other Right* 24. As undeveloped land became more valuable, the requirement for just compensation swept even more broadly, such that the "the granting of compensation was well established and extensively practiced at and before the time of the Revolution." *Id.* at 25.

### C. The Revolutionary War And Founding Era Yielded Enhanced Property Protections, Including The Codification Of The Just Compensation Principle

At the time of the American Revolution, more colonies had embraced the principle that takings were subject to the consent of the property owner or elected representatives and that compensation was required. Virginia, for instance, declared that persons who owned enough property for suffrage "cannot be taxed or deprived of their property for public uses without their own consent or that of their representative so elected." Va. Decl. of Rights § 6 (1776). It "allowed the seizure of surplus 'live stock, or beef, pork, or bacon' for the military, but only upon 'paying or tendering to the owner the price so estimated by the appraisers.'" *Horne v. Department of Agric.*, 576 U.S. 350, 358-359 (2015) (quoting 1777 Va. Acts ch. XII). South Carolina likewise permitted the "seizure of 'necessaries' for public use" so long as they were paid for. *Id.* at 359 (quoting 1779 S.C. Acts § 4).

The uncompensated takings of real and personal property that resulted from the Revolutionary War made the issue of just compensation especially salient to early Americans. "Loyalist property was seized. Undeveloped land was taken for roads. Goods of all types were impressed for military use." Treanor, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 Yale L.J. 694, 698 (1985) (citations omitted). John Jay decried "military impressment by the Continental Army of 'Horses, Teems, and Carriages,'" and expressed concern that the practices would not end there. *Horne*, 576 U.S. at 359. The "heightened concern for the protection of property rights" yielded explicit compensation requirements in state legislation and constitutions. Ely, *The Guardian of Every Other Right* 26; *see also*, *e.g.*, Mass. Decl. of Rights art. X (1780) ("[W]henever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."); Vt. Const. ch. I, art. II (1786) ("[W]henever any particular man's property is taken for the use of the public, the owner ought to receive an equivalent in money."); 1778 N.Y. Laws ch. 29 (providing compensation for the impressment of horses and carriages).

The requirement for just compensation—born of common and natural law jurisprudence, adopted by the colonists, and developed further in the wake of colonists' uncompensated losses during the war—eventually made its way into

federal law.  The Continental Congress enacted the Northwest Ordinance in 1787, which provided that, "should the public exigencies make it necessary for the common preservation to take any person's property, or to demand his particular services, full compensation shall be made for the same."  Northwest Ordinance of 1787 art. II.  This was the "first national legislation" to require compensation when the government exercised its eminent domain powers.  Ely, *The Guardian of Every Other Right* 29.

Shortly thereafter, the just compensation requirement was ratified as part of the Bill of Rights, reflecting its entrenched nature in early America.  Madison included only the principles that he believed were broadly accepted by American society, avoiding anything "of a controvertible nature that might endanger the concurrence of two-thirds of each House and three quarters of the States."  Ely, 36 Am. Legal Hist. at 17 (quoting 12 *The Papers of James Madison* 272 (Rutland & Hobson eds., 1979)).  Sure enough, the provision garnered no opposition during the ratification process, as Federalists and Anti-Federalists alike subscribed to the just compensation principle.  *Id.* at 18.

Madison continued to underscore the "inviolability of property" as a moral imperative, asserting that:

> If the United States mean to obtain or deserve the full praise due to wise and just governments, they will equally respect the rights of property, and the property in rights:  they will rival the government that most sacredly guards the former; and by repelling its example in violating

the latter, will make themselves a pattern to that and all other governments.

14 *The Papers of James Madison* 266-268 (Hutchinson et al. eds., 1962). The obligation to safeguard property rights was embraced by states and, when necessary, by courts in the decades to come.

## II. THE JUST COMPENSATION REQUIREMENT WAS RECOGNIZED AS ESSENTIAL BY STATES AT THE RATIFICATION OF THE FOURTEENTH AMENDMENT

State jurisprudence throughout the nineteenth century demonstrates the fundamental importance of just compensation. Judicial opinions across the states emphasized that the legislative power to seize property was conditioned on the provision of compensation. Indeed, by the time of the Fourteenth Amendment's enactment, a slew of state court opinions had sided with plaintiffs and awarded damages for asserted takings. And although the Supreme Court did not incorporate the just compensation requirement against the states until 1897, there was already a body of state court opinions that made clear what the Supreme Court later echoed— that the principle was an essential element of due process and universal law. The principle's essential nature justified the pre- and post-Fourteenth Amendment history of state and federal courts ensuring a proper remedy against states and state officials even without an express cause of action.

**A.    State Courts Recognized The Fundamental Nature Of Just Compensation**

State courts took the lead in fashioning takings jurisprudence, affirming states' constitutional and legislative pronouncements about the just compensation requirement.  State courts consistently upheld the right to just compensation, with reasoning frequently grounded in natural law principles and universal law.

The fundamental nature of the just compensation requirement was perhaps best articulated by Chancellor James Kent in the seminal case of *Gardner v. Village of Newburgh*, 2 Johns. Ch. 162 (N.Y. Ch. 1816).  Although there was no express just compensation provision in the New York Constitution at the time, Kent found that just compensation for a taking of property was warranted on natural law grounds. While affirming the legislature's right to take private property when necessary, he qualified its exercise:

> [T]o render the exercise of the power valid, a fair compensation must, in all cases, be previously made to the individuals affected, under some equitable assessment to be provided by law. This is a necessary qualification accompanying the exercise of legislative power, in taking private property for public uses; the limitation is admitted by the soundest authorities, and is adopted by all temperate and civilized governments, from a deep and universal sense of its justice.

*Id.* at 166.

Kent further explained that indemnification was so integral to the "inviolability of private property" and "a clear principle of natural equity" that it had been incorporated into the constitutions of countries in Europe and several states.

- 13 -

*Id.* at 167.  Invoking the federal Constitution's just compensation provision as a "higher authority, and … absolutely decisive of the sense of the people of this country," Kent concluded that just compensation was "an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property."  *Id.* at 167-168; *see also Proprietors of Piscataqua Bridge v. New Hampshire Bridge*, 7 N.H. 35, 66 (1834) (construing the New Hampshire Bill of Rights to "include, as a matter of right, and as one of the first principles of justice … due compensation" for property taken without consent).

That just compensation was considered a fundamental right is also evinced by state courts' willingness to imply a cause of action.  In the antebellum period, property owners often relied on common law forms of action to seek compensation for takings if the legislature had not provided a statutory cause of action.  *See Knick*, 588 U.S. at 199 (citing Brauneis, *The First Constitutional Tort:  The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 57, 67-68 (1999)); Woolhandler, Mahoney, & Collins, *Takings and Implied Causes of Action*, 2023-2024 Cato Sup. Ct. Rev. 249, 255-256 (2024).  When common law actions were abolished for takings, state courts implied rights of action for damages under their constitutions.  *See* Brauneis, 52 Vand. L. Rev. at 92 ("For several decades…, law reformers had attacked common law pleading as unjustifiably convoluted, and had succeeded in many states in procuring the passage of legislation

- 14 -

abolishing the forms of action[.]").  Reflecting this trend, the New Hampshire Supreme Court opined in one of the seminal nineteenth century eminent domain cases that "[t]he form of action … cannot be decisive of the question whether the injury falls within the constitutional prohibition [for just compensation]."  *Eaton v. Boston, Concord & Montreal R.R.*, 51 N.H. 504, 520 (1872).

**B.    Many State Courts Required Compensation For Takings Before Ratification**

Before the Fourteenth Amendment was enacted, state courts both implied causes of action and regularly awarded damages for takings of private land for public use.  Governmental takings were typically asserted against individual officers or state-authorized entities, who would defend themselves on the grounds that their actions were justified by law.  Woolhandler, Mahoney, & Collins, 2023-2024 Cato Sup. Ct. Rev. at 255-256.  But the defense would fail if, for lack of compensation, the taking was not authorized by law or the law authorizing the taking was found to be unconstitutional.  *Id.*  Critically, neither good-faith immunity under the common law nor sovereign immunity were available as defenses for the individual officers. *Id.*

In *Hooker v. New Haven & Northampton Company*, for instance, a plaintiff brought a common law action to recover damages from flooding caused by a canal company chartered by the state that had the power of eminent domain.  14 Conn. 146 (1841).  On appeal, the Connecticut Supreme Court held that the flooding was

- 15 -

a taking and that the plaintiff's injury to his property "flowed directly from …
throwing … surplus water upon the plaintiff's land, … depriving him of the use of
it … without any just compensation therefor." *Id.* at 161-162. The court concluded
that the taking required compensation under "natural equity" and "universal law"
and directed a new trial for determination of damages. *Id.* at 153.

Such cases were prevalent in the years immediately before and after the
Fourteenth Amendment's enactment and ratification. In *Henry v. Dubuque &
Pacific Railroad Company*, the Iowa Supreme Court upheld an opinion requiring
compensation for land taken to construct a railroad under both the Iowa Constitution
and a state statute. 10 Iowa 540, 546 (1860). The court reasoned that, although the
plaintiff could have sued to enjoin the railroad company to restrain it from using the
land, he was "not confined to this remedy." *Id.* at 545; *see also Eaton*, 51 N.H. at
504, 513, 517-518 (awarding compensation for flooded land under a common law
action); *Grand Rapids Booming Co. v. Jarvis*, 30 Mich. 308 (1874) (the conclusion
that a state-sanctioned flooding was a taking entitling the owner to compensation
was "so self-evident as hardly to admit of illustration by any example which can be
made clearer, and which therefore can hardly need the support of authorities"); *Stone
v. Fairbury, Pontiac & N.W. R.R. Co.*, 68 Ill. 394 (1873) (holding that plaintiff
successfully stated common law cause of action for a taking resulting from railroad
company's engine waste and remanding the case for further proceedings); *Alloway*

- 16 -

*v. City of Nashville*, 13 S.W. 123 (Tenn. 1890) (affirming judgment of monetary award when property was taken for public use); *Ham v. City of Salem*, 100 Mass. 350 (1868) (upholding jury finding for damages for a taking by city for its water supply).

Lower federal courts also fielded takings cases, applying state law and common law principles to adjudicate property owners' rights against municipalities as well as against state and local officials. For example, in *Hollingsworth v. Parish of Tensas*, a federal court invalidated a Louisiana state statute that authorized the construction of levees on private property without just compensation. 17 F. 109, 117-118, 119 (C.C.W.D. La. 1883). In doing so, the court declined to follow a similar case decided by the Louisiana Supreme Court. *Id.* The court instead applied general legal principles to reject the argument that the state police power included an unqualified authority to infringe on property rights. *Id.* Rather, only the eminent domain power authorized such an action, the exercise of which committed the state to provide "just indemnity" to the property holder. *Id.*

In short, well before the Supreme Court opined on the Fourteenth Amendment's application to states' exercise of eminent domain, state courts (and federal courts applying state law) regularly protected property owners by invoking the universal principles that were codified in state constitutions and the federal constitution. Although the nature of the taking and legal authorities invoked may

have varied, these cases make clear that many state courts viewed monetary compensation as an obligatory remedy for takings even before the Takings Clause was formally incorporated against the states.

### C.    The Supreme Court Acknowledged The Role Of Common Law Principles And State Constitutions Before Incorporating The Just Compensation Requirement

In 1897, the Supreme Court held that the Fourteenth Amendment's Due Process Clause guarantees compensation for taking of private property for public use by the states. *Chicago, Burlington & Quincy R.R. Co. v. Chicago*, 166 U.S. 226 (1897). But even before that ruling, the Court had decided several takings cases against states and the federal government. In doing so, it emphasized that just compensation is a right stemming from common law principles, relying on "treaty provisions, the Contract Clause, and the general common law to provide redress for state and local takings." Woolhandler & Mahoney, *Federal Courts and Takings Litigation*, 97 Notre Dame L. Rev. 679, 684 (2022).

For example, in *Yates v. City of Milwaukee*, the plaintiff sued to enjoin the city from removing his wharf. 77 U.S. (10 Wall.) 497 (1871). In directing the lower court to grant an injunction, the Supreme Court reasoned that the plaintiff had a property right to erect his wharf. *Id.* at 504, 507. If the city insisted on removing it, just compensation would be required. *Id.* In so doing, the pre-*Erie* Court invoked

general common law principles and made clear it was not bound by the Wisconsin courts' view of the common law in making this determination.  *See id.* at 506-507.

One year later, in *Pumpelly v. Green Bay Company*, the Supreme Court likewise ruled in favor of a plaintiff who brought a common law action against a defendant for overflowing his land.  80 U.S. (13 Wall.) 166 (1872).  This time, the Court used the Wisconsin Constitution as the basis for its ruling.  But it also pointed out that just compensation is "a settled principal of universal law"—one "so essentially a part of American constitutional law that it is believed that no State is now without it."  *Id.* at 177-178.  The only issue was the application of the principle to the facts.  *Id.* at 176-177; *see also City of Chicago v. Taylor*, 125 U.S. 161, 165 (1888) (deciding a takings claim under Illinois's Constitution).

These cases culminated in the Supreme Court's decision in *Chicago, Burlington & Quincy Railroad*, which held that the Fourteenth Amendment requires compensation for a taking by a state.  166 U.S. at 241.  Although the Court did not expressly mention the Fifth Amendment, it drew on the same just compensation principles that state courts had been citing for more than a century:

> Due protection of the rights of property has been regarded as a vital principle of republican institutions…. The requirement that … property shall not be taken for public use without just compensation is but "an affirmance of a great doctrine established by the common law for the protection of private property.  It is founded in natural equity, and is laid down as a principle of universal law."

*Id.* at 235-236 (quoting 2 Story, *Commentaries on the Constitution of the United States* § 1790 (1830)).

Thus, by the turn of the twentieth century, the principle that just compensation was required for a taking had been articulated by courts around the country. The just compensation requirement was one of the first provisions of the Bill of Rights made binding on the states. *Id.* at 241. And just compensation for takings was required by practically all state constitutions, the Fifth Amendment, and the Fourteenth Amendment via the Due Process Clause. *See* Nichols, *The Power of Eminent Domain* § 259 (1909).

## III. THE FIFTH AND FOURTEENTH AMENDMENTS REQUIRE SOME SUFFICIENT REMEDY FOR A TAKING

From Magna Carta through the development of the common law, the Founding, and the incorporation of the Fifth Amendment (through the Fourteenth Amendment) to the states, the availability of just compensation for a taking of property has consistently been understood to be fundamental to ordered liberty. Just as the common law ensured a remedy before and after the Founding, the Fifth Amendment (and, as relevant to the states, the Fourteenth Amendment) guarantees a remedy today—even if it does not dictate a particular procedure or forum in which to bring claims. If legislatures were to attempt to deprive the people of adequate remedies to effectuate the Fifth Amendment's guarantee, it would eviscerate the protection that the Takings Clause provides against governments imposing public

costs on private citizens.  In such a case, courts could—and indeed should—imply a direct cause of action.

**A.    Just Compensation Is Necessary To Fulfill The Takings Clause's Protective Function Of Ensuring Individual Property Owners Do Not Bear Public Costs**

The Takings Clause secures the rights of individuals against government— not by prohibiting the taking of private property for public use *per se*, but by requiring that any taking be limited to public use and subject to just compensation. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147 (2021) ("When the government physically acquires private property for a public use, the Takings Clause imposes a clear and categorical obligation to provide the owner with just compensation."); *see also Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003); *First English*, 482 U.S. at 315; *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 631 (1952) (Douglas, J., concurring) ("The power of the Federal Government to condemn property is well established…. But there is a duty to pay for all property taken by the Government.").

The rationale undergirding the just compensation requirement is that no individual property owner should bear the costs of a public benefit.  Pufendorf articulated this in 1672, explaining:

> [T]here are times in the life of every state when a great necessity does not allow the collection of strict quotas from every one, or when something belonging to one or a few citizens is required for the necessary uses of the commonwealth, the supreme sovereignty will be

- 21 -

> able to seize that thing for the necessities of the state, on condition, however, that whatever exceeds the just share of its owners must be refunded them by the other citizens.

Ely, 36 Am. J. Legal Hist. at 16 (quoting 2 Pufendorf, *De Jure Naturae et Gentium Libri Octo* 1285).

Other than due process and the command that takings be for public use, the just compensation requirement is the only limit on government's expansive ability to take property. This delicate balance is upset if the government is permitted to avoid its obligation because of a lack of adequate remedies or unreasonable procedures. As Justice Joseph Story opined, "where the rights of property are left solely dependent on the will of the legislative body, without any restraint," such action disregards the "fundamental maxims of a free government [that] seem to require[] that the rights of personal liberty and private property[] should be held sacred." *Wilkinson v. Leland*, 27 U.S. (2 Pet.) 627, 657 (1829). Allowing the government to take or destroy property and reap the benefits without ensuring there is a mechanism for it to bear the costs eviscerates the protective function of the just compensation requirement.

At its core, the just compensation requirement protects not just property, but people. *See Boston Chamber of Com. v. City of Bos.*, 217 U.S. 189, 195 (1910) ("[The Constitution] deals with persons, not with tracts of land."). That is for good reason, as property rights are fundamentally human rights. The Framers recognized

that the Takings Clause was necessary "for the protection of and security of the rights of the individual as against the government."  Mills & Abbott, *Mills on the Law of Eminent Domain* § 30, at 119 (2d ed. 1888).  Indeed, property ownership was interwoven with notions of happiness and liberty.  William Penn's commentary on Magna Carta called upon colonists to "not … give away any thing of Liberty and Property" that they enjoy.  Ely, *The Guardian of Every Other Right* 13-14.  "The right of property" is ultimately "'the guardian of every other right, and to deprive a people of this, is in fact to deprive them of their liberty.'"  *Id.* at 26.  Courts should thus ensure that legislatures do not erect unjustified barriers for securing just compensation for taken property and confirm that adequate remedies are available to protect property rights.

   **B.    Courts Have Enforced The Just Compensation Requirement Against the Federal Government Without An Implied Constitutional Cause Of Action**

   The history of takings claims against the federal government makes clear that the Takings Clause is "self-executing," *Knick*, 588 U.S. at 192, and that the Constitution would require a judicial remedy if one were not legislatively available. Federal courts since the Founding have ensured that takings claimants have had at least one procedural vehicle available to adjudicate their cases, whether through common law, statute, or implied cause of action.  This tradition demonstrates that

- 23 -

the legislature need not provide an express cause of action for courts to hear takings claims against the federal government.

After the Founding, those whose property was taken by the federal government could pursue relief through multiple processes. Those who sought monetary compensation directly under the Fifth Amendment could petition Congress for a private bill issuing payment. *Library of Cong. v. Shaw*, 478 U.S. 310, 316 n.3 (1986). And state and federal courts entertained common law ejectment and trespass claims against federal officials. *See, e.g.*, *Brown v. Huger*, 62 U.S. (21 How.) 305, 308 (1858) (ejection action against federal military officials); *Wilcox v. Jackson ex dem. McConnel*, 38 U.S. (13 Pet.) 498, 499 (1839) (ejection action against federal officials originating in Illinois state court); *Polack v. Mansfield*, 44 Cal. 36, 42 (1872) (California); *Stanley v. Schwalby*, 147 U.S. 508, 519 (1893) (Texas). Indeed, in similar cases ostensibly decided under the common law, the court explicitly cited the Fifth Amendment just compensation principle in its reasoning. *See Meigs v. McClung's Lessee*, 13 U.S. (9 Cranch) 11, 18 (1815) (ejection action citing the "just compensation" principle); *United States v. Lee*, 106 U.S. 196, 210, 262 (1882) (same).

More avenues for relief became available over the past century and a half. Although courts eventually narrowed the reach of common-law claims against federal officials, *see Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461

- 24 -

U.S. 273, 282 n.9 (1983), Congress created new procedures for obtaining monetary and equitable relief directly against the United States, *id.* at 280, 282.  In the late nineteenth century, courts began to award money damages against the United States under the Tucker Act and its predecessors, even though those statutes purported only to provide jurisdiction and waive sovereign immunity.  *See United States v. Russell*, 80 U.S. (13 Wall.) 623, 630 (1871) (a taking created an implied contract justiciable by the Court of Claims under the Tucker Act's predecessor); *see also United States v. Causby*, 328 U.S. 256, 267 (1946) (deciding a takings claim based on the Tucker Act); *Ruckelshaus v. Monsanto Co.*, 467 U. S. 986, 1016 (1984) (same).[2]

---

[2]     The Tucker Act waives sovereign immunity and provides jurisdiction for constitutional and contractual claims in the Court of Federal Claims, but it does not expressly provide a cause of action for a taking.  *See* 28 U.S.C. §§ 1346(a), 1391. Courts interpreted the statute and its predecessors to provide for takings claims either because they were grounded in the Fifth Amendment or because they were based on an implied contract between the government and the property owner, but early cases did not see a clear distinction between the two theories:

> [W]e are of opinion that the United States, having by its agents, proceeding under the authority of an act of congress, taken the property of the claimant for public use, are under an obligation, *imposed by the constitution*, to make compensation.…  Such an implication being consistent with the constitutional duty of the government, as well as with common justice, the claimant's cause of action is one that arises out of implied contract within the meaning of the statute, which confers jurisdiction upon the court of claims of actions founded "upon any contract, express or implied, with the government of the United States."

*United States v. Great Falls Mfg. Co.*, 112 U.S. 645, 656-657 (1884) (emphasis added).  This understanding further bolsters the idea that the Fifth Amendment provides a cause of action against the United States independent of any statutory grant..

Many claimants can also pursue equitable remedies for unconstitutional takings by the federal government. Those seeking to assert their ownership interest against the government can sue the United States directly under the Quiet Title Act of 1972, subject to limited exceptions. 28 U.S.C. § 2409a. In some instances, both injunctive relief under the Administrative Procedure Act and declaratory relief under the Declaratory Judgment Act are available where an eventual award of money damages or quiet title would be inadequate. *See Eastern Enters. v. Apfel*, 524 U.S. 498, 522 (1998) (plurality opinion). Taken together, the variety of procedural avenues available to claimants indicates that the Fifth Amendment's guarantee as to the federal government generally remains effective today, and that it is unlikely that an independent cause of action is necessary.

## C. Nearly Every State Has Provided Express Procedures To Vindicate The Just Compensation Principle

Just as the Fifth Amendment requires an adequate remedy against the federal government, the Fourteenth Amendment requires an adequate remedy for a taking by a state—or, by extension, by a municipality or other local governmental entity. Consistent with that mandate, almost all states today have judicial remedies for takings claims. And direct review by the Supreme Court remains available to ensure that state procedures respect the substance of the Takings Clause's guarantee. *See San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 347 n.26 (2005).

At present, almost all state legislatures and state courts have provided causes of action that likely fulfill the just compensation guarantee. *See Knick*, 588 U.S. at 186 & n.1. Even the oft-cited exceptions help prove the rule: For example, in Ohio, a property owner can bring a mandamus action to compel the government to initiate an eminent domain case. *See id.* Louisiana, another state considered an exception, allows inverse condemnation suits against local governments. *Cf. Watson Mem'l Spiritual Temple of Christ v. Korban*, 387 So. 3d 499 (La. 2024) (holding that mandamus would lie to compel a local governmental entity to satisfy an inverse condemnation award and remanding to the trial court to tailor a plan for the satisfaction of the judgment within a reasonable time). And these state causes of action coexist alongside 42 U.S.C. § 1983's federal cause of action against state officials and municipalities for unconstitutional takings. *Knick*, 588 U.S. at 184.

Relevant to the present case, there are examples of these remedies in action in Georgia. Georgia's constitution provides that "private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid." Ga. Const. art. I, § III, ¶ I(a). Reinforcing this constitutional language, the Georgia Supreme Court recently affirmed the existence of a state-law cause of action, stating that "Georgia courts have long understood the [Georgia] Takings Clause—which specifically prescribes just and adequate compensation as a remedy for an uncompensated taking—to imply a right of action against the government."

*Lathrop v. Deal*, 301 Ga. 408, 426 (2017).  Accordingly, Georgia courts are open to property owners alleging takings by state and local entities.  *See, e.g.*, *City of Atlanta v. Penosky*, 856 S.E.2d 762, 764 (Ga. Ct. App. 2021) (upholding a jury award against the city for inverse condemnation, trespass, and nuisance); *Philip O'Dell v. DeKalb Cnty.*, No. 13A48030, 2015 Jury Verdicts LEXIS 6040 (Ga. Super. Ct. May 20, 2015), *aff'd* No. A16A0232 (Ga. Ct. App. June 7, 2016) (awarding damages under inverse condemnation).  Section 1983 is also available for property owners to assert claims in federal court.  *See, e.g.*, *ALA Mgmt., LLC v. Hall Cnty., Ga.*, No. 24-10618, 2024 WL 4449752 (11th Cir. Oct. 9, 2024) (affirming dismissal of § 1983 claim for a Fifth Amendment taking against Georgia county); *Doral 10, LLC v. City of Doral*, No. 20-13528, 2023 WL 6891270, at *3-*4 (11th Cir. Oct. 19, 2023) (reversing dismissal of a Section 1983 claim for a Fifth Amendment taking against Florida municipality).[3]

### D.    It Is Not Clear Whether An Implied Cause Of Action Against Georgia Is Necessary In The Present Case

The Fifth and Fourteenth Amendments mandate that property owners be able to seek redress for uncompensated takings.  But legislatures may regulate

---

[3]    *Knick*'s overruling of *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), removed the previously existing requirement that plaintiffs exhaust state remedies before filing federal takings claims.  *See* 588 U.S. at 202-206.  This makes Section 1983 a more viable path for pursuing takings claims than it was in the pre-*Knick* regime.

jurisdictional and procedural issues that govern how claimants seek and obtain such redress, as Congress and the Georgia legislature have done with respect to takings claims. *Cf. Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017) ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary[.]"). It is incumbent on courts to scrutinize the remedial schemes available to plaintiffs and ensure they provide meaningful redress.

The history of takings litigation shows that while courts have substantial latitude to ensure reasonable remedies without necessarily implying a federal constitutional cause of action, meritorious claims cannot be defeated by invocations of good-faith immunity under the common law or sovereign immunity. Woolhandler, Mahoney, & Collins, 2023-2024 Cato Sup. Ct. Rev. at 255-256. Nor can states escape their obligations to pay by creatively sourcing their authority under the police power. *See Hollingsworth*, 17 F. at 117-118, 119.

One of the modern era's seminal Takings Clause cases bears this out. In *First English*, the Supreme Court held that a property owner was entitled to compensation in a California state-law action for inverse condemnation, overruling a California Supreme Court case about when the right to compensation accrues. 482 U.S. at 306-307. It observed that "a landowner is entitled to bring an action in inverse condemnation as a result of the self-executing character of the constitutional provision with respect to compensation" and that "claims for just compensation are

- 29 -

grounded in the Constitution itself." *Id.* at 315.  Because the case proceeded under a state-law cause of action, the Court vindicated the Takings Clause right without needing to consider whether the Clause's "self-executing" nature provides an independent cause of action.

Even given this history, courts should still be cautious in considering whether to imply a direct cause of action under the Fifth Amendment when adequate procedures already exist. *See Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1213 (10th Cir. 2019) (collecting sources for the proposition that the Fifth and Fourteenth Amendments might abrogate a state's sovereign immunity if that state has not provided a Takings Clause remedy in its own courts).  In *DeVillier v. Texas*, the Supreme Court confronted this issue and concluded that "the absence of a [historical] case relying on the Takings Clause for a cause of action does not by itself prove there is no cause of action," but instead "demonstrates only that constitutional concerns do not arise *when property owners have other ways to seek just compensation*."  601 U.S. 285, 292 (2024) (emphasis added).  The Supreme Court has also said in other contexts that implied causes of action directly under the Constitution are disfavored, often for reasons of judicial administrability. *Egbert v. Boule*, 596 U.S. 482, 491 (2022).

There are additional factors that counsel against implying a separate cause of action under the Fifth Amendment when other pathways are available to claimants.

For instance, inferring a direct cause of action risks interfering with Congress's prerogative to provide remedies for constitutional violations and to determine the jurisdiction of lower federal courts. Woolhandler, Mahoney, & Collins, 2023-2024 Cato Sup. Ct. Rev. at 263. Moreover, doing so may unintentionally slow the recent expansion of remedies for takings under state law. *Id.* at 261 & 256-257 nn. 44-48. Finally, an implied federal remedy directly against states would need to overcome the currently uniform view among the courts of appeals that the Takings Clause does not abrogate state sovereign immunity under the Eleventh Amendment. *See Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 640 (11th Cir. 1992); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456 (5th Cir. 2019); *Williams*, 928 F.3d at 1214; *Ladd v. Marchbanks*, 971 F.3d 574, 578 (6th Cir. 2020).

Taken together, the authorities discussed above do not yield clear answers about whether the Court should imply a cause of action in this case, and Amici have no position on that question. In determining whether to infer a cause of action, the Court should consider whether existing remedies are adequate given the unique circumstances of each case, such as the disposition of the property at issue. *See Eastern Enters.*, 524 U.S. at 521 (plurality) (stating that the typical Tucker Act remedy of direct compensation for a taking was inadequate given the property was transferred to a third party rather than directly to the government). It should further consider whether the available remedies impose only a reasonable burden on

claimants, rather than making litigants navigate labyrinthine procedures. *See Knick*, 588 U.S. at 185 (calling *Williamson County*'s state-litigation requirement an "unjustifiable" burden on Takings Clause claimants).

But courts need not be myopic in considering available remedial procedures. In the mine run of cases, multiple avenues for redress exist, creating "a complex network" of takings remedies. Woolhandler, Mahoney, & Collins, 2023-2024 Cato Sup. Ct. Rev. at 266. For typical state-level takings, for instance, these remedies include eminent domain proceedings initiated by the state or state-law inverse condemnation proceedings initiated by the property holder.

**E.    Whether A Cause Of Action Lies Against Municipalities Is Available Is Relevant To Assessing Whether An Implied Cause Of Action May Be Required**

The history of takings cases makes clear that courts have long effectuated a remedy against municipalities. *See supra* pp. 13-19 (discussing post-Founding era, antebellum, and post-Civil War examples of takings claims against municipalities). Indeed, some of the foundational takings cases were brought against municipalities. *E.g.*, *Chicago, Burlington & Quincy R.R. Co.*, 166 U.S. 226; *First English*, 482 U.S. 304. Whether a plaintiff can obtain a remedy against a municipality is a factor courts should consider in determining whether an implied cause of action is necessary. One available remedy has been money damages claims brought by plaintiffs against individual officers and municipalities under Section 1983.

Admittedly, Section 1983 is not in and of itself a perfect vehicle for state-level takings claims because various immunity doctrines narrow its applicability among different classes of defendants.  As to individual defendants, the one circuit to have explicitly considered the question held that qualified immunity bars takings claims against individual defendants.  *Sterling Hotels, LLC v. McKay*, 71 F.4th 463, 468 (6th Cir. 2023) (holding a state elevator inspector was not entitled to qualified immunity for alleged due process violations but was entitled to immunity for a takings claim); *see also O'Connor v. Eubanks*, 83 F.4th 1018, 1022 (6th Cir. 2023) (re-affirming *Sterling Hotels*).  Meanwhile, as to municipalities, some courts have held that some defendants are shielded by the Supreme Court's holding in *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690 (1978), which requires the unconstitutional conduct at issue occur according to an official pattern or practice adopted by the municipality.  *See, e.g.*, *Red Zone 12 LLC v. City of Columbus*, 758 F. App'x 508, 515-516 (6th Cir. 2019) (rejecting a takings claim for failure to adequately allege an unconstitutional policy or custom under *Monell*); *Speed v. Mills*, 919 F. Supp. 2d 122, 128 (D.D.C. 2013) (same).  Although a prototypical taking by a municipality may involve such a practice because it will represent a final decision by an authorized policymaker, it still must be pleaded and proven in court.  *See* Leong et al., *Pleading Failures in* Monell *Litigation*, 73 Emory L.J. 801, 804 (2024).

These doctrinal issues, along with sovereign immunity, can effectively bar a takings claimant with the wrong fact pattern from suing either an individual, a municipality, or the state in *federal* court. *O'Connor*, 83 F.4th at 1024 (Amar, J., concurring). That said, a plaintiff who *can* meet the *Monell* bar is arguably incentivized to do so, particularly given the availability of attorneys fees for prevailing litigants. *See* 42 U.S.C. § 1988. And a plaintiff who ultimately cannot meet *Monell*'s standard may have the option to use state procedures. Courts should consider the totality of availability options and the adequacy of the remedies they provide in determining whether it is necessary to imply a cause of action.

*     *     *

The patchwork of remedies may be complex, but it works reasonably well to vindicate most takings claims. Woolhandler, Mahoney, & Collins, 2023-2024 Cato Sup. Ct. Rev. at 266. Federal courts should, however, be on the lookout for situations in which a true injustice could occur from the failure to imply a constitutional remedy, considering the full range of remedies currently available under state and federal law. Because the Fifth Amendment and Fourteenth Amendment require a remedy, recognizing an implied cause of action would be warranted where there are no existing procedures to provide just compensation or the procedures that do exist are inadequate.

- 34 -

## CONCLUSION

The Court should fulfill its duty to ensure that states provide adequate and reasonable procedures to vindicate the just compensation principle codified by the Takings Clause. If the state has not done so, it should consider whether to imply a direct cause of action under the Fifth and Fourteenth Amendments.

Respectfully submitted.

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS
DONNA M. FARAG
DOUGLAS W. GATES
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC  20037
(202) 663-6000

*Counsel for Amici Curiae* Professor James W. Ely, Jr., Professor Julia D. Mahoney, & The Buckeye Institute

December 19, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 29 and 32, the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 29 (a)(5) and 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 29(a)(5) and 32(f) the brief contains 8,238 words.

2.     The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS

December 19, 2024

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December, 2024 I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS