## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

BRANDON FULTON,
*Plaintiff-Appellant,*

v.

BOARD OF COMMISSIONERS, FULTON COUNTY,
*Defendant-Appellee.*

Appeal from the U.S. District Court for the
Northern District of Georgia, No. 1:20-cv-1936-SCJ

## PETITION FOR REHEARING EN BANC

<table>
<tr>
<td valign="top">

Michael D. Hoffer
Karen Woodward
CRUSER, MITCHELL, NOVITZ,
SANCHEZ, GASTON & ZIMET, LLP
275 Scientific Dr., Ste. 2000
Peachtree Corners, GA 30092
(404) 881-2622

</td>
<td valign="top">

Cameron T. Norris
Gilbert C. Dickey
Nicholas B. Venable*
CONSOVOY MCCARTHY PLLC
ANTONIN SCALIA LAW SCHOOL
SUPREME COURT CLINIC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

*Supervised by principals of the firm
admitted to practice in Virginia

</td>
</tr>
</table>

*Counsel for Defendant-Appellee*

**CERTIFICATE OF INTERESTED PERSONS**

Per Rule 26.1 and Circuit Rule 26.1, Defendant-Appellee certifies that the following have an interest in the outcome of this appeal:

1.      Bowman, Brad (Counsel for Appellee)

2.      The Buckeye Institute (Amicus Curiae)

3.      Consovoy McCarthy PLLC (Counsel for Appellee)

4.      Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP (Counsel for Appellee)

5.      Dickey, Gilbert C. (Counsel for Appellee)

6.      Edwards, John C. (Counsel for Appellant)

7.      Ely Jr., James W. (Amicus Curiae)

8.      Farag, Donna M. (Counsel for Amici)

9.      Fulton, Brandon (Appellant)

10.     Fulton County Board of Commissioners (Appellee)

11.     Gates, Douglas W. (Counsel for Amici)

12.     Georgia Department of Law, Solicitor General (Counsel for Amicus)

13.     Hebert, Christen Mason (Counsel for Amicus)

14.     Hoffer, Michael (Counsel for Appellee)

15.     Institute for Justice, a 501(c)(3) nonprofit corporation (Amicus Curiae)

16.     John Edwards Law Group, LLC (Counsel for Appellant)

17.     Jones, The Honorable Steve C. (United States District Judge)

18.     Lee & Ziegler, LLP (Counsel for Appellant)

19.     Mahoney, Julia D. (Amicus Curiae)

20. McNamara, Robert J. (Counsel for Amicus)

21. Norris, Cameron T. (Counsel for Appellee)

22. Office of the Fulton County Attorney (Counsel for Appellee)

23. Petrany, Stephen J. (Counsel for Amicus)

24. Plott, Mathew (Counsel for Appellee)

25. Rodenberg, William D. (Counsel for Amicus)

26. Rosenberg, Steven (Former Counsel for Appellee)

27. Saunders, Thomas G. (Counsel for Amici)

28. Sen, Suranjan M. (Counsel for Amicus)

29. Scalia Law School Supreme Court Clinic (Counsel for Appellee)

30. Solicitor General of the State of Georgia (Amicus Curiae)

31. Venable, Nicholas B. (Counsel for Appellee)

32. Ward, Andrew (Counsel for Amicus)

33. Wilmer Cutler Pickering Hale and Dorr LLP (Counsel for Amici)

34. Woodward, Karen E. (Counsel for Appellee)

35. Ziegler, Konrad G.W. (Counsel for Appellant)

Dated: September 10, 2025                    /s/ *Cameron T. Norris*
                                          Counsel for Defendant-Appellee

# CIRCUIT RULE 40-3(C) STATEMENT

I believe, based on a reasoned and studied professional judgment, that the panel's decision is contrary to the following decisions of the Supreme Court: *Devillier v. Texas*, 601 U.S. 285 (2024); *Egbert v. Boule*, 596 U.S. 482 (2022).

I further believe, based on a reasoned and studied professional judgment, that this appeal involves a question of exceptional importance: When a plaintiff does not meet the requirements for, or chooses not to use, the existing causes of action for vindicating his rights under the Takings Clause, does he have a separate federal cause of action for damages under the Constitution itself?

Dated: September 10, 2025

 /s/ *Cameron T. Norris*
Counsel for Defendant-Appellee

# TABLE OF CONTENTS

Circuit Rule 40-3(c) Statement ..................................................................................i

Table of Citations .................................................................................................iii

Statement of the Issue ..........................................................................................1

Statement of the Case and Facts ..........................................................................2

Argument ...............................................................................................................3

    I.      The panel's decision contradicts Supreme Court precedent. ...........4

    II.    The panel's decision splits with other circuits. ...................................9

    III.   The panel's decision is exceptionally important. ............................ 11

Conclusion ......................................................................................................... 15

Certificate of Compliance ................................................................................. 16

Certificate of Service ......................................................................................... 16

Addendum

# TABLE OF CITATIONS

## Cases

*74 Pinehurst LLC v. New York*,
  59 F.4th 557 (2d Cir. 2023) ............................................... 11

*Alden v. Maine*,
  527 U.S. 706 (1999) .............................................................9

*Azul-Pacifico v. City of L.A.*,
  973 F.2d 704 (9th Cir. 1992) ...........................................9

*Bd. of Cnty. Com'rs v. Brown*,
  520 U.S. 397 (1997) ......................................................... 14

*Bush v. Lucas*,
  462 U.S. 367 (1983) ...........................................................8

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ...........................................................6

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ......................................................... 14

*Civil Rights Cases*,
  109 U.S. 3 (1883) ...............................................................6

*DeVillier v. State of Tex.*,
  53 F.4th 904 (5th Cir. 2023) ......................................... 10

*DeVillier v. State of Tex.*,
  63 F.4th 416 (5th Cir. 2023) (en banc) ........................ 10

*DeVillier v. Texas*,
  601 U.S. 285 (2024) ...................................... 5, 6, 7, 8, 10

*Egbert v. Boule*,
  596 U.S. 482 (2022) .................................................6, 7, 8, 12

*Fla. Dep't of State v. Treasure Salvors*,
  458 U.S. 670 (1982) ...........................................................6

*GeorgiaCarry.Org v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012) .......................................2

*Goldey v. Fields*,
  606 U.S. 942 (2025) ................................................... 6, 12

*Grech v. Clayton County*,
  335 F.3d 1326 (11th Cir. 2003) ..................................... 14

*Harbert Intern'l v. James*,
157 F.3d 1271 (11th Cir. 1998) ............................................................ 11

*Hernandez v. Mesa*,
589 U.S. 93 (2020) ......................................................................................7

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ...................................................................................4

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1989) ............................................................................ 2, 14

*Pierson v. Ray*,
386 U.S. 547 (1967) ...................................................................................9

*Souders v. S.C. Pub. Serv. Auth.*,
497 F.3d 1303 (Fed. Cir. 2007) ..............................................................5

*Trump v. Anderson*,
601 U.S. 100 (2024) ............................................................................. 5, 6

*United States v. Adewani*,
467 F.3d 1340 (D.C. Cir. 2006) ........................................................ 10

**Statutes**

28 U.S.C. §2244(b) ......................................................................................... 14

28 U.S.C. §2244(d) ......................................................................................... 14

42 U.S.C. §1983 ......................................................................................... 2, 8, 9

**Rules**

FRAP 40(b)(2) ......................................................................................... 3, 9, 11

S.Ct.R.10(c) ..................................................................................................... 11

**Constitutional Provisions**

U.S. Const. amend. III ......................................................................................4

U.S. Const. amend. IV ......................................................................................4

U.S. Const. amend. V .......................................................................................4

## STATEMENT OF THE ISSUE

The panel majority compares the plaintiff in this case to Tantalus, the tragic Greek figure who was forced to stand in a cursed pool where fruit and water were just out of reach. Maj.-Op.2. Brandon Fulton is not Tantalus. Sticking with the analogy, Fulton traipsed into the pool after refusing to use a "litany" of water fountains and fruit stands along the way. Dissent.2. Fulton had at least four ways to vindicate his rights under the Takings Clause. *See* Dissent.3-5. He chose not to bring the state options; and he didn't follow the rules for the federal options, like suing on time or naming the right defendants. His litigation choices were not a reason to recognize, for the first time in our nation's history, a cause of action under the Takings Clause itself—one that conveniently has a longer statute of limitations and ditches important common-law defenses like *Monell*. The panel's decision to announce this major innovation splits with all existing precedent, usurps legislative authority, and will have costly and unpredictable consequences for governments and taxpayers.

This Court should grant rehearing en banc to decide the following question: When a plaintiff does not meet the requirements for, or chooses not to use, the existing causes of action for vindicating his rights under the Takings Clause, does he have a separate federal cause of action for damages under the Constitution itself?

## STATEMENT OF THE CASE AND FACTS

According to his complaint, Fulton was arrested and charged with felony animal cruelty in April 2017. R.1 at 3. County officials confiscated seven of his horses. R.1 at 3. Though the district attorney declined to prosecute in April 2018, *see* R.50-1, Fulton waited until May 2020 to file this federal lawsuit, R.1 at 5-8. His complaint alleged a violation of the Takings Clause against the county under 42 U.S.C. §1983. R.1 at 5. But the statute of limitations for §1983 is two years, and Fulton sued three years after the alleged taking. He also conceded that the county did not act under an "official policy or custom," as required by *Monell*. Maj.-Op.3 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1989)). After the county moved to dismiss, R.18, Fulton moved to amend his complaint to add a takings claim against the county directly under the Fifth Amendment, R.26 at 5. Fulton never brought, or tried to bring, any takings claim against any individual. Maj.-Op.5 n.1.

The district court granted the county's motion to dismiss and denied Fulton leave to amend. Fulton could not sue the county under §1983 because he did not allege a policy or custom under *Monell*. R.39 at 8-9. And Fulton could not sue directly under the Constitution because Congress already provided a cause of action for takings claims under §1983; Fulton just didn't satisfy its requirements. R.39 at 10. "'Where a statute provides an adequate remedy,'" courts in this circuit "'will not imply a judicially created cause of action directly under the Constitution.'" R.39 at 10 (quoting *GeorgiaCarry.Org v. Georgia*, 687 F.3d 1244, 1253 n.15 (11th Cir. 2012)).

On appeal, a divided panel reversed the denial of Fulton's motion for leave to amend. In a 73-page opinion, the majority held that "the Takings Clause contains a direct cause of action against local governments." Maj.-Op.7. After recognizing this cause of action for the first time, the majority decided that its statute of limitations should be four years, not two. Maj.-Op.12-15. And it decided that *Monell* should not apply. Maj.-Op.54-55. So Fulton's attempt to add that constitutional cause of action would not be futile.

Chief Judge Pryor dissented. He explained that the majority's recognition of a cause of action directly under the Constitution is wrong as an original matter, contradicts the Supreme Court's precedents, and "usurps" legislative power. Dissent.1. The majority found this new cause of action for the first time in 2025, he noted, even though property owners "enjoy more remedies for takings than ever before." Dissent.27. And he thought the majority's analysis left "constitutional wreckage" in its wake. Dissent.35.

## ARGUMENT

Rehearing is warranted when a panel's opinion "conflicts with a decision of the United States Supreme Court," "conflicts with the authoritative decision of another United States court of appeals," or "involves one or more questions of exceptional importance." FRAP 40(b)(2). The panel's opinion here does all three.

# I. The panel's decision contradicts Supreme Court precedent.

This panel became the first court to hold that the Takings Clause contains its own cause of action, free from the strictures of *Monell* and other important limits created by the States and Congress. That ruling "flouts" text, history, and precedent. Dissent.35.

The "text" of the Constitution provides no express, federal cause of action to sue state actors for damages. *Cf.* Maj.-Op.71, 16-17. The Takings Clause says: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Like several neighboring provisions, the Takings Clause states an individual right: a broad rule (no takings) followed by an exception (payment of just compensation). *See, e.g.*, *id.* ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment"); *id.* ("nor be deprived of life, liberty, or property, without due process of law"); amend. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner"); amend. IV ("no Warrants shall issue, but upon probable cause …"). Nothing in those twelve words looks anything like a cause of action: No court is mentioned, no venue is specified, no defendants or defenses are identified, nothing. So as the Supreme Court has explained, "[t]he Constitution did not expressly create a right of action when it mandated 'just compensation' for Government takings." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 323 n.12 (2020) (cleaned up); *accord id.* at 333 n.3 (Alito, J., dissenting).

"[H]istory" disproves any right to sue the government for damages directly under the Takings Clause. *Cf.* Maj.-Op.71, 26. The Fifth Amendment directly "applies only to

the federal government." *Souders v. S.C. Pub. Serv. Auth.*, 497 F.3d 1303, 1308 (Fed. Cir. 2007). Yet for the nation's first 100 years, no one could sue the federal government for damages under the Takings Clause. Congress did not waive the government's sovereign immunity until 1887. Dissent.16. When federal takings occurred, the only way to get repaid by the government was to convince Congress to pass a "private bill." Dissent.20-22. Property owners could sue an individual federal official, but they had to use common-law actions (like trespass) and raise the Takings Clause as a response to the official's defenses. Dissent.24-25. For the States, Congress created §1983's federal cause of action in 1871; Congress gave the federal courts general federal-question jurisdiction in 1875; and the Supreme Court held that the Fourteenth Amendment's Due Process Clause incorporates the Takings Clause in 1897. Maj.-Op.48-49 n.15. All the way up to that point, no one had any way to sue directly under the Takings Clause. "Such a lack of historical precedent" for a judicial remedy supposedly mandated by the Fifth Amendment is "telling." *Trump v. Anderson*, 601 U.S. 100, 113-14 (2024) (cleaned up).

"Supreme Court precedent" forecloses a cause of action directly under the Takings Clause. Dissent.1. The panel latched onto cases that describe just compensation as a "'self-executing'" remedy. Maj.-Op.19. But as the Supreme Court explained in *DeVillier v. Texas*, that language does "not directly confront whether the Takings Clause provides a cause of action." 601 U.S. 285, 291 (2024). The Supreme Court has called *all* rights in the first eight amendments and section 1 of the fourteenth "self-executing," since they impose obligations directly on governmental actors. *City of Boerne v. Flores*,

521 U.S. 507, 524 (1997); *Civil Rights Cases*, 109 U.S. 3, 20 (1883); *cf. Trump*, 601 U.S. at 110 (section 3 is not self-executing because it has no force until Congress passes legislation). In other words, a state actor who takes private property has a duty *under the Constitution* to pay just compensation; and a state actor who refuses to pay has acted *unconstitutionally*. But there's an important difference between "the nature of the substantive right to just compensation" and "the procedural vehicle by which a property owner may seek to vindicate that right." *DeVillier*, 601 U.S. at 291. "Constitutional rights do not typically come with a built-in cause of action...." *Id.* (citing *Egbert v. Boule*, 596 U.S. 482, 490-91 (2022)). For all "self-executing" individual rights, "legislation" is still "necessary" to "prescribe proper modes of redress for [the right's] violation." *Civil Rights Cases*, 109 U.S. at 20; *see* Dissent.13.

To be sure, jurists have debated when, if ever, it's appropriate for federal courts to *create* causes of action to enforce constitutional rights—like the Supreme Court infamously did in *Bivens*. A judicially implied cause of action can be appropriate, the argument goes, if citizens otherwise have no effective remedy for violations of a constitutional right. *See Fla. Dep't of State v. Treasure Salvors*, 458 U.S. 670, 697 (1982).

But that concern does not apply here. As the Supreme Court's *Bivens* cases "consistently" explain, it is virtually never appropriate for federal courts to imply new causes of action for damages under the Constitution. *Goldey v. Fields*, 606 U.S. 942, 944-45 (2025). This practice contradicts "the Constitution's separation of legislative and judicial power" because "creating a cause of action is a legislative endeavor." *Hernandez v. Mesa*,

589 U.S. 93, 100 (2020); *Egbert*, 596 U.S. at 491. Federal courts certainly cannot recognize causes of action when "Congress already has provided … 'an alternative remedial structure.'" *Egbert*, 596 U.S. at 493. And as the Supreme Court held in *DeVillier*, federal courts also cannot recognize causes of action when "state law provides a cause of action." 601 U.S. at 293. The "constitutional concerns" with depriving citizens of any way to get just compensation for an unconstitutional taking "do not arise when property owners have other ways to seek just compensation." *Id.* at 292. And today, property owners like Fulton have many ways to get just compensation under state and federal law: Congress passed §1983, and Georgia law has inverse-condemnation actions and several common-law actions. *See* Dissent.3-5, 28-33.

The panel majority fused and confused two lines of Supreme Court precedent. The panel reasoned that, because Fulton had no other cause of action to sue the county for just compensation, he must be able to sue directly under the Takings Clause. Maj.-Op.10-12, 53-54. But if the panel were right that the Takings Clause *itself* creates a cause of action, *see* Maj.-Op.20-21, 25, then it shouldn't matter whether Fulton has other remedies. He should always be able to use the Constitution's "expres[s]" cause of action, no questions asked. Maj.-Op.20. Fulton's lack of other remedies matters only if the Court was creating an implied cause of action to avoid the supposed "constitutional concerns" with denying a property owner any way to recover just compensation. *DeVillier*, 601 U.S. at 292. But as the Supreme Court held in *DeVillier*, those concerns are not present when state law provides a cause of action for just compensation, as Georgia law

does here. *Id.* at 293. And courts cannot create causes of action when Congress has provided an alternative remedy, as §1983 does here. *Egbert*, 596 U.S. at 493; *Bush v. Lucas*, 462 U.S. 367, 388 (1983).

Similarly troubling is the panel's reasoning for why Fulton had no other cause of action. The panel held that Fulton lacked alternative remedies not because those remedies don't exist, but because some defendants would have *winning defenses* against Fulton under those remedies. *See* Maj.-Op.63-66 (*Monell* and timeliness for the county, qualified immunity for the county officials). Most losing plaintiffs under *Bivens*, after all, are asserting that longshot theory precisely because they cannot or did not take advantage of the existing remedies. As the Supreme Court held in *Bush v. Lucas*, "[t]he question" is whether the existing remedies "should be augmented by the creation of a new judicial remedy for the constitutional violation at issue," which "obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff." 462 U.S. at 388.

By conflating distinct lines of precedent, the panel effectively held that 42 U.S.C. §1983 is *unconstitutional* to the extent it requires takings claims to satisfy its preconditions—like *Monell*, Maj.-Op.3, 54-55; qualified immunity, Maj.-Op.64-65; and even sovereign immunity, Maj.-Op.60 n.23, 67-68. (State-law statutes of limitation and notice requirements are unconstitutional too, according to the panel. Maj.-Op.63 & n.25, 64.) The panel reasoned that §1983's limits contradict the Takings Clause's broader cause of

action (*i.e.*, they are unconstitutional). Maj.-Op.59-60. And it compared Congress imposing those limits to Congress suspending the writ of habeas corpus (*i.e.*, legislating unconstitutionally). Maj.-Op.24-25. But Congress passed §1983 shortly after it drafted the Fourteenth Amendment. The defenses that §1983 preserves are supported by this country's constitutional and legal tradition. *See, e.g.*, *Alden v. Maine*, 527 U.S. 706, 733 (1999) (sovereign immunity); *Pierson v. Ray*, 386 U.S. 547, 555-57 (1967) (qualified immunity). The notion that this foundational cause of action for vindicating federal constitutional rights could itself violate one of those constitutional rights is radical.

## II.     The panel's decision splits with other circuits.

All other circuits that have decided this question agree that plaintiffs bringing takings claims have "no cause of action directly under the United States Constitution." *Azul-Pacifico v. City of L.A.*, 973 F.2d 704, 705 (9th Cir. 1992). The panel's decision thus "conflicts" not just with "a decision of the United States Supreme Court," but also with "an authoritative decision of another United States court of appeals." FRAP 40(b)(2).

In *Azul-Pacifico*, the Ninth Circuit rejected the same argument that the panel embraced here. 973 F.2d at 705. In refusing to recognize a cause of action under the Takings Clause itself, the Ninth Circuit pointed to the same alternative federal remedy that Chief Judge Pryor identified here: "42 U.S.C. §1983." *Id.* The Ninth Circuit declared that remedy adequate, even though that plaintiff could not bring a §1983 claim because it failed to sue within the statute of limitations. *Id.*

In *DeVillier*, the Fifth Circuit likewise held that the Constitution "does not provide a right of action for takings claims." 53 F.4th 904, 904 & n.2 (5th Cir. 2023). Though brief, the Fifth Circuit's opinion cites and follows the Ninth Circuit's decision in *Azul-Pacifica*. *Id.* at n.1. It cites and follows the Supreme Court's precedent admonishing courts against "'recogniz[ing] a damages remedy'" without "'a statute enacted by Congress.'" *Id.* And it stresses that Texas state law "recognizes takings claims under the federal and state constitutions." *Id.* at n.2. When the Fifth Circuit denied rehearing en banc, two members of the panel wrote longer concurrences explaining their position. *See* 63 F.4th 416, 417-26 (5th Cir. 2023). And eleven out of sixteen judges voted to leave the panel's opinion in place. *Id.* at 417.

Though the Supreme Court later vacated the Fifth Circuit's opinion, it did so only because Texas law creates a cause of action for just compensation. 601 U.S. at 292-93. The Supreme Court vacated to let the plaintiffs "amen[d]" their complaint to add that cause of action under Texas law. *Id.* at 293. That disposition aligned with the Fifth Circuit's holding that, when another cause of action is available, plaintiffs have no cause of action under the Takings Clause itself. 53 F.4th at 904 & n.2. So the Fifth Circuit's decision rejecting a cause of action directly under the Takings Clause still has precedential weight. *See generally United States v. Adewani*, 467 F.3d 1340, 1342 (D.C. Cir. 2006).

No matter how deep the conflict, the panel's novel decision conflicts with all circuit precedent to date—even this circuit's own. In *Harbert International v. James*, the

plaintiff brought a takings claim under §1983 against state officials in their official capacity. 157 F.3d 1271, 1275 (11th Cir. 1998). When his complaint was dismissed for sovereign immunity, he said this defense could not bar his claim because the "Takings Clause provides an absolute guarantee of just compensation." *Id.* at 1278. This Court, in an opinion by Judge Ed Carnes, disagreed. Because the "Alabama state courts" provided "an avenue of relief" for takings claims like the plaintiff's, it was not unconstitutional for sovereign immunity to keep him out of federal court. *Id.* at 1279. Yet no analysis of Alabama law should have been necessary if litigants can simply bypass sovereign immunity by suing under the Takings Clause itself—as the panel held here and the plaintiff argued in *Harbert*. Maj.-Op.66-68; *see Harbert*-Appellant's-Br.43, 1998 WL 34300875 ("[n]o particular statutory authorization to sue or receive a remedy is necessary because of the 'self-executing character'" of the Takings Clause).

This Court's decision in *Harbert* mirrors what the Fifth Circuit later held in *DeVillier*. It also mirrors every other circuit, which let sovereign immunity bar takings claims in federal court when state actors can be sued in state court. *See 74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 & n.7 (2d Cir. 2023) (collecting cases). The panel here thus marched down a path that all other courts have been careful to avoid.

## III. The panel's decision is exceptionally important.

The question presented is unquestionably "importan[t]." FRAP 40(b)(2)(D). The Supreme Court granted certiorari on it in *DeVillier*. *See* S.Ct.R.10(c) (requiring an "important question of federal law"). After *DeVillier*, this Court sua sponte asked for three

amicus briefs on the question. Maj.-Op.6-7. The answer then divided the panel 2-1, in dueling opinions spanning over 100 pages. Though local governments will feel the brunt of the majority's new cause of action, the decision is not limited to local governments. It admittedly applies to States, contra the position of every State to weigh in. *E.g.*, Georgia-SG-Br. (CA11-Doc.59) (Georgia); *DeVillier*-Resp't-Br., 2023 WL 8809537 (Texas); *DeVillier*-States-Amicus-Br., 2023 WL 8900795 (17 other States). And the panel's decision extends to the federal government, contra the position of the United States across several administrations. *See, e.g.*, *DeVillier*-USA-Amicus-Br., 2023 WL 8652912.

Indeed, when a federal court creates a new cause of action, it "cannot predict the 'systemwide' consequences" of that decision. *Egbert*, 596 U.S. at 493. *Bivens* is an infamous example. Though the Supreme Court created a damages action in three narrow contexts, *Bivens* created a runaway train that the Court has been trying to stop for "45 years." *Goldey*, 606 U.S. at 944-45. The panel's decision risks similar "wreckage," both procedurally and substantively, that will be difficult to predict or contain. Dissent.35. And it imposes new and unnecessary costs on governments, and thus taxpayers.

As the first court to recognize a cause of action under the Takings Clause, the panel's opinion signs this Court up for the essentially "'legislative'" task of drafting the rules for that cause of action. Dissent.34. The panel's opinion tries to preemptively decide many of the rules. But many were not presented in this case and so could be

ignored by future panels as dicta. And the panel's initial choices are arbitrary and unstable. For example, the majority claims that, for its new constitutional cause of action:

- Federal jurisdiction exists under 28 U.S.C. §1331. Maj.-Op.9. Congress can maybe take that original jurisdiction away, Maj.-Op.34-35, 25 n.7, though it's unclear why if the Takings Clause is "self-executing."

- The statute of limitations is borrowed from state law. Maj.-Op.13-14. Some other "state procedural" rules are not borrowed, even if they are mandatory and govern the timing of suits. Maj.-Op.13 n.4, 63.

- Sovereign immunity is not a defense. Maj.-Op.66-68.

- *Monell* is not a defense. Maj.-Op.59-60, 63 n.25.

- Qualified immunity is not a defense. Maj.-Op.64-65.

- Official immunities under state law are not a defense. Maj.-Op.65. Absolute immunity under federal law is an open question.

- Plaintiffs can recover damages. Maj.-Op.39, 53, 71. The measure of damages, including whether "retrospective" relief is sufficient, is an open question. Maj.-Op.43 & n.12. Whether other relief is available is also open.

- Attorney's fees are an open question, though seem to be unavailable. *Cf.* Maj.-Op.72.

- Plaintiffs might be unable to use this cause of action at all unless they cannot get just compensation from the government in state court. Maj.-Op.65. How to prove that threshold question is unresolved. It might be enough that the plaintiff's right to relief is uncertain because "the state supreme court has not ruled on the issue." Maj.-Op.62.

Untangling these and other questions will require years of follow-on litigation (and its own chapter in the federal-courts textbook). Though judges *can* pick what rules to apply, that exercise will not properly be called judicial. Dissent.34.

The defenses that the panel eliminated are themselves important. The panel nixed *Monell*'s policy-or-custom requirement from its cause of action, even though the Supreme Court says that requirement is an appropriate limit on respondeat-superior

liability for municipalities. *See City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989); *Bd. of Cnty. Com'rs v. Brown*, 520 U.S. 397, 403-05 (1997). This requirement ensures that a county is liable "only for acts for which the county is actually responsible." *Grech v. Clayton County*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) (cleaned up). Without it, many thought §1983 would be *unconstitutional. See Monell*, 436 U.S. at 693-94, 673-75. Constitutional or not, if counties were liable for every wrongdoing, "virtually every" case against their agents would become a case against the deeper-pocketed county, even when the county did nothing wrong and could not have prevented the misconduct. *Harris*, 489 U.S. at 391-92. Yet under the panel's decision, municipal governments are now responsible for all takings of any property by any agent—significantly expanding their litigation risks, insurance costs, and potential liability.

Though the panel calls the Takings Clause a "unicorn," Maj.-Op.21, its extended discussion of the Suspension Clause makes clear where its logic goes next: habeas. If the Takings Clause has a direct cause of action, why doesn't the Suspension Clause? Rather than denying the problem, the panel leans into it, suggesting that prisoners *could* seek habeas directly under the Constitution had Congress not passed a statute. Maj.-Op.22-25. That hypothesis is wrong textually and historically. *See* Dissent.13-14. And its logic calls into question the many procedural requirements that limit habeas in federal court. For example, a prisoner has no habeas remedy if he cannot satisfy the onerous standard for second-or-successive petitions, 28 U.S.C. §2244(b)(2)-(3), or the short stat-ute of limitations, §2244(d). Under the panel's decision, a prisoner could call these rules

"unreasonably restrictive," Maj.-Op.63 n.25, and bypass them by seeking habeas "directly" under the Suspension Clause. Maj.-Op.25. The panel's discussion of habeas opens yet another source of mischief that could wreak havoc on this Court's precedents.

## CONCLUSION

For all these reasons, and the reasons in Chief Judge Pryor's dissent, this Court should grant rehearing en banc.

Dated: September 10, 2025

Respectfully submitted,

/s/ Cameron T. Norris

Michael D. Hoffer
Karen Woodward
CRUSER, MITCHELL, NOVITZ, SANCHEZ, GASTON & ZIMET, LLP
275 Scientific Dr., Ste. 2000
Peachtree Corners, Georgia 30092
(404) 881-2622

Cameron T. Norris
Gilbert C. Dickey
Nicholas B. Venable*
CONSOVOY MCCARTHY PLLC
ANTONIN SCALIA LAW SCHOOL
SUPREME COURT CLINIC
1600 Wilson Boulevard, Suite 700
Arlington, Virginia 22209
(703) 243-9423
cam@consovoymccarthy.com

*Supervised by principals of the firm admitted to practice in Virginia

*Counsel for Defendant-Appellee*

**CERTIFICATE OF COMPLIANCE**

This petition complies with Rule 40(d)(3) because it contains 3,778 words, excluding the parts that can be excluded. It also complies with Rules 32(a)(5)-(6) and Circuit Rule 27-1(a)(11) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: September 10, 2025                                    /s/ *Cameron T. Norris*

**CERTIFICATE OF SERVICE**

I e-filed this petition, which will email everyone requiring notice.

Dated: September 10, 2025                                    /s/ *Cameron T. Norris*

**ADDENDUM**

*Fulton v. Fulton Cnty. Bd. of Commissioners*, No. 22-12041, 2025 WL 2166416 (11th Cir. July 31, 2025) (slip op.)

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12041

_____

BRANDON FULTON,

Plaintiff-Appellant,

*versus*

FULTON COUNTY BOARD OF COMMISSIONERS,

Defendant-Appellee,

PAUL L. HOWARD, JR.,
Esq.; in his individual capacity, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-01936-SCJ

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU,
Circuit Judges.

ROSENBAUM, Circuit Judge:

In Greek mythology, the Greek gods condemned Tantalus
to eternal hunger and thirst, all while forcing him to forever stand
in a shallow pool of water under a tree with low-hanging fruit.
Though the remedy for Tantalus's hunger and thirst was right at
hand, he could not take advantage of it. The water receded when
Tantalus bent down to drink, and the fruit rose to just above his
grasp when Tantalus tried to reach it.

Our Founders did not do to us what the Greek gods did to
Tantalus. Our Constitution explicitly promises exactly two reme-
dies: "just compensation" if the government takes our property,
and the writ of habeas corpus if it tries to take our lives or liberty.
And the Constitution delivers directly on each. It doesn't taunt us
by naming these remedies but then holding them out of reach, de-
pending on the whims of the legislature.

So even if Congress doesn't legislate a procedure by which a
person can obtain one of these remedies, the Constitution's prom-
ise is not illusory. A person can bring a case directly invoking either
constitutional remedy.

This case involves the "just compensation" remedy. Brandon Fulton alleges that Fulton County took his horses without justification and without paying for them. He asserts that the Fifth Amendment demands the County pay him "just compensation" for the taking of his property. *See* U.S. CONST. amend. V. So he seeks to sue to recover what he says the County owes him under the Constitution.

The problem: Congress has not provided him with a cause of action to secure "just compensation" in federal court. Fulton initially tried to bring an action under 42 U.S.C. § 1983. That statute allows suits against municipalities who, through official policies or customs, violate the Constitution. *See Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 694 (1978). But because Fulton is unable to plead an official policy or custom under which the County took his horses, he can't proceed under that statute—even though the Takings Clause doesn't require a plaintiff to clear that bar to be entitled to "just compensation."

So Fulton seeks a plan B. He asks to amend his complaint to sue directly under the Takings Clause itself.

Whether the Takings Clause contains a cause of action that allows a litigant to recover "just compensation" in federal court presents an open question. In *DeVillier v. Texas*, the Supreme Court confirmed that its "precedents do not cleanly answer the question . . . ." 601 U.S. 285, 292 (2024). Yet the Court also confirmed that "the absence of a case relying on the Takings Clause for a cause of action does not by itself prove there is no cause of action. It

demonstrates only that constitutional concerns do not arise when property owners have other ways to seek just compensation." *Id.* Now, after careful review of the text, structure, and history of the Constitution, we conclude that the Takings Clause does directly authorize suit.

The Dissent responds by saying we are "creat[ing] a new right of action" and leaving "constitutional wreckage in the wake." Diss. Op. at 35. But its answer that the Takings Clause includes no direct cause of action ignores the original public meaning of the Clause and transforms the Constitution's promise of "just compensation" into nothing more than a Tantalus-type taunt. Most respectfully, we don't think that's "judicial humility," *see id.* at 35; we think it's judicial abdication. We have a duty to apply the Constitution as written. So we respectfully decline to read out of the Constitution the relief it expressly promises for taken property.

The Framers of the Fifth and Fourteenth Amendments provided a real remedy in "just compensation" for government takings. They guaranteed the ability to recover "just compensation" directly under the Constitution. So we hold that Fulton's proposed amendment to his complaint is not futile.

## I. BACKGROUND

This case comes to us on appeal from a denial of a motion for leave to amend the complaint. So for purposes of our analysis, we accept as true the facts pled in the proposed amended complaint and construe them in the light most favorable to the plaintiff.

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004).

On April 22, 2017, Fulton County Animal Services arrested Brandon Fulton for felony cruelty to animals and seized seven horses in his possession. Nearly a year later, on April 5, 2018, Georgia dismissed the criminal charges against Fulton. But Fulton County didn't return the horses or otherwise compensate Fulton for the loss of his property.

So on May 5, 2020, Fulton brought this federal suit to recover his property. He initially sued the Fulton County Board of Commissioners under 42 U.S.C. § 1983, alleging that the seizure was an unconstitutional taking in violation of the Fifth Amendment.[1]

The Board of Commissioners moved to dismiss his claim. It argued that (1) it isn't an entity capable of being sued; (2) Fulton failed to state a claim under § 1983; and (3) the statute of limitations bars Fulton's claim. Fulton opposed the Board of Commissioners' motion. He also moved to amend his complaint to substitute the County as defendant in place of the Board of Commissioners and

---

[1] Fulton also sued Paul L. Howard, Jr., the former District Attorney for the County, and Rebecca Guinn, the CEO for the organization that manages the Fulton County Animal Services, in their individual capacities under 42 U.S.C. § 1983 for violating his procedural due process rights. But Fulton ultimately withdrew the claim against Guinn. And the district court dismissed Fulton's claim against Howard. Fulton doesn't appeal that ruling.

to add an alternative claim against the County directly under the Fifth Amendment.

The district court denied Fulton's motion to amend his complaint and dismissed his claim against the Board of Commissioners without prejudice.  It determined that Fulton's proposed alternative claim would fail because plaintiffs who want to bring constitutional takings claims against a municipality must sue under § 1983 and cannot sue directly under the Takings Clause.  And in the district court's view, Fulton couldn't maintain his § 1983 claim against the Board of Commissioners or against the County because he failed to allege that some official municipal policy or practice caused the constitutional violation, as *Monell v. Department of Social Services of New York City*, requires.  436 U.S. at 694.  Since any amendment would be futile, the district court reasoned, it declined to address whether Fulton's suit was timely.

Fulton appealed this order.

After we heard oral argument in this case, the Supreme Court decided *DeVillier*, which, as we've noted, considered whether to address whether the Takings Clause creates a direct cause of action.  601 U.S. at 292.  The Supreme Court concluded that that case did not require it to do so.  *Id*.  And faced with deciding a novel question without the Court's guidance, we invited the Institute for Justice and the cohort of Professor James W. Ely, Jr., Professor Julia D. Mahoney, and The Buckeye Institute, each group having briefed the issue in *DeVillier*, to brief several related questions here.  We also asked the Solicitor General of Georgia to brief the same

questions.  We thank them all for their excellent briefs in keeping with the highest tradition of the legal profession.

## II. STANDARD OF REVIEW

We review for abuse of discretion the district court's denial of a motion for leave to amend a complaint.  *Spanish Broad. Sys.*, 376 F.3d at 1077.  But we review de novo the district court's legal conclusion that amendment would be futile.  *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1336 (11th Cir. 2010).  Amendment is futile if the amended complaint still would be subject to dismissal.  *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004).

## III. DISCUSSION

Fulton attempts to amend his complaint to bring a damages action directly under the Takings Clause.  That requires us to consider whether the Takings Clause provides a cause of action to recover "just compensation."  Recently, the Supreme Court declined to answer that question in *DeVillier*.  But we cannot take that tack because we conclude that Fulton cannot amend his complaint to bring a state-law action and that any theoretical Takings Clause action would be timely.  So we must confront the question head on.

To do so, we consider the text and history of the Fifth and Fourteenth Amendments.  Based on our review, we hold that the Takings Clause contains a direct cause of action against local governments.  As a result, Fulton's proposed amendment to his complaint would not be futile.  So we vacate the district court's order

denying the motion to amend, and we remand for further proceedings consistent with this opinion.

### A. The district court would have had jurisdiction over Fulton's Takings Clause claim.

We begin with a clarification. In his opening brief, Fulton asserts that amendment wouldn't be futile because the district court would have federal-question jurisdiction over his proposed claim. But the district court never suggested that it might lack jurisdiction over a Takings Clause claim. Instead, the district court held that amendment would be futile because the Takings Clause doesn't provide a cause of action against municipalities. We briefly explain the difference.

Subject-matter jurisdiction is "the courts' statutory or constitutional power to adjudicate [a] case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis omitted) (citing 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350). We dismiss a claim for lack of subject-matter jurisdiction only if the claim (1) "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction;" or (2) "is wholly insubstantial and frivolous." *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F.3d 1347, 1352 (11th Cir. 1998) (quoting *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)).

For a claim based directly under the Constitution, 28 U.S.C. § 1331 provides the statutory basis for jurisdiction.[2]  Under this law, federal courts enjoy jurisdiction over "all cases aris[ing] under the Constitution, laws, or treaties of the United States."  *Bush v. Lucas*, 462 U.S. 367, 374 (1983) (quoting 28 U.S.C. § 1331 (1976)) (internal quotation marks omitted) (bracket in original).  Here, Fulton's proposed amended claim alleges a violation of the Takings Clause under the Fifth and Fourteenth Amendments.  So as long as his claim wouldn't have been "wholly insubstantial and frivolous," the district court would have had federal-question jurisdiction over this case.

The existence of a cause of action raises a distinct issue.  *See Resnick v. KrunchCash, LLC*, 34 F.4th 1028, 1034–35 (11th Cir. 2022). A cause of action exists when "a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court."  *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979).  Whether a plaintiff has alleged a cause of action generally presents a merits question.  *See Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 70 (1978).

---

[2] Fulton also claims that the district court would have had jurisdiction under 28 U.S.C. § 1343(a)(3).  But as the Board of Commissioners notes, he didn't plead this basis for jurisdiction in his complaint, so he can't rely on 28 U.S.C. § 1343(a)(3).  *See Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir. 1994).  And because his claim "depends . . . upon construction or application of the Constitution," 28 U.S.C. § 1331 is the correct jurisdictional hook.  *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 70 (1978) (internal quotation marks and citation omitted).

As an analogy, if court were an event like a play or a musical, a cause of action would be a ticket to the show. Jurisdiction, on the other hand, would be the right to put on the show. No ticket, no entry. But the show can still go on for other audience members, provided the venue finds those others have a valid ticket.

Here, Fulton has attempted to state a cause of action directly under the Takings Clause. As we've noted, whether the Takings Clause creates a cause of action to obtain "just compensation" raises an open question. *DeVillier*, 601 U.S. at 292. So Fulton's alleged cause of action isn't "patently without merit." *McGinnis v. Ingram Equip. Co.*, 918 F.2d 1491, 1494 (11th Cir. 1990) (en banc) (citation omitted). And the district court had jurisdiction to evaluate whether the Takings Clause gave him a cause of action. As a result, we must independently evaluate that merits question. This case is about whether Fulton has a ticket, not whether the show can go on at all.

### B. Georgia law bars Fulton from bringing a state-law action.

Before we get to the central question of the case, we must address whether we need to answer it at all. We might avoid the issue if we can remand the case to allow Fulton to press an action under *state law* to recover the value of his horses.

That is essentially what the Supreme Court did in *DeVillier*. Indeed, the *DeVillier* Court found it "imprudent to decide" whether the Takings Clause contains a cause of action. *DeVillier*, 601 U.S. at 292. Instead, it remanded the case for the plaintiffs there to amend

their complaints to "pursue their claims under the Takings Clause through the cause of action available under Texas law." *Id.* at 293. And since Georgia permits inverse-condemnation actions to recover the value of uncompensated takings, *see Diversified Holdings, LLP v. City of Suwanee*, 807 S.E.2d 876, 884 (Ga. 2017), Fulton argues for the first time after *DeVillier* in supplemental briefing that we could remand this case to allow him to bring a claim under a Georgia vehicle.

But we think Georgia law now bars any such claim. In Georgia, actions to recover personal property have a four-year statute of limitations from when the claim accrues. GA. CODE ANN. §§ 9-3-31 to 9-3-32 (2025). Here, Georgia seized Fulton's horses on April 22, 2017, for a criminal investigation. On April 5, 2018, it dropped the charges. And Georgia law may have required law enforcement to have returned Fulton's horses by May 5, 2018. *See id.* § 17-5-54(c)(2) (giving 30 days following a guilty verdict to return property taken as part of an investigation). So even assuming Fulton's state-law claim did not accrue until May 5, 2018, it wouldn't be timely now, over seven years later, if it were the first time Fulton raised the issue.

That said, Fulton did file a federal complaint arising from the same set of facts on May 5, 2020, within the four-year window. And any claim added to his complaint would relate back to its original filing date, as though he had brought it on that date, May 5, 2020. *See Est. of West v. Smith*, 9 F.4th 1361, 1366 n.3 (11th Cir. 2021) (looking to the state law providing the statute of limitations to

determine whether an amendment to the complaint will relate back); GA. CODE ANN. § 9-11-15(c) (2025) ("Whenever the claim or defense asserted in the amended pleading arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.")  So a state-law claim wouldn't be barred by the four-year statute of limitations.

The problem, though, is Georgia has a special rule for suits against counties.  It requires that "[a]ll claims against counties . . . be presented within 12 months after they accrue or become payable or the same are barred . . . ."  *Id.* § 36-11-1.  And the record contains no evidence showing Fulton satisfied this requirement.  So this provision bars Fulton's state-law claim.

For this reason, we can't avoid the question of whether Fulton can proceed directly under the federal Constitution.

### C. A direct Takings Clause action would not be time-barred.

So we turn next to whether an action under the Takings Clause could move forward.  But we still might not need to address the existence of that theoretical cause of action if it would also be time-barred.  Indeed, we can't acknowledge Fulton's ticket—even if it's valid—if it's marked expired.  For that reason, we first consider the appropriate statute of limitations for a claim directly under the Takings Clause.  We conclude that, in Georgia, the statute of limitations would be four years.  As a result, Fulton's claim would not be time-barred.

When a federal claim lacks an express statute of limitations, we look to "the forum state's limitations period applicable to the state cause of action that bears the closest substantive resemblance to the federal cause of action." *Vigman v. Cmty. Nat'l Bank & Tr. Co.*, 635 F.2d 455, 459 (5th Cir. Jan. 1981) (citations omitted).[3] Here, two potentially relevant limitations periods exist.[4]

First, as we've mentioned, Georgia law requires actions to recover the value of personal property to be filed within four years. GA. CODE ANN. §§ 9-3-31 to 9-3-32 (2025). Similarly, inverse-condemnation actions for recovering the value of real property also have a four-year limitations period. *See id.* § 9-3-30.

But second, Georgia allows potential litigants only two years to file personal-injury actions. *Id.* § 9-3-33. And we apply this limitation period to § 1983 actions. *See Hillcrest Prop., LLC v. Pasco County*, 754 F.3d 1279, 1281 (11th Cir. 2014) ("Section 1983 claims

---

[3] "[T]he decisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, [are] binding as precedent in the Eleventh Circuit . . . ." *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[4] Not relevant is the special provision for counties requiring claims to be presented within 12 months. *See* GA. CODE ANN. § 36-11-1 (2025). That's so because it's not a statute of limitations. Rather, it's a state procedural requirement that a plaintiff formally notify the county before suit. *See Dates v. City of Atlanta*, 903 S.E.2d 289, 292 (Ga. Ct. App. 2024). The legalistic Latin name for this type of requirement is *ante litem* notice. *See id.*

are subject to a forum state's statute of limitations for personal in-jury claims." (citation omitted)).

We conclude that the limitations period for the recovery of personal property—four years—governs. That's so because it's the most substantively similar action to Fulton's effort to pursue his federal just-compensation right. So if Fulton were able to bring a state-law claim grounded in the Takings Clause, the four-year pe-riod for the recovery of personal property is the one that would apply. *See* GA. CODE ANN. §§ 9-3-31 to 9-3-32 (2025); *Rowland v. Clarke Cnty. Schl. Dist.*, 532 S.E.2d 91, 93 (Ga. 2000) (applying a four-year limitations period for the recovery of personal property from a county school district).

True, as we've mentioned, § 1983 cases, which include Tak-ings Clause claims, are subject to the personal-injury statute of lim-itations. *See Hillcrest Prop., LLC*, 754 F.3d at 1281. But that's so be-cause § 1983 is a "general remedy for injuries to personal rights." *See Wilson v. Garcia*, 471 U.S. 261, 278 (1985). The statute "encom-passes a broad range of potential tort analogies, from injuries to property to infringements of individual liberty." *Id.* at 277. So the Supreme Court thought it appropriate to apply a statute of limita-tions that captured the "unifying theme" of the statute—even if other torts might also be analogues to more specific rights that § 1983 protects.[5] *Id.*

---

[5] Because *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), "create[d] a remedy against federal officers, acting under color of federal law, that was analogous to the [§] 1983 action against state

But we are determining the statute of limitations that would apply to a unique cause of action that, if it exists, arises directly under the Takings Clause.  And the right to "just compensation" is most analogous to recovery for inverse condemnation rather than personal injury.  So we apply Georgia's statute of limitations that governs inverse-condemnation actions.

When we do that, we conclude that Fulton's action directly under the Takings Clause would be timely.  Law enforcement seized Fulton's horses in 2017, the charges were dropped in 2018, and he brought his action in 2020—within four years of the relevant facts.  So the statute of limitations wouldn't bar Fulton's action.

Because a theoretical action directly under the Takings Clause would be timely, we must determine whether such a cause of action in fact exists.

---

officials . . . . courts generally apply § 1983 law to *Bivens* cases." *Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir. 1996) (quoting *Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995)).  So *Bivens* actions brought in Georgia similarly use the state's two-year personal-injury statute of limitations.  *Id*.  But as we explain in Part III.D.5, *infra*, a cause of action directly under the Takings Clause would be completely independent of *Bivens* and unrelated to § 1983.  So we don't see *Bivens* as a reason to apply the two-year statute of limitations to a direct just-compensation claim.

### D. The Takings Clause creates a direct cause of action for unconstitutional takings by local governments.

Finally, we get to the main event (it may not be *Hamilton*, but we do have the two other authors of the Federalist Papers a little later). We must confront whether a litigant may sue a county in Georgia—a political subdivision of the state, *see* GA. CODE ANN. § 25-3-4 (2025)—directly under the Takings Clause to obtain "just compensation" for a taking. After reviewing the text, history, and structure of the Constitution, we hold that a litigant can.

    1.  The text of the Fifth Amendment and the structure of the Constitution show that the Takings Clause contains a direct cause of action.

The Takings Clause provides that no "private property [shall] be taken for public use, without just compensation." U.S. CONST. amend. V. Three major points about this text and how it fits into the Constitution's overall structure stand out: (1) the Takings Clause guarantees "just compensation"—a monetary remedy—when the government takes private property; (2) the Takings Clause is "self-executing," *Knick v. Township of Scott*, 588 U.S. 180, 194 (2019); and (3) the Takings Clause is one of only two constitutional guarantees that provides its own remedy. Together, these three points lead to the conclusion that the Constitution automatically provides Americans with the federal right to sue for "just compensation." In this subsection, we explain each point and why it supports that conclusion.

We begin with the meaning of "just compensation." Dictionaries during the Founding period and in the early years of our Republic defined "just" to mean "[u]pright; incorrupt; *equitable* in the distribution of justice"—in other words, fair. SAMUEL JOHNSON, *Just. adj.*, A DICTIONARY OF THE ENGLISH LANGUAGE (1773), https://perma.cc/W4M8-T5C2 (emphasis added); *see also* NOAH WEBSTER, *Just, adjective*, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://perma.cc/PD4F-PHYQ (defining "just," in relevant part, to mean "[e]quitable; due; merited; as a *just* recompense or reward"). And they defined "compensation" as "[r]ecompence; something equivalent; amends"—that is, payment for what's been taken. SAMUEL JOHNSON, *Compensa'tion. n.s*, A DICTIONARY OF THE ENGLISH LANGUAGE (1773), https://perma.cc/7RVU-GDKK; *see also* NOAH WEBSTER, *Compensation, noun*, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828), https://perma.cc/C3PP-EEBC ("That which is given or received as an equivalent for services, debt, want, loss, or suffering; amends; remuneration; recompense."). Together, then, the plain meaning of the term "just compensation" refers to fair payment.

So it's unsurprising that the Supreme Court has said that "just compensation" is monetary relief. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999). To determine "just compensation," we ask "what has the owner lost"? *See id.* (quoting *Bos. Chamber of Com. v. Boston*, 217 U.S. 189, 195 (1910)). We don't consider "what . . . the taker gained" or seek to put the owner in an equitable position with the taker. *See id.* Instead, we seek to give the owner only the value of what the government

took.  *See id*.  In essence, then, "just compensation is, like ordinary money damages, a compensatory remedy."  *Id*.  So in legalistic terms, "just compensation" is "legal relief."  *Id*. at 710–11.

And to get any form of "legal relief" in the federal courtroom, a litigant must have a cause of action.  *See id*.; *Davis*, 442 U.S. at 239 n.18.  So with an express constitutional right to receive "just compensation" as a form of legal relief, we would expect a guaranteed cause of action to sue to recover that relief.[6]  *See United States v. Lee*, 106 U.S. 196, 220 (1882) ("It cannot be denied that [the Takings Clause was] intended to be enforced by the judiciary as one of

---

[6] Citing the work of Professor Jud Campbell, the Dissent argues that a constitutional right to a legal remedy does not necessarily supply a cause of action to get that relief.  *See* Diss. Op. at 7 (citing Jud Campbell, *Determining Rights*, 138 Harv. L. Rev. 921, 923, 944, 974 n.370, 981 (2025); and then citing William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1191 (2024)).  But Campbell has argued that rights may be either legally determinate, and therefore judicially enforceable, or indeterminate.  *See, e.g.*, Campbell, *Determining Rights*, *supra*, at 923 n.7 ("Many Founders accepted the judicial enforceability of legally determinate fundamental rights, whether enumerated or not."); *cf. id*. at 931 ("Although natural law was 'law' in an abstract sense, it generally was not 'law' in a judicially enforceable sense because it lacked determinate content.").  And he has been clear that, under his theory, the right to "just compensation" is a determinate right, so it follows that it is judicially enforceable.  *See id*. at 974 n.370 (describing "the right against uncompensated takings" as a "legally determinate right[]"); Baude, Campbell & Sachs, *General Law and the Fourteenth Amendment*, *supra*, at 1236 (recognizing "the right to compensation for takings" as a "centerpiece[]" of both the Bill of Rights and the privileges or immunities of citizenship).  As a result, an adherent to Campbell's views should remain comfortable with the conclusion that the Constitution supplies a direct cause of action for judicial enforcement of the Takings Clause.

the departments of the government established by th[e] constitution.").

The Supreme Court has also told us that the Takings Clause's right to "just compensation" is "self-executing." *See Knick*, 588 U.S. at 194. That means that a person is automatically entitled to this relief as soon as they suffer a taking. *See id*. at 190. Congress need not recognize their injury nor their right to a remedy. *See id*. (discussing *Jacobs v. United States*, 290 U.S. 13 (1933)). And based on the text of the Clause, that makes sense. By its terms, the Clause reflects that as soon as the government commits a "taking, compensation must be awarded" and the property owner "has *already* suffered [a constitutional violation] at the time of the uncompensated taking." *Id*. at 193 (internal quotation marks and citation omitted).

Because property owners have an automatic right to a form of legal relief, it follows they have an automatic cause of action to get that relief. They are instantly entitled to receive "just compensation" in the courts. *See id*. at 194 (recognizing the ability to recover "just compensation" from federal officials directly under the Fifth Amendment pursuant to the Tucker Act and from local governments under 42 U.S.C. § 1983). And they need not point to a statute recognizing a right to "just compensation" or an acknowledgment by the government of its willingness to pay. Rather, as the Supreme Court has explained, "[s]uch a promise [i]s implied because of the duty to pay imposed by the Amendment." *First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482

U.S. 304, 315 (1987) (quoting *Jacobs*, 290 U.S. at 16).  In fact, as we explore in greater detail in Part III.D.5, the Supreme Court has already effectively held that the Takings Clause directly supplies a cause of action against the *federal government*.  *See Jacobs*, 290 U.S. at 16 (Tucker Act takings suits are "founded upon the Constitution of the United States.").

It makes structural sense that the Constitution grants an automatic cause of action to recover "just compensation."  As we explain further in Part III.D.2, because of the outsized burden legislatures placed on individual property owners before and during the Revolution, the Framers did not trust those bodies to ensure "just compensation" for takings.  *See* Part III.D.2, *infra*.  And if they did not provide the Takings Clause with a cause of action in the absence of legislation creating one, the provision's promised "just compensation" remedy would be empty.

So the intrinsic cause of action within the Takings Clause ensures meaning behind the constitutional guarantee.  In other words, by expressly giving Americans the right to get payment from the government in the courtroom, the Constitution, of course, too gives them the ticket they need to enter in the first place.  Otherwise, the government could just refuse to issue a ticket anytime it didn't want to pay.  We don't think the Founders made an empty promise to Americans.  A guaranteed remedy is a guaranteed remedy only if it's accessible.

Ultimately, the text is straightforward.  The Takings Clause guarantees a legal damages-type remedy, and it is "self-executing".

These characteristics are especially noteworthy because they make the Takings Clause a constitutional unicorn—no other constitutional guarantee expressly contains these two features. *Cf. DeVillier*, 601 U.S. at 291 ("Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." (citation omitted)).

As a result, the Framers did not have to be concerned that a cause of action directly under the Takings Clause would willy-nilly lead to the finding of direct causes of action under multiple other parts of the Constitution.  In fact, only one other part of the Constitution—Article I, Section 9's Suspension Clause, which guarantees the writ of habeas corpus—even refers to any remedy at all, though not a compensatory one.  RICHARD H. FALLON, JR., JOHN F. MANNING, DANIEL J. MELTZER & DAVID L. SHAPIRO, HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 330 (7th ed. 2015) [hereinafter HART & WECHSLER]; *see also* Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 YALE L.J. 1425, 1509 n.329 (1987) ("[T]he non-suspension clause is the original Constitution's most explicit reference to remedies.").

That only two constitutional provisions expressly provide for a remedy upon violation "sets [them] apart from others and at least suggests these two rights—even if not all others in the Constitution—have special protections against congressional abrogation or dereliction" of their guaranteed remedies.  *DeVillier v. Texas*, 63 F.4th 416, 439 (Oldham, J., dissenting from denial of rehearing

en banc) (5th Cir. 2023), *denying reh'g from*, 53 F.4th 904 (5th Cir. 2023) (per curiam), *vacated*, 601 U.S. 285 (2024).

We can see that by how the Supreme Court has treated the Suspension Clause. Indeed, the Supreme Court has expressly compared the Constitution's only two guaranteed remedies. In *United States v. Lee*, the Court reasoned, if the Constitution offers "sufficient authority for [a] court to interfere to rescue a prisoner from the hands of those holding him under the asserted authority of the government [by issuing a writ of habeas corpus], what reason is there that the same courts shall not give remedy to the citizen whose property has been . . . devoted to public use without just compensation?" 106 U.S. at 218.

So we take a look at how the Supreme Court has treated the Suspension Clause. The Suspension Clause guarantees "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9, cl. 2. That is, the Suspension Clause secures the remedy of the writ of habeas corpus for detained or imprisoned individuals except in highly limited circumstances. The Supreme Court has construed this "Privilege" of habeas corpus to be at least as extensive as it existed at the time of the Founding. *Boumediene v. Bush*, 553 U.S. 723, 746 (2008) ("[A]t the absolute minimum the Clause protects the writ as it existed when the Constitution was drafted and ratified." (citation and internal quotation marks omitted)).

Over the years, Congress has enacted legislation that creates substitutes for the writ of habeas corpus. And the Supreme Court has ensured that the new frameworks preserved the constitutional guarantee. *See, e.g.*, *id.* In 1948, for instance, Congress passed 28 U.S.C. § 2255 as a substitute for the writ of habeas corpus for prisoners in custody under a sentence that a federal court imposed. *See United States v. Hayman*, 342 U.S. 205, 206–07 (1952). After a prisoner filed a § 2255 motion, a federal appeals court sua sponte raised concerns that the statute violated the Suspension Clause. *Id.* at 209. But the Supreme Court highlighted that the statute avoided those constitutional concerns because "where the Section 2255 procedure is shown to be 'inadequate or ineffective', the Section provides that the habeas corpus remedy shall remain open to afford the necessary hearing." *See id.* at 223 (quoting 28 U.S.C. § 2255 (1947)). The Court "implicitly held . . . that the substitution of a collateral remedy" that does not purport to narrow the writ of habeas corpus "does not constitute a suspension of the writ of habeas corpus." *Swain v. Pressley*, 430 U.S. 372, 381 (1977) (discussing *Hayman*).

Similarly, when the District of Columbia adopted a law modeled on § 2255, the Supreme Court upheld it as constitutional under the Suspension Clause. *Id* at 381–84. The Court explained that "[s]ince the scope of the remedy provided by [the District of Columbia law] is the same as that provided by § 2255, it is also commensurate with habeas corpus" in all relevant respects. *Id.* at 381–82. So once again, when the substitute remedy did not narrow the writ of habeas corpus, leaving a coextensive remedy to the constitutional guarantee, it did not violate the Suspension Clause.

But when Congress *did* narrow the constitutional remedy, the Court took issue with its legislation. In the aftermath of the September 11, 2001, terrorist attack, Congress enacted a statute that was "intended to circumscribe habeas review" for aliens designated as enemy combatants and detained at the United States Naval Station at Guantanamo Bay. *Boumediene*, 553 U.S. at 776. And "[u]nlike in *Hayman* and *Swain*, . . . there [was] no effort to preserve habeas corpus review as an avenue of last resort." *Id.* at 777. Because the legislation narrowed the habeas corpus remedy, the Court concluded it was "an inadequate substitute for habeas corpus" and it "effect[ed] an unconstitutional suspension of the writ." *Id.* at 792. So the petitioners still had access to the underlying constitutional remedy of a petition for a writ of habeas corpus.[7] *See id.* at 798.

---

[7] The Dissent suggests, contrary to all the binding precedent we have cited, that the Constitution doesn't automatically secure access to the writ of habeas corpus in federal courts. *See* Diss. Op. at 13–14. It highlights that the First Congress had to grant the lower federal courts *jurisdiction* to issue this constitutional remedy. *See id.* at 14. But the Dissent muddles the concepts of subject-matter jurisdiction and causes of action. *Cf.* Part III.A, *supra* (explaining the distinction). Article III provides for just one mandatory federal court with constitutionally prescribed jurisdiction: the Supreme Court. *See* U.S. CONST. art. III, §§ 1, 2. It's up to Congress to provide for and structure lower federal courts and grant them jurisdiction. *See id.* § 1; Akhil Reed Amar, *A Neo-Federalist View of Article III: Separating the Two Tiers of Federal Jurisdiction*, 65 B.U.L. REV. 205, 212 (1985) ("Article III plainly imposes no obligation to create lower federal courts."); *but see Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat.) 304, 331 (1816) ("It would seem . . . that congress are bound to create some inferior courts . . . ."). Even so, though, Article III still requires eventual federal judicial review, in a federal court of Congress's choosing, for certain classes of

We draw two simple lessons from this line of precedent on habeas corpus substitutes: (1) Congress cannot narrow the scope of a constitutionally prescribed remedy, and (2) if it tries to do so, the underlying constitutional remedy remains directly available.

Because "just compensation" is a constitutionally prescribed remedy—indeed, the only other constitutionally prescribed remedy besides the writ of habeas corpus—Congress likewise cannot narrow the scope of that right through legislation. *See Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) ("Just compensation is provided for by the Constitution and the right to it cannot be taken away by statute"); *cf. DeVillier*, 601 U.S. at 292 ("[C]onstitutional concerns do not arise when property owners have other ways to seek just compensation."). So if a legislative substitute for "just compensation" is not coextensive with the constitutionally prescribed remedy of "just compensation," then the constitutionally prescribed remedy remains directly available.

---

cases. *See* Amar, *A Neo-Federalist View*, *supra*, at 238–54 (explaining that Article III requires judicial review of three categories of mandatory cases); *Martin*, 14 U.S. at 330–36 (same). And those mandatory cases include cases that seek relief under the Constitution's two guaranteed remedies: the writ of habeas corpus and "just compensation." *See* U.S. CONST. art. III, § 2 ("The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . ."). To be sure, Congress can pick the stage for the show. But it must provide for some way to honor a valid ticket. It has done so for takings claims by granting the federal courts federal-question jurisdiction. *See* 28 U.S.C. § 1331.

For all these reasons, the text of the Fifth Amendment and the structure of the Constitution require the conclusion that the Takings Clause includes a direct cause of action.

> 2.  The history behind the Takings Clause and the Four-teenth Amendment shows that the Clause contains a direct cause of action against local governments.

The history of the Takings Clause and the Fourteenth Amendment also supports the conclusion that the Takings Clause contains a direct cause of action against local governments.  As we show below, the history tells us several things:  (1) the Framers of the Takings Clause included the "just compensation" right to pro-tect against government abuses—even by a well-meaning govern-ment that acts for the public good; (2) the Framers designed the Takings Clause with the intent that its "just compensation" remedy would not depend upon legislation; (3) even when states did not have their own versions of the Takings Clause, courts viewed the just-compensation principle as a fundamental right and regularly awarded "just compensation" in the form of damages in common-law actions; (4) even before Congress gave federal courts jurisdic-tion to hear specifically claims for "just compensation" for takings, federal courts resolved takings claims against federal and state offi-cials when they had jurisdiction; and (5) the Framers of the Four-teenth Amendment intended for the amendment to make the Tak-ings Clause remedy available against state and local governments in federal courts.

We start with colonial times. During that period, the fundamental protection against governmental seizure of property was limited: the government could seize property only *if the legislature or a jury authorized it*. *See* William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 COLUM. L. REV. 782, 785–88 (1995). But that protection contained no right to "just compensation" once a majoritarian body approved a taking.

This legislature-authorization protection traces to Article 39 of the Magna Carta. That article provided that "[n]o free man shall be . . . dispossessed . . . except by the legal judgment of his peers or by the law of the land." *Id.* at 787. And it fit the period when Parliament reigned supreme with near plenary powers over the empire. *See id.* at 786 n.15. Based on this historical background, several colonial legislatures authorized *uncompensated* takings—as long as a body representing the public good approved.[8] *See id.* at 787–88.

Still, two fundamental documents of the colonial era contained provisions mandating "just compensation:" the Massachusetts Body of Liberties of 1641 and the 1669 Fundamental Constitutions of Carolina (drafted by John Locke but never completely

---

[8] William Blackstone in his famous *Commentaries* did recognize a right to "just compensation" for takings of real property, although he gave no citation for where English law recognized this principle. *See* Treanor, *The Original Understanding*, *supra*, at 786 n.15. And this appears to be a rare instance where his view did not convince English jurists of the time. *See id.*

implemented). *Id.* at 785–86. Yet even those two provisions had limited applications, with Massachusetts applying the principle to personal property only and Carolina to real property. *Id.* Other colonies enacted statutes with compensation in select situations, but they recognized no fundamental right. *See* James W. Ely, Jr., *"That Due Satisfaction May be Made:" The Fifth Amendment and the Origins of the Compensation Principle*, 36 AM. J. LEGAL HIST. 1, 5–13 (1992).

Then the Revolution ushered in a new era for property law. In advancing one of the most important causes in American history for the public good, Washington's army seized personal property—including horses—without compensation. *See* Treanor, *The Original Understanding*, *supra*, at 790; AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 79–80 (1998); Jed Rubenfeld, *Usings*, 102 YALE L.J. 1077, 1122–23 (1993).

That frustrated people. And those uncompensated seizures triggered a sudden interest in guaranteeing compensation for the unlucky few who suffered losses at the hands of even a well-meaning majority. Treanor, *The Original Understanding*, *supra*, at 790; AMAR, THE BILL OF RIGHTS, *supra*, at 79–80; Rubenfeld, *Usings*, *supra*, at 1122–23; *see also* 1 HENRY ST. GEORGE TUCKER, BLACKSTONE'S COMMENTARIES app. at 305-06 (Philadelphia, Birch & Small 1803) (opining that the eventual federal just-compensation guarantee "was probably intended to restrain the arbitrary and oppressive mode of obtaining supplies for the army, and other public

uses, by impressment, as was too frequently practiced during the revolutionary war, without any compensation whatever").

Vermont, for instance, added a just-compensation principle to its 1777 Constitution. VT. CONST. of 1777, ch. I, art. II. Massachusetts followed suit in 1780. *See* MASS. CONST. of 1780, part I, art. X. The Confederation Congress wasn't far behind when it passed the Northwest Ordinance, governing the Northwest Territories, with a similar guarantee. *See* Northwest Ordinance of 1787, art. 2.

Meanwhile, when it came time to structure the new federal government, most of the Founding generation focused on the threat that a corrupt central government could pose to all Americans. *See* AMAR, THE BILL OF RIGHTS, *supra*, at 77. As a result, the Bill of Rights in large part emphasized constraining the power of federal officials who might engage in self-dealing. *Id.*

But some Framers, most notably John Jay and James Madison, zeroed in on the importance of checking even a good-natured government's abuses in the form of property takings. As the war proved, even a well-intentioned government could trample the individual in the name of the public good. So following Jay and Madison's lead, the Framers tacked the Takings Clause onto the Fifth Amendment. *Id.* at 77–80.

That Clause is the only Bill of Rights provision designed to act as a special outside check on Congress's treatment of disfavored persons. *See id.* at 77–78. It does so, as we've explained, by guaranteeing a remedy. And here's the key point: both Jay and Madison

were centrally concerned with protecting the right to "just compensation" from the whims of the legislature. That's why they spearheaded an amendment that departed from the Magna Carta model and would guarantee compensation for taken property even when the legislature authorized the taking. *See* U.S. CONST. amend. V.

We start with Jay. In 1778, Jay penned a letter to the New York legislature, decrying "the Practice of impressing *Horses,* Teems, & Carriages by the military, without the Intervention of *a civil Magistrate,* and without any Authority from the Law of the Land." John Jay (A Freeholder), *A Hint to the Legislature of the State of New York,* FOUNDERS ONLINE, https://perma.cc/32NL-432K (emphases altered). Instead, Jay advanced a vision where "many who . . . severely feel this kind of oppression, may . . . *bring Actions and recover Damages." Id.* (emphasis added). Our first Chief Justice couldn't have been clearer that he thought a plaintiff like Fulton, who had his horses taken without compensation, should be able to sue for damages.

As for the author of the Fifth Amendment—James Madison—writing Federalist 10, Madison "was ahead of his time in arguing that the dominant danger in America came from a possibly overweening majority rather than from self-interested government agents." AMAR, THE BILL OF RIGHTS, *supra,* at 77; *see also* FEDERALIST No. 10. In Madison's view, a majoritarian body without an outside check on its power offered insufficient protection for property rights. *See* James Madison, *For the National Gazette:*

*Property* (Mar. 27, 1792), FOUNDERS ONLINE, https://perma.cc/K8EH-FU5N [hereinafter *Property*] ("Where an excess of power prevails, property of no sort is duly respected.").

So Madison crafted the Takings Clause. That Clause was unique: it created a right that applied even when the government didn't misuse its power and instead acted "for public use." *See* U.S. CONST. amend. V; Madison, *Property*, *supra* (stating that no property "shall be taken *directly* even for public use without indemnification to the owner . . .."). Madison envisioned the protection of that right through "independent tribunals of justice [who] will consider themselves in a peculiar manner [its] guardians . . . ." James Madison, *Amendments to the Constitution* (June 8, 1789), FOUNDERS ONLINE, https://perma.cc/ZF5L-W9ZN.

And as a congressman, Madison tried to honor that plan by proposing a law granting the Supreme Court appellate jurisdiction to review decisions on federal claims. *See* Floyd D. Shimomura, *The History of Claims Against the United States: The Evolution from a Legislative Toward a Judicial Model of Payment*, 45 LA. L. REV. 625, 638 & n.94 (1985). In his view, the adjudication of a federal claim was a "judicial rather than executive" power. *Id.* (citing 1 ANNALS OF CONG. 611–12 (J. Gales ed. 1834)) (recording Madison as having stated that "deciding upon the lawfulness and justice of . . . claims, and accounts subsisting between the United States and particular citizens . . . partakes strongly of the judicial character . . . .").

But of course, at the Founding, the federal judiciary was largely undeveloped. Indeed, Congress didn't grant the lower

federal courts federal-question jurisdiction until almost a hundred years later—in 1875.  *See* Act of Mar. 3, 1875, ch. 137, § 1, 18 Stat. 470, 470; *see also* HART & WECHSLER, *supra*, at 22–24, 27–28 (discussing the grounds for subject-matter jurisdiction for lower federal courts at the Founding through Reconstruction).  And it wasn't until 1887 that Congress passed the Tucker Act, which gave the Court of Claims jurisdiction to hear cases requiring payment from the United States.  *See* Tucker Act, ch. 359, § 1, 24 Stat. 505, 505 (1887).  Without that, federal courts generally lacked the jurisdiction to hear cases brought directly under the Fifth Amendment—even if litigants theoretically had a cause of action directly under it.  Litigants might have had a ticket, but federal courts had no right to put on the show.

And in any case, litigants filed few takings cases against the federal government because the federal government used states to condemn property for federal use.  Treanor, *The Original Understanding*, *supra*, at 794 n.69; William Baude, *Rethinking the Federal Eminent Domain Power*, 122 YALE L.J. 1738, 1762 (2013) ("During the first twenty years of the federal government, Congress built quite a few things and sometimes needed eminent domain . . . . [T]he use of state power was uniform and unquestioned.").

Still, federal courts did zealously enforce the Takings Clause in the limited instances they had jurisdiction and a relevant suit came up.  In 1815, for example, the Supreme Court discussed the "just compensation" right when it was reviewing a state-law action brought to recover possession of property that federal officials

occupied.  In *Meigs v. McClung's Lessee*, the Defendants were United States officers who erected a garrison on property in North Carolina, under the authority of the United States.  13 U.S. (9 Cranch) 11, 12 (1815) (bill of exceptions).  Plaintiff McClung's lessee claimed to have leased the property where Meigs and the others resided.  *Id.* He asserted that the officers were on the property improperly.  *See id.*  So he filed a common-law action of ejectment, a state-law action to recover possession of property from any wrongful occupier.[9]  *See id.*

The Defendants argued "[t]hat the United States had a right by the constitution to appropriate the property of individual citizens" and they had done so "as officers of the United States, for the benefit of the United States, and by their direction . . . ."  *Id.* at 13. But the trial court rejected that defense.  Instead, it instructed the jury that "if the land . . . was at the time vacant land[,] the United States could appropriate it as they pleased; but if it was private property[,] the United States could not deprive the individual of it without making him just compensation therefor."  *Id.* at 14.  The trial court awarded judgment to McClung's lessee.  *See generally id.*

Then the Supreme Court affirmed.  *See id.* at 18.  In upholding the ejectment remedy, Chief Justice Marshall, writing for the Court, explained that the land was "certainly the property of [McClung's lessee]; and the United States cannot have intended to

---

[9] Although the case does not state why federal-court jurisdiction existed below, we can surmise that there must have been diversity of citizenship between the parties.  *Cf.* HART & WECHSLER, *supra*, at 22–24, 27–28.

deprive him of it by violence, and without compensation." *Id*. In other words, the Court would not allow the United States to claim possession of property without paying for it.

*Meigs* shows that the Marshall Court understood that, where it had jurisdiction, the Constitution required it to enforce the right to "just compensation." And the Court enforced that right even though that meant allowing a private citizen to sue officers of the United States in federal court without the government's consent. *See Lee*, 106 U.S. at 210–11 (discussing how *Meigs* recognized a private plaintiff can sue federal officers for possession of taken property).

Still, *Meigs* was a rarity. And during those early years of the Republic, in the absence of federal-question jurisdiction in lower federal courts for alleged Takings Clause violations, Congress served as the primary "forum for takings claims." Treanor, *The Original Understanding*, *supra*, at 794 n.69. Yet the terms of the Takings Clause ensure that Congress lacked "discretion to deny takings claims mandated by the Takings Clause." *Id*. After all, the Takings Clause guaranteed the "just compensation" remedy. And Congress instead acted only as the lawful judicial tribunal to hear damages actions stemming directly under the Clause. *See id.*; Shimomura, *The History of Claims, supra*, at 638 & n.94 (discussing Madison's view that the adjudication of federal claims was a judicial power). So even before the federal courts had the jurisdiction to hear claims for damages arising out of federal takings, litigants enjoyed an effective direct cause of action for "just compensation"—only

Congress, not the courts, sat as the "judicial" tribunal to determine the just amount.

The Dissent disagrees with our understanding of this early history. It says Congress didn't exercise a judicial function when it adjudicated takings claims. *See* Diss. Op. at 20–22. Rather than acting as "a pseudo-judicial tribunal," the Dissent argues, Congress exercised its legislative "power over the purse" to pay claims as it pleased. *See id.* at 20. For support, the Dissent draws from scholarship on how the early Congresses resolved all federal claims—not specifically takings claims. *See id.* at 20–22 (first citing Shimomura, *The History of Claims*, *supra*; then citing 2 Wilson Cowen, Philip Nichols, Jr. & Marion T Bennett, The United States Court of Claims: A History (1978); and then citing William M. Wiecek, *The Origins of The United States Court of Claims*, 20 Admin. L. Rev. 387 (1968)).

But a practice of discretionarily declining to pay valid claims, while maybe permissible for most federal claims, would be a clear violation of the text of the Fifth Amendment if extended to takings claims. *See* U.S. Const. amend. V (No "private property [shall] be taken for public use, without just compensation."). As we've explained, the Takings Clause was an innovation at the Founding—designed as a unique constraint on legislative power that required mandatory enforcement. In other words, Congress could act only

consistently with the Constitution's just-compensation guarantee when it served as a tribunal for takings.[10]

And to the extent that early Congresses treated takings claims like all other claims—to be clear, we don't think the Dissent has established they did—then Congress did so contrary to leading

---

[10] The Dissent implies that Congress must retain jurisdiction over takings claims to heed the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ." *See* Diss. Op. at 22–23 (quoting U.S. CONST. art. I, § 9, cl. 7). We start by noting that the Appropriations Clause has no relevance in the case before us because we are considering whether the Takings Clause provides a cause of action against *local governments*, who are not encompassed by the Appropriations Clause. *See* U.S. CONST. art. I, § 9, cl. 7. But even when it comes to federal takings, for at least two reasons, Congress always maintains control over the fisc, even when courts handle takings claims. First, even though Congress must provide a forum for takings claimants to pursue their constitutional cause of action, Congress retains authority to structure and assign the tribunal with jurisdiction over these claims. *See* U.S. CONST. art. III, § 1; *cf. Vishnevsky v. United States*, 581 F.2d 1249, 1256 (7th Cir. 1978) (collecting "a long line of cases" where "the Supreme Court has itself . . . specifically affirmed the appropriateness of mandamus relief to compel federal officers to pay monies out of the public treasury, where the duty to do so was clear and ministerial"). Second, the federal government is liable for takings only when its officers act "within the general scope of their duties." *See Darby Dev. Co. v. United States*, 112 F.4th 1017, 1024 (Fed. Cir. 2024); Part III.D.3, *infra*. So to owe "just compensation," Congress must pass legislation imbuing an officer with responsibilities that generally authorize her to take property and put the public on the hook for "just compensation." *See* Part III.D.3, *infra*; *cf. CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 431 (2024) ("[T]he origins of the Appropriations Clause confirm that appropriations needed to designate particular revenues for identified purposes. Beyond that, however, early legislative bodies exercised a wide range of discretion.").

Founders like Madison and Jay's understanding of the Takings Clause. In contrast to the "just compensation" remedy, early Congresses drew the general claims-resolution process from early English practice when the "just compensation" principle did not constrain legislatures. *See* Shimomura, *The History of Claims*, *supra*, at 627–37 (describing the evolution of a legislative model of federal claims resolution). Congress extended that common-law practice after the Founding as it quickly moved to assert its dominance over a yet-to-be-established judiciary. *Id.* at 637.

But in its zeal to cement power over the courts, Congress sometimes took blatantly unconstitutional acts, often to kneecap and subserviate the judiciary. *See Hayburn's Case*, 2 U.S. (2 Dall.) 408, 410 n.* (1792) (providing circuit court opinions that an act of Congress requiring the judiciary to evaluate pensioner claims subject to review by the Secretary of War and Congress was unconstitutional); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) (concluding Congress unconstitutionally attempted to expand the original jurisdiction of the Supreme Court); *cf. Stuart v. Laird*, 5 U.S. (1 Cranch) 299 (1803) (acquiescing to a congressional act, which wholly eliminated properly appointed Article III judgeships). A weak early judiciary could do little to push back when Congress disregarded the tripartite structure of our Constitution. *See* Shimomura, *History of Claims*, *supra*, at 645–46 (discussing how the Supreme Court permitted congressional adjudication of federal claims "as a political fact" and "an extension of colonial history [rather] than a deduction of logic from the new Constitution" and

"refused to dignify it with any theoretical or policy justification" (footnote omitted)).

And the results of such congressional contempt for the proper role of the judiciary were disastrous—as early as 1838, the House of Representatives's Committee on Claims released a report that Congress had been inundated with private claims, consuming time and resources and causing injustice. *See id.* at 648–51 (discussing early disfunction in the private bill system of claim adjudication). By the Civil War, President Lincoln echoed Madison, telling Congress that "the investigation and adjudication of claims in their nature belong to the judicial department . . . ." Wiecek, *The Origins of The United States Court of Claims*, *supra*, at 398 (quoting 7 MESSAGES AND PAPERS OF THE PRESIDENTS 3252 (James D. Richardson, ed., New York, 1897–1911)).

All of this is to say that early congressional practice didn't always conform to the Constitution's structure as ratified and as leading Founders understood it. Even assuming the Dissent's understanding of early congressional treatment of takings claims is correct (again, we don't think it is), that practice would be one such case. And we couldn't summarily declare its constitutionality as a "contemporaneous legislative exposition of the Constitution . . . , acquiesced in for a long term of years, [that] fixes the construction to be given [the Constitution's] provisions." *Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003) (quoting *Myers v. United States*, 272 U.S. 52, 175 (1926)). After all, it wasn't.

In fact, we don't have an "unbroken practice since the founding generation" of resolving takings claims through legislative rather than judicial adjudication. *Cf. id.* Americans did not acquiesce to that practice. Instead, through the early nineteenth century, the public grew even more attached to the idea of *judicial enforcement* of the right to "just compensation"—vindicating Jay and Madison in any dispute with Congress.

Specifically, the inclusion of a just-compensation principle in the Fifth Amendment led to a wave of recognition of the right at the state level. And as a result, our history contains repeated acknowledgment that citizens were entitled to recover "just compensation" in the courts. Indeed, by the middle of the century, it became clear that state just-compensation clauses inherently contained a right to bring damages actions. This history offers important context to understand the intent of the Framers of the Fourteenth Amendment, who extended the reach of the *federal* Takings Clause to the states. So we take a moment to review it.

When the country ratified the Fifth Amendment, only one of the first thirteen states, Massachusetts, recognized a right to "just compensation" in its constitution. AMAR, THE BILL OF RIGHTS, *supra*, at 79. By 1800, two had. J.A.C. Grant, *The "Higher Law" Background of the Law of Eminent Domain*, 6 WIS. L. REV. 67, 70 (1931). By 1850, six did. *Id.* And by 1868, eight. *Id.* Plus, nearly every new state admitted to the union included a just-compensation provision. *Id.* Not only that, but leading American jurists proclaimed a right to "just compensation" as a fundamental right

undergirding free government. *See, e.g.*, 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW 339 (New York: O. Halsted, 1832) (just compensation "is founded in natural equity, and is laid down by jurists as an acknowledged principle of universal law"); 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1784, at 661 (Boston: Hilliard, Gray, 1833) (same).

Ultimately, courts in virtually every state extended the principle of "just compensation" against state and local governments. AMAR, THE BILL OF RIGHTS, *supra*, at 269. And they did so even if their state constitutions didn't mention "just compensation." Rather, courts discerned the just-compensation principle to be a fundamental right. *See, e.g.*, *Gardner v. Newburgh*, 2 Johns. Ch. 162, 166 (N.Y. 1816) ("a fair compensation must, in all cases, be previously made to the individuals affected . . . . This is a necessary qualification accompanying the exercise of legislative power, in taking private property for public uses; the limitation is admitted by the soundest authorities, and is adopted by all temperate and civilized governments, from a deep and universal sense of its justice."); *Sinnickson v. Johnson*, 17 N.J.L. 129, 146 (1839) (describing just compensation as "operative as a principle of universal law"); *Young v. McKenzie*, 3 Ga. 31, 44 (1847) (enforcing the right declared in the Takings Clause because it embodies a "great common law principle . . . applicable to all republican governments, and which derived no additional force, as a *principle*, from being incorporated into the Constitution of the United States."); *Bradshaw v. Rodgers*, 20 Johns. 103, 105–06 (N.Y. Sup. Ct. 1822) (same); *Crenshaw v. Slate River Co.*, 27 Va. (6 Rand.) 245, 265 (1828) (opinion of Carr, J.) (same); *The*

*Proprietors of the Piscataqua Bridge v. N.H. Bridge*, 7 N.H. 35, 66 (1834) (same); *L.C. & C.R.R. Co. v. Chappell*, 24 S.C.L. (Rice) 383, 387 (1838) (same); *Hall v. Washington County*, 2 Greene 473, 478 (Iowa 1850) (same); *State v. Glen*, 52 N.C. (7 Jones) 321, 330–31 (1859) (same).

When they had jurisdiction, federal courts, including the Supreme Court, also invoked or applied the just-compensation principle against the actions of states as a fundamental right against all governments. *See, e.g., VanHorne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 310 (C.C.D. Pa. 1795) ("The [Pennsylvania] legislature . . . had no authority to make an act devesting one citizen of his freehold, and vesting it in another, without a just compensation."); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810) ("It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and, if any be prescribed, where are they to be found, if the property of an individual, fairly and honestly acquired, may be seized without compensation."); *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 52 ("[T]hat the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the state, or dispose of the same to such purposes as they may please, without the consent or default of the corporators, we are not prepared to admit; and we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and the letter of the constitution of the United States, and upon the decisions of most respectable judicial tribunals, in resisting such a

doctrine."); *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 38  (1823) ("[B]y the common law of Virginia, if not by the universal law of all free governments, private property may be taken for public use, upon making to the individual a just compensation."); *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 828 (C.C.D.N.J. 1830) (The Takings Clause "is the declaration of what in its nature is the power of all governments and the right of its citizens . . . .").

And once a court recognized a just-compensation right against a state, a plaintiff could recover damages for the violation of that right.  Plaintiffs brought their actions to recover compensation for takings in common-law forms of action—typically a trespass action against an offending official.  *See* Robert Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth Century State Just Compensation Law*, 52 VAND. L. REV. 57, 67–83 (1999).  That official would justify their action as authorized under state law.  And the court would invalidate that defense when the action was an uncompensated taking.[11]  *See id.* at 67–68, 83–97.  And then courts could award damages available in trespass actions.  *Id.* at 97–100; *see also Sinnickson*, 17 N.J.L. at 147; *Bradshaw*, 20 Johns. at 103, 106; *Bos. & R. Mill Corp. v. Gardner*, 19 Mass. (2 Pick.) 33, 43 n.2 (1823); *Thayer v. Boston*, 36 Mass. (19 Pick.) 511, 515–17 (1837); *State*

---

[11] Although rarer, as in *Meigs*, these state-law suits could also be brought against federal officials who took property claiming official authority but violated the Federal Takings Clause.  *See, e.g., Meigs*, 13 U.S. 11; *Lee*, 106 U.S. 196; Amar, *Of Sovereignty and Federalism, supra*, at 1512 (discussing how a state-law trespass action allowed suit against federal officials in *Lee* for an uncompensated taking).

*v. Hooker*, 17 Vt. 658, 672 (1845); *Pumpelly v. Green Bay Co.*, 80 U.S (13 Wall.) 166, 175–80 (1872). Although these damages were initially limited to retrospective relief, by 1860 some courts had allowed plaintiffs to recover full permanent damages.[12]   Brauneis, *The First Constitutional Tort*, *supra*, at 100*; see also, e.g.*, *Mayor & Council of Rome v. Perkins*, 30 Ga. 154 (1860). In effect, courts allowed direct damages actions for "just compensation" to move forward.

And during the later nineteenth and early twentieth centuries, states abandoned rigid common-law forms of action as prerequisites for suits for damages and combined the courts of law and equity. *Cf.* Douglas Laycock, *How Remedies Became a Field: A History*, 27 REV. LITIG. 161, 171 (2008) ("Anglo-American law abolished the writ system, and merged the courts of law and equity, over roughly a century from 1848 . . . to 1937 . . . . In the nineteenth century, we begin to see transsubstantive treatises on damages . . . ."). As part of this process, courts in the 1870s and 1880s described damages actions to recover "just compensation" not only as trespass but also as *actions derived directly from constitutional guarantees*. *See* Brauneis, *The First Constitutional Tort*, *supra*, at 109–15; *see also, e.g.*, *City of Elgin v. Eaton*, 83 Ill. 535, 536–37 (1876) ("[T]he right to recover damages was given by the constitution . . . .").

---

[12] Retrospective relief might allow Fulton full recovery here because no evidence in the record shows the possibility of return of his horses. So his retrospective loss would be their full value.

Even as some state courts conceptualized just-compensation clauses as not expressly providing a remedy, they held that the right necessarily implied the existence of a guaranteed judicial remedy allowing for recovery. *See, e.g.*, *Johnson v. City of Parkersburg*, 16 W. Va. 402, 426 (1880) ("Where the Constitution forbids a *damage* to the private property of an individual, and points out no remedy, and no statute gives a remedy, for the invasion of his right of property thus secured, the common law, which gives a remedy for every wrong, will furnish the appropriate action for the redress of his grievance.") (emphasis in original); *Householder v. City of Kansas*, 83 Mo. 488, 495 (1884) (quoting *Tapley v. Forbes*, 84 Mass. (2 Allen) 20, 24 (1861)) ("Wherever a statute or the organic law creates a right, but is silent to the remedy, the party entitled to the right 'may resort to any common law action which will afford him adequate and appropriate means of redress.'").

Federal courts, too, inferred causes of action, directly under state constitutions, against local governments for damages. *See, e.g.*, *Blanchard v. City of Kansas*, 16 F. 444, 446 (W.D. Mo. 1883) (Miller, J.) ("[S]ince the positive declaration of the constitution is that private property shall not be taken or damaged for public use without just compensation, . . . it is bound in some way to make that just compensation, and . . . the law shall compel it to do it."); *see also Sumner v. Philadelphia*, 23 F. Cas. 392 (C.C.E.D. Pa. 1873) (awarding damages for common-law taking).

We emphasize that these courts recognized actions directly under state constitutions without acknowledging that doing so

marked a fundamental change from the previous common-law actions litigants used to obtain "just compensation" in the form of damages. *See Elgin*, 83 Ill. at 536–37; *Johnson*, 16 W. Va. at 424–26; *Householder*, 83 Mo. at 495; *Blanchard*, 16 F. at 446–47.[13]  For these courts, "the limitation, turning as it did on compensation, obviously and necessarily encompassed the remedial grant . . . ." Brauneis, *The First Constitutional Tort, supra*, at 113.  And so, in effect, these courts recognized as direct actions the same damages actions that other courts earlier did as trespass actions. *See, e.g., Blanchard*, 16 F. at 447 ("[T]he other party has . . . the right that the law gave her to recover these damages in any proper form of action.").

In sum, through the nineteenth century, it became clear that state just-compensation clauses inherently contained a right to bring damages actions.[14]

---

[13] West Virginia came the closest to acknowledging an innovation.  It partially justified its decision by stating that "[a] constitutional prohibition forbidding an injury to the property of a citizen is certainly as effective as a statute framed for the same purpose . . . ." *Johnson*, 16 W. Va. at 425.  But it made this statement after a long summary describing how "the pride of the common law [was] that it furnishes a remedy for every wrong." *Id.* at 424.  So West Virginia framed its decision as a logical extension of traditional common-law practices.

[14] The Dissent chastises us for "point[ing] to *no* decision from the early republic that permitted a suit at law against the government for compensation under the Takings Clause." *See* Diss. Op. at 23–26 (emphasis in original).  It emphasizes that at the Founding, actions to recover "just compensation" proceeded in rigid common-law forms. *See id.*  But it misunderstands the key point.  True, at the Founding, litigants had to bring state actions for damages like "just compensation" in statutorily prescribed vehicles or rigid common-law forms like

And as we've mentioned, this history of a just-compensation right under state law helps explain why a direct *federal* right of action exists. That's so because despite the availability of state remedies for state and local-government takings, the Framers of the Fourteenth Amendment thought state damages actions for "just compensation" were an insufficient remedy.

So with Section One of the Fourteenth Amendment, they constitutionalized a right to bring a *federal* action against local governments. In doing so, the Framers overruled *Barron v. Baltimore*, 32 U.S. (7 Pet.) 243 (1833).

In *Barron*, the Supreme Court considered the case of a plaintiff who sought "to recover damages for injuries to [his] wharf-

---

trespass. *See* Brauneis, *The First Constitutional Tort*, *supra*, at 69–71. That was how the legal system worked back then. *See id.* But states *abolished* rigid forms of action over the mid-nineteenth to early-twentieth century. *See* Laycock, *How Remedies Became a Field*, *supra*, at 171. As part of the process, courts described the old common-law actions for "just compensation" as actions directly under state takings clauses. *See* Brauneis, *The First Constitutional Tort*, *supra*, at 109–15. But, at bottom, both the common-law and direct-takings actions were the *same kind of actions* with a shared lineage. *See id.* They both ensured that citizens could always exercise their constitutional rights to obtain "just compensation" in the courts. *Compare Bos. & R. Mill Corp.*, 19 Mass. at 43 n.2, *with Householder*, 83 Mo. at 495. Today, we have a federal right to "just compensation" against local governments that guarantees Americans may recover damages in a federal forum with jurisdiction. *See* U.S. CONST. amends. V; XIV, § 1. And we have a federal judicial system that recognizes only "one form of action—the civil action." *See* FED. R. CIV. P. 2. So we translate the language of the Founding to the modern world and recognize the Constitution provides a cause of action directly under the Takings Clause. And it may be brought in federal courts with appropriate jurisdiction.

property . . . arising from the actions" of the local government of Baltimore. 32 U.S. at 243 (syllabus). The plaintiff contended that the Takings Clause directly applied to the states. *Id.* at 247. So, he asserted, Baltimore committed "an actionable tort" by "depriv[ing] a citizen of his property, though for public uses, without indemnification . . . ." *Id.* at 245 (syllabus). The Supreme Court disagreed. It held that the Takings Clause "is intended solely as a limitation on the exercise of power by the government of the United States, and is not applicable to the legislation of the states." *Id.* at 250–51. As a result, the Court, as the ultimate federal court, determined it "ha[d] no jurisdiction of the cause . . . ." *Id.* at 251.

The Framers of the Fourteenth Amendment intended for the Amendment to overturn *Barron*. Despite extensive state-law protections for "just compensation" by the 1860s, the Framers made it clear that they wanted federal enforcement against state and local uncompensated takings to be available.

For his part, John Bingham, the author of Section One of the Fourteenth Amendment, noted that before Reconstruction, the Takings Clause was not a "limitation[] upon the States as can be enforced by Congress and *the judgment of the United States courts*." *See* Cong. Globe, 39th Cong., 2d Sess. 811 (1867) (emphasis added); *see also id.* 1st Sess. 1065 (1866) (statement of Rep. Bingham) (Section One was "proposed . . . to protect the thousands and tens of thousands and hundreds of thousands of loyal . . . citizens of the United States whose property, by State legislation, has been wrested from them under confiscation . . . ."). So he expressed the

desire for the Fourteenth Amendment to change that state of affairs. *See id.* 2d Sess. 811 (1867).

Bingham later explained that he "had read" *Barron*, which he described as a case where "the *city* had taken private property for public use, without compensation as alleged, and *there was no redress for the wrong in the Supreme Court of the United States.*" *Id.*, 42D CONG., 1st Sess. App. 84 (1871) (emphasis added). *Barron* "induced [Bingham] to attempt to impose by constitutional amendments new limitations upon the power of the States . . . ." *Id.* As Bingham saw things, when left to their own devices, the States "took property without compensation, and the [citizen] had no remedy." *Id.* at App. 85. But the Fourteenth Amendment was intended to fix that.[15]

---

[15] Bingham made these later comments in debates over the Ku Klux Klan Act of 1871, 17 Stat. 13 (1871), section one of which is now codified as 42 U.S.C. § 1983. It might be easy to construe his advocacy for § 1983, proclaiming that "[t]he people of the United States are entitled to have their rights guarantied to them by the Constitution of the United States, protected by national law," as a belief that no remedy yet secured "just compensation" in court. *See* CONG. GLOBE, 42D CONG., 1st Sess. App. 85 (1871). But Bingham clarified that while "the negative limitations imposed by the Constitution on States can be enforced by law against individuals and States," Congress can also provide for additional enforcement on top of that. *See id.* So, for example, the Thirteenth Amendment bars slavery, a prohibition that could presumably be enforced in court, even in the absence of legislation. But Congress can (and did) add an extra protection, making it a felony to enslave someone. *Id.* Bingham's fierce advocacy for the Ku Klux Klan Act can also be explained by his emphasis on the other parts of the Act beyond § 1983, on which he appeared more focused. *See id.* For example, the Act provided additional civil and criminal penalties for those who conspiratorially interfered with civil rights. Ku Klux Klan Act

Another leading Framer of the Fourteenth Amendment echoed Bingham's call for federal protections against takings. Senator Jacob Howard highlighted the need to pass the Fourteenth Amendment because "it has been repeatedly held that the restriction contained in the Constitution against the taking of private property for public use without just compensation is not a restriction upon State legislation . . . ." *Id.*, 39TH CONG., 1st Sess. 2765 (1866). Instead, "the States [were] not restrained from violating the principles embraced in [the Bill of Rights] except by their own local constitutions, which may be altered from year to year." *Id.* at 2766.

Howard and Bingham believed that state protection for the right to "just compensation" just wasn't enough. Rather, they thought, federal law needed to independently protect the just-compensation principle. And they thought so even though, as we've noted, by the late 1860s and 70s, when the Fourteenth Amendment was ratified, the law had developed under state courts to the point where a right to "just compensation" included a right to sue for damages from an uncompensated taking. So at a minimum, the

---

of 1871, §§ 2–6, 17 Stat. at 13–15. Indeed, he highlighted that some "combinations . . . destroying the property of the citizen" may be "too powerful to be overcome by judicial process . . . ." *See* CONG. GLOBE, 42D CONG., 1st Sess. App. 85 (1871). And we must also consider his comments against the background of a lack of federal-question jurisdiction for the lower federal courts until 1875, *see* Act of Mar. 3, 1875, ch. 137, § 1, 18 Stat. at 470, and the Supreme Court's failure to recognize the right to "just compensation" as applicable to the states until 1897. *See Chi., B. & Q.R. Co. v. City of Chicago,* 166 U.S. 226, 241 (1897). Faced with that judicial environment, legislation affirmatively providing a cause of action for takings likely seemed more important.

Framers of the Fourteenth Amendment understood that they were constitutionalizing a right to sue for "just compensation" against state and local governments in a federal forum.

The Dissent offers no persuasive retort to all this antebellum and Reconstruction history. *See* Diss. Op. at 25–26. Instead, it dismisses evidence from state law because, it says, "[m]any jurists viewed state constitutional declarations of rights differently than federal declarations of the same rights."[16] *See id.* at 25 (citing Jud

---

[16] Ironically, the Dissent also asserts that almost all rights in the Constitution, including the right to "just compensation," draw their meaning from pre-Ratification understandings. *See* Diss. Op. at 7. So under the Dissent's view, the Takings Clause would have to draw its meaning from its few precursors—namely the Vermont and Massachusetts constitutions. *See* Part III.D.2, *supra*. Put more generally, the *federal* right to "just compensation" would be defined with the same contours as the *state* rights to "just compensation." *Cf.* Baude, Campbell & Sachs, *General Law and the Fourteenth Amendment, supra* n.6, at 1199 & n.81, 1236 (explaining that certain rights had "determinate legal content," including the right to just compensation). As a result, whether state constitutional guarantees of "just compensation" automatically secured judicial relief for takings would be critically relevant. And Vermont's and Massachusetts's constitutions did. *See Bos. & R. Mill Corp.,* 19 Mass. at 43 n.2 ("Where it appears that a resolve of the legislature, directing the location of a road, makes no provision for a 'just compensation' to the owners of property to be taken for the purposes of the road, agreeably to the provisions of the constitution, the agents of the State in constructing the road are liable to be treated as trespassers by those whose property is so taken, or upon whose property such agents enter for locating the road. Compensation in such case should be made or provided for when the property is taken." (internal citation omitted)); *Thayer,* 36 Mass. at 515–17 (recognizing broad municipal liability for the actions of municipal officers); *Hooker,* 17 Vt. at 672 ("[I]f the sheriff [unlawfully] takes property . . . he must answer in a suit for damage . . . .").

Campbell, *Constitutional Rights Before Realism*, 2020 U. Ill. L. Rev. 1433, 1441–42); *but see* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 STAN. L. REV. 1185, 1199 & n.81, 1236 (2024) (explaining that antebellum "Americans enjoyed certain fundamental legal rights with determinate legal content—rights that 'no state could rightfully abridge,'" including the right to just compensation for takings). And it effectively dismisses the intent of the Framers of the Fourteenth Amendment as irrelevant. *See* Diss. Op. at 25–26.

*But the Takings Clause applies to local governments only through the Fourteenth Amendment.* So the original intent of Americans when they ratified that Amendment governs its meaning. *See generally* AMAR, THE BILL OF RIGHTS, *supra*. And leading up to the Civil War, Americans loudly confirmed that they believed the "just compensation" right to be judicially enforceable. They also made clear they intended the new Amendment to overturn *Barron* and make the right *federally* enforceable.[17]

_____

[17] We note that the Dissent's minimum enforcement mechanism for the Takings Clause—private bills—is an ill fit for violations by local governments. Congress isn't liable for violations by local governments, so it has no obligation to pay for them. And Congress likely can't force state legislatures to pass bills paying for takings by local governments. *See New York v. United States*, 505 U.S. 144, 179 (highlighting that "[n]o . . . constitutional provision authorizes Congress to command state legislatures to legislate"). So even if at the Founding Congress could handle takings violations through private bills, the Fourteenth Amendment demands an alternative remedy. *Cf. Fuld v. Palestine Liberation Org.*, 145 S. Ct. 2090, 2105 (2025) (recognizing a difference in the appropriate jurisdictional inquiries under the Due Process Clauses of the Fifth and

Given this robust support for the just-compensation princi-ple after the Civil War, it's no wonder that the Supreme Court rec-ognized it as the first provision of the Bill of Rights to apply to the States.  *See Chi., B. & Q.R. Co. v. City of Chicago,* 166 U.S. 226, 241 (1897).  In fact, the Court did so fifty years before Justice Hugo Black launched a conversation about whether the Fourteenth Amendment incorporated the protections of the Bill of Rights.  *See Adamson v. California*, 332 U.S. 46, 74–75 (1947) (Black, J., dissenting) (concluding the Framers of the Fourteenth Amendment intended to apply the protections of the Bill of Rights to the states).

And the Court later heard several equitable cases against lo-cal governments proceeding directly under the Takings Clause (with no reference to § 1983 or any other statutory cause of action). *See Norwood v. Baker*, 172 U.S. 269, 276 (1898); *Cuyahoga River Power Co. v. Akron*, 240 U.S. 462, 463 (1916); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926); *Del., L. & W. R. Co. v. Morristown*, 276 U.S. 182, 188 (1928); *Dohany v. Rogers*, 281 U.S. 362, 364 (1930).[18]  So once the court incorporated the right to "just compensation"

―――――――――――――

Fourteenth Amendments to "respect . . . the distinct sovereignties" the two Amendments govern).

[18] The Supreme Court observed that "the mere fact that the Takings Clause provided the substantive rule of decision for . . . equitable claims . . . does not establish that it creates a cause of action for damages, a remedy that is legal, not equitable, in nature."  *DeVillier*, 601 U.S. at 292.  So these cases aren't con-clusive on the question before us.  Still, they offer additional support that the Takings Clause directly mandates a federal remedy against local governments independent of a statutory cause of action.

against the states, it was clear that the Takings Clause included a direct federal remedy for its violation by state and local governments.

Altogether, this history establishes that from the Founding through Reconstruction, Americans believed that the just-compensation principle, when it applied, offered relief—even if at times, the provided forum was actually in Congress or before state courts in common-law actions. And that relief always included damages. The Framers of the Fourteenth Amendment then ensured a federal guarantee of the "just compensation" remedy against state and local governments. This history supports the conclusion that a federal cause of action for damages exists directly under the Takings Clause.

> 3. The direct cause of action under the Takings Clause is available here against Fulton County.

As we've discussed, the text, structure, and history of the Constitution all lead to the conclusion that the Takings Clause contains a direct cause of action. Now, we consider whether that direct cause of action is available to Fulton. We conclude that it is.

The Supreme Court's habeas jurisprudence teaches us that a substitute remedy for a constitutional remedy may suffice, if it's no narrower than the constitutional remedy. *See* Part III.D.1, *supra*. But no other remedy available to Fulton at least duplicates the scope of the just-compensation remedy under the Fifth and Fourteenth Amendments.

Congress hasn't provided for an adequate remedial system for uncompensated takings by local governments in situations like this one—leaving Fulton remediless.  Two forms of federal judicial relief might be adequate to vindicate the just-compensation right: damages actions under 42 U.S.C. § 1983 and equitable relief.  But neither completely captures the constitutional guarantee here.

We begin with § 1983.  Fulton filed under § 1983, which allows a litigant to seek damages against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. § 1983.  That allows suits against local governments to recover "just compensation."  *Knick*, 588 U.S. at 194.  But a limitation on § 1983 cases bars a class of Fifth Amendment plaintiffs.

Under *Monell v. Department of Social Services*, a local government may not be sued under § 1983 "for an injury inflicted solely by its employees or agents."  436 U.S. at 694.  Rather, suits may move forward only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.*

This limitation makes the § 1983 remedy narrower than the Takings Clause's direct cause of action in some cases, like Fulton's.  That's so because under the Takings Clause, the duty to provide "just compensation" attaches to a government when its officer acts

"within the general scope of their duties." *See Darby Dev. Co. v. United States*, 112 F.4th 1017, 1024 (Fed. Cir. 2024). And it doesn't matter whether that taking resulted directly from a "regulation (or statute, or ordinance, or miscellaneous decree)." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). So Fulton could satisfy that showing here, even though he can't establish that the County took his horses under an official policy or custom.[19]

To be sure, the lesser showing courts have required in takings cases doesn't relieve a litigant of his obligation to show that the taking is traceable to the governmental entity alleged to have committed it. And it's not enough to find simply that an officer employed by the relevant government interfered with property. *See, e.g.*, *In re Chi., Milwaukee, St. Paul & Pac. R.R. Co.*, 799 F.2d 317, 326 (7th Cir. 1986) ("Accidental, unintended injuries inflicted by governmental actors are treated as torts, not takings.").

But even so, the Supreme Court has repeatedly found the government liable for takings that occur "without express statutory authority or prohibition . . . . as a consequence of a[n] . . . officer's discharge of his normal responsibilities . . . ." *See Ramirez de Arellano v. Weinberger*, 724 F.2d 143, 151–53 (D.C. Cir. 1983) (Scalia, J.) (collecting cases), *vacated & reheard*, 745 F.2d 1500 (D.C. Cir. 1984)

---

[19] For this reason, Fulton didn't "waive" his right to "just compensation" when he conceded he could not meet *Monell*'s policy-or-custom requirement as the Dissent contends. *See* Diss. Op. at 3. The Takings Clause offers a broader protection than § 1983. The key point is the statute sets a higher bar for relief than the Constitution imposes on Fulton.

(en banc), *vacated sub nom.*, *Weinberger v. Ramirez de Arellano*, 471 U.S. 1113 (1985).[20]  So when an officer takes property within his typical responsibilities, the right to "just compensation" kicks in against his government.

*Great Falls Manufacturing Co. v. Garland* shows how this works.  124 U.S. 581 (1888).  There, the Court weighed whether a compensable taking occurred when the Secretary of War took property to construct a dam outside a surveyed area Congress authorized for takings.  *Id.* at 595–96.  Even though the Secretary's actions were not fully in accord with official policy, the Court determined that "still the United States [was] under an obligation imposed by the constitution to make just compensation for all that ha[d] been in fact taken and [was] retained for the proposed dam."  *Id.* at 596.  The Court emphasized that the Secretary "honestly and reasonably exercise[d] the discretion with which he was invested," even if he ultimately went beyond official policy.  *Id.* at 597.

Or consider *Portsmouth Harbor Land & Hotel Co. v. United States*.  260 U.S. 327 (1922).  There, the Supreme Court considered whether a plaintiff properly alleged a taking when officers manning a fort neighboring his resort property planned to repeatedly shoot cannon projectiles over that property.  *Id.* at 328–30.  The Court found the plaintiff met his burden for his case against the

---

[20] Although the en banc court vacated the panel opinion in *Ramirez de Arellano*, it "did not disagree with the panel's analysis of the authorization issue."  *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998).  On this point, then-Judge Scalia's opinion remains persuasive.

government to proceed, even though he did not allege a specific policy authorizing the firing. *See id.* at 330. It was enough that the "United States built the fort and put in the guns and the men . . . ." *Id.* But if the plaintiff had to meet § 1983's added requirement to plead an official policy or custom, his claim would have likely failed because all he could allege was that his harm stemmed from the actions of the government's agents.

*United States v. Causby* presents yet another example. 328 U.S. 256 (1946). In that case, the Supreme Court found the government on the hook for a taking when the Civil Aeronautics Authority authorized flights that passed 83 feet above the plaintiff's property. That was so even though Congress had authorized the taking of only "navigable airspace"—defined by regulation as at least 300 feet above the ground. *Id.* at 258–60, 263–64.

This requirement of "just compensation" applies just as equally to local governments as it does to the federal government. When, as in Georgia, local governments are political subdivisions of a state, *see* GA. CODE ANN. § 25-3-4 (2025), they must furnish compensation for their takings. *See Knick*, 588 U.S. at 189 ("If a local government takes private property without paying for it, that government has violated the Fifth Amendment—just as the Takings Clause says . . . ."). After all, the Takings Clause is "applicable to the States through the Fourteenth Amendment . . . ." *Cedar Point Nursery*, 594 U.S. at 147. And the Framers of the Fourteenth Amendment, as we've mentioned, specifically sought to reverse *Barron v. Baltimore*, the decision where the Supreme Court held

that, before the Fourteenth Amendment, the Takings Clause did not apply to the actions of a *city*. *See* CONG. GLOBE, 42D CONG., 1st Sess. App. 84 (1871) (statement of Rep. Bingham) (discussing how *Barron* was top of mind when drafting Section One of the Fourteenth Amendment).

So if like in *Great Falls Manufacturing Co.*, a city official exercised eminent domain outside a limited area that official policy authorized, his local government would still be liable. Or if, as in *Portsmouth*, a local police force engaged in repeated firing practice over private property, its government would be responsible. Or, as in *Causby*, if a fire department consistently flew helicopters 83 feet over an individual's property when the city council only authorized flights at a minimum altitude of 300 feet, the local government would pay the price. In all these examples, a plaintiff would be entitled to "just compensation" from his local government but would not necessarily be able to plead a § 1983 action.[21]

---

[21] The Dissent acknowledges that the federal government is liable for takings "perpetrated by its officers acting in 'the normal scope of [their] duties.'" *See* Diss. Op. at 30 (alteration in original). Yet it contends the Takings Clause offers less protection for takings that officers of local governments commit. *See id.* This position is inconsistent with its argument that the Fourteenth Amendment's protections apply identically between the federal and state governments. *See id.* at 26. And it's also odd given the well-documented focus of the Framers on overturning *Barron*, which, as we've noted, held that the Takings Clause applied to only those takings by the federal government, not the local-government defendant in that case. *See* Part III.D.2, *supra*. Bingham and Howard couldn't have been clearer that they sought to extend the federal protections of the Takings Clause to local governments. *See id.* Indeed, we doubt the action brought in *Barron* itself would have satisfied *Monell*'s policy-or-

The gap between § 1983 liability for a county's taking and a county's liability for the same taking under the Takings Clause leaves a substantial class of plaintiffs who can't recover "just compensation" under § 1983. *Compare Ramirez de Arellano*, 724 F.2d at 151 (describing takings liability as "a concept akin to, though not as liberal as, the 'scope of employment' test for application of the doctrine of *respondeat superior* in private law"), *with Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory.").[22]   As Fulton's own case shows, any time officers seize property as part of a lawful investigation but the government later fails to return it for unknown reasons, § 1983 does not afford a "just compensation" remedy. *Cf. Jenkins v. United States*, 71 F.4th 1367, 1373–74 (Fed. Cir. 2023) (recognizing "just

---

custom requirement.  *See Barron*, 32 U.S. at 243–44 (syllabus) (summarizing that the plaintiff's injuries were caused by flooding from streams of water diverted by the city "partly by adopting new grades of streets, and partly by the necessary results of paving, and partly by mounds, embankments and other artificial means" that don't appear to have resulted from an officially adopted policy or custom as *Monell* and its progeny construe the term).

[22] Amicus Institute for Justice contends that *Monell*'s policy-or-custom requirement does not apply to takings claims because "[a] just-compensation claim necessarily sounds against governmental entities."  But *Monell* expressly considered that takings actions would proceed under § 1983, yet it carved out no exception to its policy-or-custom requirement for takings violations.  *See Monell*, 436 U.S. at 686–87, 694.  Nor does anything in the text of § 1983 suggest a special carveout for takings violations.  *See* 42 U.S.C. § 1983.  And almost all constitutional rights are asserted against state action.  *See, e.g.*, U.S. CONST. amends. I; II; III; IV; V; VI; VII; VIII; XIV, § 1; XV, § 1; IX; XXIV, § 1; XXVI, § 1.

compensation" liability where officers do not return seized property at the conclusion of an investigation); *Frein v. Pa. State Police*, 47 F.4th 247, 252–53 (3d Cir. 2022) (same).

Congress can't prescribe an exclusive remedy for uncompensated takings that is more restrictive than the Takings Clause's guarantee of "just compensation."[23] Its authority to enact § 1983 comes from Section 5 of the Fourteenth Amendment, which authorizes Congress "to enforce, by appropriate legislation" the Amendment. *See Monell*, 436 U.S. at 665. But that provision gives "no power to restrict, abrogate, or dilute" the intrinsic protections of the Bill of Rights. *See Katzenbach v. Morgan*, 384 U.S. 641, 651 n.10 (1966). And the Takings Clause mandates compensation for litigants who have suffered takings by government employees acting within the normal scope of their duties, whether under official local policy or not. So some other federal mechanism must allow litigants who have suffered takings by their local government to recover "just compensation."

---

[23] We also emphasize another way § 1983 offers an incomplete remedy for takings violations: The statute does not allow suits against state governments for takings because it doesn't abrogate their sovereign immunity. *See Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 640 (11th Cir. 1992); Part III.D.4, *infra* (explaining the doctrine of sovereign immunity does not bar a direct takings action). As a statutory cause of action, a § 1983 suit could move forward against state governments only if Congress abrogated their immunity, which Congress did not. *See Quern v. Jordan*, 440 U.S. 332, 341 (1979). So there is no federal statutory damages remedy for takings by a state.

The other federal remedy that might apply is equitable relief. *See Ex Parte Young*, 209 U.S. 123 (1908). In the context of a takings claim, equitable relief would be an order enjoining the government from taking or possessing the disputed property, requiring the government to leave the property in the possession of its owner. *See First English*, 482 U.S. at 319. But the Supreme Court has already recognized that equitable relief is inadequate because it does not allow for recovery of the rental value of property that the government temporarily possesses. *See id*. Nor does it offer any remedy in a case like the one here, where the government already took property and its location is unknown—or worse, its value is destroyed. At bottom, "just compensation" is a form of "legal relief," *see City of Monterey*, 526 U.S. at 710–11, so a system for the recovery of legal relief necessarily must exist to fulfill the promise of "just compensation."

One final remedy could be sufficient under the Fifth Amendment: relief that state-law causes of action authorize. As we've mentioned, the Supreme Court has said that "constitutional concerns do not arise when property owners have other ways to seek just compensation," including state-law vehicles. *Id*. at 292. But we have no evidence, and some doubts, that all states permit actions to recover "just compensation" for *personal* property loss, like horses. *Cf. Raylu Enters., Inc. v. City of Nobesville*, 205 N.E.3d 260, 264 (Ind. Ct. App. 2023) (rejecting an argument that Indiana's inverse-condemnation actions allow for the recovery of compensation for personal property taken); *Holmes Protection of Pittsburgh, Inc. v. Port Auth. of Allegheny Cnty.*, 495 A.2d 630, 633 (Pa. Commw.

Ct. 1985) (holding that an inverse-condemnation action could not be sustained where there was a taking of personal but no real property); *Vaughn v. City of Muskogee*, 359 P.3d 192, 196 n.1 (Okla. Civ. App. 2015) (refusing to opine on whether a plaintiff can bring an inverse-condemnation action for a taking of personal property unrelated to real property); *Allianz Global Risks U.S. Ins. Co. v. State,* 161 N.H. 121, 126 (2010) (declining to address whether inverse-condemnation actions are cognizable for loss of personal property); WIS. STAT. § 32.19(3)(a) (2025) (capping compensation for losses to personal property from condemnation "at an amount equal to the reasonable expenses that would have been required to relocate such property").

In Georgia, where Fulton is, to our knowledge, the state supreme court has not ruled on the issue. *See Pribeagu v. Gwinnett County*, 785 S.E.2d 567, 571 (Ga. Ct. App. 2016). And it wasn't until 2016 that a single panel of the intermediate appellate court in the state, *reversing a lower court on the issue*, found personal property damage recoverable in an inverse condemnation action.[24] *Id.* That doesn't offer assurances that all inverse-condemnation actions allow recovery of personal property.

---

[24] We do note, however, that other panels seemed to take it for granted that compensation could be awarded for personal property takings. *See, e.g., Howard v. Gourmet Concepts Intern, Inc.*, 529 S.E.2d 406, 410 (Ga. Ct. App. 2000) ("Personal injury, however, for purposes of inverse condemnation does not constitute personal property that can be taken."); *Rutherford v. DeKalb County*, 651 S.E.2d 771, 774 (Ga. Ct. App. 2007) (same).

Plus, we've noted that Georgia requires "[a]ll claims against counties [to] be presented within 12 months after they accrue or become payable or the same are barred . . . ." GA. CODE ANN. § 36-11-1 (2025).  And it's too late now for Fulton to comply with that requirement.  But a direct action under the Takings Clause includes no such limitation.  So Georgia's state remedy is narrower than the direct cause of action under the Takings Clause.[25]

---

[25] The Dissent takes issue with our observation that Georgia's notice requirement makes the state's inverse-condemnation action narrower than the Takings Clause directly provides.  *See* Diss. Op. at 33.  It warns that our logic demands that any procedural constraint on a constitutional action unconstitutionally narrows it.  *Id.*  But the Dissent misconstrues our point.  The problem is that Georgia, a *state*, unilaterally imposed this requirement on a remedy that the federal Constitution guarantees.  *See Knick*, 588 U.S. at 194 (rejecting that a Fifth Amendment claim could be contingent on plaintiffs pursuing state procedures).  We agree with the Dissent that *Congress* may impose reasonable procedural rules on the adjudication of takings claims to ensure the efficient administration of justice.  *See* Diss. Op. at 32–33.  We see a problem only if Congress attempts to add a substantive constraint on the scope of the Takings Clause, wholesale barring a class of litigants entitled to relief.  That's the result under § 1983 claims against local governments, as *Monell* construes the statute.  We similarly would take issue if Congress were to adopt a procedural rule so unreasonably restrictive as to unfairly prevent takings claimants from having their day in court.  *See* U.S. CONST. amend. XIV, § 5 (authorizing Congress "to enforce, *by appropriate* legislation" the protections of the Fourteenth Amendment, which include the incorporated Takings Clause (emphasis added)).  But we think the Constitution permits Congress, for example, to set a reasonable statute of limitations for takings claims with its authority "to enforce" the Fourteenth Amendment.  *See id.*  And nobody is suggesting that the Federal Rules of Civil Procedure don't apply to takings claims.  Similarly, state courts have no obligation to dispense with their regular procedural rules when adjudicating takings claims.  *See DeVillier*, 601 U.S. at 292.  But they can't be the

At bottom, "[t]he availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim . . . ." *Knick*, 588 U.S. at 191. We reiterate "[t]he fact that the State has provided a property owner with a procedure that may subsequently result in just compensation cannot deprive the owner of his Fifth Amendment right to compensation under the Constitution, leaving only the state law right." *Id.* A federal right guarantees a federal remedy not dependent on the whims of states.

The Dissent suggests one other remedy that it claims Fulton could have availed himself of: suits against the officers who conducted the takings under § 1983 or state law. Diss. Op. at 3–6, 32. But even the Dissent recognizes why that doesn't offer Fulton relief—officers receive qualified immunity under federal law and

---

*exclusive* forum for this constitutional remedy if they have procedures that narrow the availability of that remedy without any congressional blessing. *Cf. id.* at 293 (remanding only because petitioner had a cause of action under state law, and the state promised not to oppose amendment of his complaint to pursue it); *Knick*, 588 U.S. at 194. That's because the Takings Clause promises a federal remedy independent of the whims of states. *See Knick*, 588 U.S. at 194; Part III.D.1 & 2, *supra*. And only Congress can impose ultimate procedural bars because the Fourteenth Amendment charges Congress specifically with its enforcement. *See* U.S. CONST. amend. XIV, § 5. But, here, because of *Monell*, the only time Fulton could have conceivably sought relief in any court would have been in state court within the one-year deadline Georgia alone set. GA. CODE ANN. § 36-11-1 (2025). So Georgia, as the exclusive forum, has unilaterally and unconstitutionally imposed a procedural bar on Fulton's takings claim—assuming Fulton could have ever sought relief in Georgia courts, which remains unclear. *Cf. Pribeagu*, 785 S.E.2d at 571.

official immunity under Georgia law.  *See id.* at 5–6 (citing *Griffith v. Robinson*, 884 S.E.2d 532, 534–35 (Ga. Ct. App. 2023) and then citing *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002)).  The parties have not presented, and we are not aware of, any clearly established law in this circuit to overcome qualified immunity in a § 1983 action against the relevant officers that took Fulton's horses.  *Cf. Gilmore v. Ga. Dep't of Corr.*, No. 23–10343, 2025 WL 1911728, at *8 (11th Cir. July 11, 2025) (en banc) (articulating the standard for overcoming qualified immunity under our precedents.).  But the Takings Clause demands the provision of "just compensation" regardless of any officer immunity.  *See* U.S. CONST. amend. V.  Plus, just as fundamentally, once an officer commits a taking, it's his government, not necessarily the officer himself, that the Constitution puts on the hook for that compensation.  *See Knick*, 588 U.S. at 189 ("If a local government takes private property without paying for it, that government has violated the Fifth Amendment . . . .").

At the end of the day, both we and the Dissent agree that Fulton currently has access to neither federal nor state relief.  *Monell* categorically bars him from ever suing his local government in federal court for the compensation it owes him.  And Georgia law does not allow him to seek compensation in its courts today.  But unlike the Dissent, we don't think the Constitution authorizes the conclusion that he must go remediless.  The Constitution doesn't promise "just compensation" only to allow a local government's whim not to provide it.

Because no other constitutionally adequate remedy for takings of personal property by local governments exists here, we hold that the Takings Clause directly provides for judicial relief.

### 4. Sovereign immunity does not bar a direct cause of action under the Takings Clause.

The Dissent disagrees with our textual, structural, and historical analysis. Besides concluding that the Takings Clause's guaranteed damages remedy doesn't give a litigant the right to sue for damages, it argues that sovereign immunity bars a direct takings cause of action. Diss. Op. at 15–19. We agree that it would be odd for the Constitution to provide an outside check on Congress only to require Congress to waive its sovereign immunity to enforce that limitation. But we disagree that sovereign immunity has relevance here. Unlike the Dissent, we think the Takings Clause has bite.

To start, sovereign immunity can't undermine a cause of action that the Constitution expressly makes a right. *See PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 508 (2021) ("[A] State may be sued if it has agreed to suit in the 'plan of the Convention,' which is shorthand for 'the structure of the original Constitution itself.'" (citation omitted)). That's why the Supreme Court has been clear that when "there [is] no remedy by which [a] plaintiff could have recovered compensation for [a] taking . . . ," he may at least sue to recover his taken property under a "constitutional exception to the doctrine of sovereign immunity . . . ." *Malone v. Bowdoin*, 369 U.S. 643, 647–48 (1962) (quoting *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 696–97 (1949)) (internal

quotation marks omitted); *see also First English*, 482 U.S. at 316 n.9 (rejecting arguments that "principles of sovereign immunity" prevent recognition that the Fifth Amendment is a "remedial provision"); *Lee*, 106 U.S. at 221 (asserting if the government can defeat a takings claim by invoking sovereign immunity "it sanctions a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights").

After all, sovereign immunity cannot defeat the other textually guaranteed remedy in the Constitution: the writ of habeas corpus. *See* U.S. CONST. art. I, § 9, cl. 2; *Lee*, 106 U.S. at 218, 220 (comparing the power to issue a writ of habeas corpus to judicially enforcing the Takings Clause). Otherwise, the government could detain an individual without ever being required to undergo judicial review, and the writ of habeas corpus would be effectively suspended in violation of the Constitution. *See* U.S. CONST. art. I, § 9, cl. 2; *Lee*, 106 U.S. at 220.

It's true, as the Dissent points out, *see* Diss. Op. at 18, that a takings suit *brought under §1983* is subject to a sovereign-immunity defense. *See Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 640 (11th Cir. 1992). But that's because § 1983 is a statutory cause of action. And a statutory cause of action abrogates a state government's immunity only if Congress intended it to, which Congress did not. *See Quern v. Jordan*, 440 U.S. 332, 341 (1979). But the Dissent offers no binding authority that a cause of action *directly from the Constitution* can be restricted by sovereign immunity. If sovereign

immunity applied to a constitutional cause of action, that constitutional cause of action would offer no protection against a fickle legislature.

And even if we were to agree with the Dissent that sovereign immunity generally bars takings causes of action—as should be clear by now, we don't—immunity has no place here. Fulton seeks to sue a local government. And "[u]nder the traditional Eleventh Amendment paradigm . . . . counties and similar municipal corporations are not" entitled to sovereign immunity. *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 601 (11th Cir. 2014). So Fulton County has no sovereign immunity, and the doctrine poses no bar to relief in this suit.

At the end of the day, we read the words of the Takings Clause to mean what they say. When a government takes private property, it's on the hook for "just compensation." We find common ground with the Dissent by heeding the words of Chief Justice Marshall: "[W]e must never forget, that it is a *constitution* we are expounding." Diss. Op. at 19 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819)). As Marshall explained, we must give "a fair construction of the whole instrument." *McCulloch*, 17 U.S. at 406. And a "fair construction" recognizes that when the Constitution grants an express right to damages, the American people have a right to recover them.

5.  The Takings Clause's cause of action stands independent of "implied" *Bivens* actions.

One final note:  some, including the Dissent, have suggested that a direct cause of action under the Takings Clause would run into the headwinds of the Supreme Court's *Bivens* jurisprudence. *See, e.g.*, *DeVillier*, 63 F.4th at 420 (Higginson, J., concurring in denial of rehearing en banc); Diss. Op. at 8–10.  They note that the practice of "implying constitutional causes of action" against federal officials, which began with *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), is "a disfavored judicial activity."  *DeVillier*, 63 F.4th at 420 (Higginson, J., concurring in denial of rehearing en banc) (quoting *Egbert v. Boule*, 596 U.S. 482, 491 (2022)).  But most respectfully, we think closer scrutiny reveals that the Court's *Bivens* guidance is of no relevance to this case.

We are, of course, aware that the Supreme Court, in dicta, has pointed out that "there is no express cause of action under the Takings Clause . . . ."  *Me. Cmty. Health Options,* 590 U.S. 296, 323 n.12 (2020).  But the Supreme Court has been equally clear that its "precedents do not cleanly answer the question whether a plaintiff has a cause of action arising directly under the Takings Clause." *DeVillier*, 601 U.S. at 292.

And the Court has also recognized that plaintiffs may sue to acquire "just compensation" from the federal government under the Tucker Act.  *See Me. Cmty. Health Options,* 590 U.S. at 323 n.12. That's so, even though the Tucker Act "does not create substantive rights."  *Id.* at 322 (citation and internal quotation marks omitted).

Instead, "[a] plaintiff relying on the Tucker Act must premise her damages action on other sources of law . . . ." *Id.* (citation and internal quotation marks omitted). Those sources can be constitutional obligations because the act permits the Court of Federal Claims to hear "claim[s] against the United States founded . . . upon the Constitution . . . ." 28 U.S.C. § 1491(a)(1). In essence, "[t]he Tucker Act . . . is itself only a jurisdictional statute . . . ." *United States v. Testan*, 424 U.S. 392, 398 (1976). So claims under the Tucker Act proceed with the Takings Clause directly supplying the cause of action against federal officials. The Tucker Act gives the Court of Federal Claims the right to put on the show, but it doesn't grant litigants a ticket.

Yet at the very same time that the Supreme Court has acknowledged the viability of takings claims under the Tucker Act, it has found only three causes of actions under *Bivens*. *See Egbert*, 596 U.S. at 490–91 (describing how the Court has only recognized *Bivens* actions under the Fourth Amendment for excessive force by federal agents, under the Fifth Amendment for workplace discrimination against federal employees, and under the Eighth Amendment for inadequate care to federal prisoners). But it has not listed the just-compensation cause of action as one of them.[26] *See id.*

---

[26] Even if we were to conceptualize a Tucker Act takings action as a *Bivens* action, it's not clear what relevance the *Bivens* framework has for recognizing a constitutional cause of action against a local government. Every *Bivens* case the Court has considered has been against the federal government. *See Egbert*, 596 U.S. at 486, 490–91 (collecting cases). The rights implicated are directly in the Founding's Bill of Rights, not incorporated through the Fourteenth

We think that shows that the Takings Clause cause of action stands independent of *Bivens*. So for example, it is irrelevant that the Court has instructed that "a court may not fashion a *Bivens* remedy if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure." *Id.* at 493 (internal quotation marks and citation omitted).

The Takings Clause's independence from *Bivens* makes sense. "The cause of action for takings claims pre-dated *Bivens* by over a hundred years . . . . It therefore cannot be dismissed as 'judicial genesis' of the same sort that begat *Bivens*." *DeVillier*, 63 F.4th at 440 (Oldham, J., dissenting from denial of rehearing en banc); *see also O'Connor v. Eubanks*, 83 F.4th 1018, 1029 (Thapar, J., concurring) ("Perhaps our circuit should also allow suits against officials directly under the Takings Clause. There's some historical support for this approach . . . . The right to just compensation shouldn't depend on any statute—the Constitution requires it."). We "create" nothing by recognizing it. *See Egbert*, 596 U.S. at 490 (describing *Bivens* as "creat[ing] a cause of action" (internal quotation marks and citation omitted)). We instead have read text that mandates monetary damages and reviewed a history supporting a guaranteed right to sue. And because the Court has already recognized a direct cause of action against federal officials inherent in the Takings Clause, its

---

Amendment birthed during a separate historical period. *See id.* These differences may alter the appropriate test to assess claims raised against local governments. And in any case, as we've explained, Congress cannot narrow the scope of the expressly guaranteed "just compensation" remedy through legislation.

own precedents suggest it must extend that protection against state and local governments. *Cf. Timbs v. Indiana*, 586 U.S. 146, 154 (2019) ("[W]hen a Bill of Rights protection is incorporated, the protection applies identically to both the Federal Government and the States." (internal quotation marks and citation omitted)).

We further recognize the limited practical effect of our decision today. Litigants are still likely to proceed under § 1983 where it is available because it authorizes consequential damages and attorney's fees. *See City of Monterey*, 526 U.S. at 749 n.10 (Souter, J., concurring in part & dissenting in part) ("Respondents in this [§ 1983] case sought damages for the fair market value of the property, interim damages for a temporary taking, holding costs, interest, attorney's fees, costs, and other consequential damages."); 42 U.S.C. § 1988(b) (authorizing the award of attorney's fees in § 1983 suits). Only plaintiffs who don't already have a recognized cause of action are likely to sue directly under the Takings Clause without access to these additional damages.

Still, the Founders included the "just compensation" remedy as one of only two remedies the Constitution expressly identifies. And they meant for those remedies to be meaningful and accessible—regardless of legislative action or inaction. So today we pay heed to the text, structure, and history of the Fifth and Fourteenth Amendments and of the Constitution more broadly and recognize a direct cause of action under the Takings Clause.

## IV. CONCLUSION

Fulton is not trying to receive relief from a past injury. He alleges that Fulton County, to this day, is violating his constitutional rights. That's because, under his allegations, the County took his property and ever since has had an active obligation under the Fifth Amendment to pay him "just compensation." We don't think the Constitution's promise of "just compensation" is an empty promise. It doesn't taunt the American public like the Greek gods did Tantalus. So Fulton can bring an action directly under the Takings Clause. And because he may do so, amendment of his complaint is not futile. For these reasons, we vacate the district court's order and remand for further proceedings consistent with this opinion.

**VACATED and REMANDED.**

WILLIAM PRYOR, Chief Judge, dissenting:

In the more than 230 years since the Bill of Rights was ratified, neither the Supreme Court nor this Court nor our predecessor circuit has ever held that the Takings Clause of the Fifth Amendment creates an implied right of action for damages against a government—federal, state, or local—and for good reason. The text and history of the Clause, the structure of the Constitution, and Supreme Court precedent make clear that we should not imply a right of action. But the majority ignores that history, usurps the role of Congress, and invents a right of action directly under the Constitution against a county even though property owners today have more ways to vindicate their constitutional right to just compensation than ever before. These ample alternatives undermine any need to imply a constitutional right of action, yet the majority "overhaul[s] constitutional doctrine" by ignoring them. Ann Woolhandler, Julia D. Mahoney & Michael G. Collins, *Takings and Implied Causes of Action*, 2023–2024 CATO SUP. CT. REV. 249, 250 (2024). I would instead follow the Supreme Court's lead in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019), and *DeVillier v. Texas*, 144 S. Ct. 938 (2024), and hold that the statutory action for federal civil-rights violations, 42 U.S.C. § 1983, and state law provide adequate remedies for takings by local governments. Because Fulton failed to pursue his many federal and state remedies against proper parties in a timely manner and because we have no business creating a constitutional remedy for him, I respectfully dissent.

## I. BACKGROUND

Although the majority describes the basic facts of this appeal well enough, it fails to explain the many paths Brandon Fulton *did not* take to vindicate his takings claim. Instead, it assumes that because "Fulton seeks a plan B" to vindicate his constitutional right to just compensation, we must create one for him. Majority Op. at 3. But, as the history of this litigation and the litany of remedies available establish, the many alternative paths that Fulton could have taken obviate any need to create a new remedy for him.

Fulton County Animal Services officers arrested Fulton for felony cruelty to animals and seized seven of his horses on April 22, 2017. On April 5, 2018, Georgia dismissed the felony charges against Fulton, but County officers did not return his horses or their equivalent value. Fulton then waited over two years to bring claims under section 1983 against the Fulton County Board of Commissioners; Paul L. Howard, Jr., the former District Attorney for Fulton County; and Rebecca Guinn, the CEO of Lifeline Animal Project, Inc., the "managing organization" of Fulton County Animal Services. 42 U.S.C. § 1983. Fulton then voluntarily dismissed his claim against Guinn under Federal Rule of Civil Procedure 41(a)(1)(A)(ii). That voluntary dismissal was Fulton's first waiver of a potential remedy. The district court also dismissed the claim against Howard.

The Board also moved to dismiss Fulton's complaint on the grounds that it was untimely, that the Board was not an entity capable of being sued, and that Fulton had failed to allege municipal

liability. Fulton responded by moving to amend his complaint by swapping the Board for Fulton County. He also sought leave to add an alternative claim against the County for an uncompensated taking based on the Fifth Amendment. The district court granted the Board's motion to dismiss and denied Fulton's motion to amend as futile. The district court reasoned that both a claim against the County under section 1983 and a direct claim under the Takings Clause would fail because Fulton pleaded no "official policy or practice," *see Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690–91 (1978), so neither amendment would save Fulton's complaint. And the original section 1983 claim against the Board failed for the same "municipal liability deficiencies."

Fulton appeals *only* the denial of his motion for leave to amend. He concedes that the district court "was right that *Monell* . . . bars [his] Takings Clause claim raised through [section] 1983 against Fulton County." So Fulton admits that he cannot allege that a policy or custom of the County caused his deprivation. That concession bars our review of the dismissal of his section 1983 claim against the County—Fulton's second road-not-taken to remedy his alleged taking. Yet the majority permits Fulton to sue the County directly under the Takings Clause without having to prove that any County policy or custom caused his alleged deprivation.

Fulton also could have availed himself of several other remedies. Under section 1983, he could have sued the officers and any other persons acting under color of law who seized his horses. *See Hudson v. Palmer*, 468 U.S. 517, 537–39 (1984) (O'Connor, J.,

concurring) (explaining that although "the Fourth Amendment does not protect a prisoner against indefinite dispossession[,] . . . [t]he Due Process and Takings Clauses of the Fifth and Fourteenth Amendments stand directly in opposition to state action intended to deprive people of their legally protected property interests"). Under Georgia law, Fulton also could have sued those individuals for conversion to obtain damages and detinue or replevin to obtain possession of his horses. *See* GA. CODE ANN. § 51-10-1; *Mims v. Exclusive Ass'n Mgmt., Inc.*, 906 S.E.2d 799, 802 (Ga. Ct. App. 2024) (explaining that the statute "embodies the common law action of trover and conversion"); *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 583 S.E.2d 6, 7 (Ga. 2003) ("Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another . . . [or] an act of dominion over the personal property of another inconsistent with his rights." (citation and internal quotation marks omitted)); *Md. Cas. Ins. Co. v. Welchel*, 356 S.E.2d 877, 879 (Ga. 1987) ("Trover in Georgia embraces the common-law actions of trover, detinue, and replevin. . . . [R]eplevin was an action to recover specific chattels unlawfully taken and wrongfully withheld; while the action of detinue was allowable to recover specific chattels wrongfully retained, though lawfully acquired." (alteration adopted) (citation and internal quotation marks omitted)); *Fla. State Hosp. for the Insane v. Durham Iron Co.*, 21 S.E.2d 216, 218 (Ga. 1942) (stating that individual-capacity tort suits are "generally maintainable" under Georgia law, including suits "to recover property wrongfully withheld from the true owner, or to recover damages . . . in tort for an injury to person or

property"). And under Georgia law, he could have sued the County for inverse condemnation. *See Bowers v. Fulton County*, 146 S.E.2d 884, 889–90 (Ga. 1966) (concluding that the Georgia Constitution forbids the uncompensated "taking or damaging . . . of any species of property," including "things real and personal owned"); *Duffield v. DeKalb County*, 249 S.E.2d 235, 237 (Ga. 1978) ("[A] county is liable for inverse condemnation of property under [the Georgia] Constitution."); *see also Pribeagu v. Gwinnett County*, 785 S.E.2d 567, 570–71 (Ga. Ct. App. 2016) (holding that an inverse-condemnation action for damage to personal property was cognizable).

The majority's assertion that "Congress has not provided [Fulton] with a cause of action to secure 'just compensation' in federal court" is absurd. Majority Op. at 3. Fulton had access to both federal and state courts to seek just compensation and more. An action under section 1983 can be filed in either federal or state court, and the district court would have supplemental jurisdiction over any claim under state law that forms part of the "same case or controversy." 28 U.S.C. § 1367(a). Had he succeeded in securing relief under section 1983, Fulton also could have recovered attorney's fees. *See* 42 U.S.C. § 1988(b). Whether any of Fulton's hypothetical claims might have succeeded is beyond the scope of this appeal. For example, we have no occasion to consider whether a claim against an individual officer could overcome official or qualified immunity. *See Griffith v. Robinson*, 884 S.E.2d 532, 534–35 (Ga. Ct. App. 2023) (discussing state official immunity); *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (discussing qualified immunity). But one

thing is clear: Fulton had *many* remedies, federal and state, to vindicate his takings claim.

## II. DISCUSSION

To explain the majority's errors, I divide my discussion in three parts. First, I explain why neither the text nor structure of the Constitution supports the creation of an implied right of action under the Takings Clause. Second, I explain how our constitutional history also leads to that conclusion. Third, I explain that section 1983 and Georgia law provide Fulton adequate remedies that counsel against our creation of an implied right of action.

### A. *Neither the Constitutinal Text nor Structure Supports Creating an Implied Right of Action under the Takings Clause.*

The text of the Takings Clause provides in its entirety, "nor shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. "[T]his provision does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987). If a government "pa[ys] for the property . . . no constitutional injury" will arise "from the taking alone." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999). In other words, the text of the Takings Clause imposes an *obligation* on the government to provide payment for any property it takes. The enforcement of that obligation is another matter.

To be sure, "in the event of a taking, the compensation remedy is required by the Constitution." *First English*, 482 U.S. at 316.

22-12041          WILLIAM PRYOR, C.J., dissenting          7

But as the Supreme Court acknowledged in *Maine Community Health Options v. United States*, the text of the Takings Clause does not provide an express cause of action to vindicate that right. 140 S. Ct. 1308, 1328 n.12 (2020). So "any cause of action in the Takings Clause . . . if it exists, is implied." *DeVillier v. Texas*, 63 F.4th 416, 420 (5th Cir. 2023) (Higginson, J., concurring in the denial of rehearing en banc). The Supreme Court has explained that "just compensation is, like ordinary money damages, a compensatory remedy . . . traditionally associated with legal relief." *Del Monte Dunes*, 526 U.S. at 710–11 (citation and internal quotation marks omitted). But *recognition* of a compensatory remedy does not necessarily mean that the Constitution directly *supplies* a cause of action to pursue the remedy. *Cf.* Jud Campbell, *Determining Rights*, 138 HARV. L. REV. 921, 923, 981 (2025) (explaining that "some rights were determined . . . by common law" and "enumerating rights in constitutional text did not automatically transform them into determinate legal objects"). Even where the Constitution enumerates "legally determinate rights"—rights whose contours were well-defined when they were enumerated—it enshrined and clarified "the content of *existing* rights" and "rarely *created* rights out of whole cloth." *Id.* at 944, 974 n.370 (emphasis added); *cf.* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 STAN. L. REV. 1185, 1191 (2024) (making a similar argument that Section One of the Fourteenth Amendment "*secured* but did not *confer*" rights).

 "Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts."

*DeVillier*, 144 S. Ct. at 943 (citing *Egbert v. Boule*, 142 S. Ct. 1793, 1802–03 (2022)). Instead, rights-holders rely on common-law remedies and statutory causes of action to supply the procedural vehicles to enforce their rights. *See, e.g.*, *Del Monte Dunes*, 526 U.S. at 710 (explaining that "in a strict sense" the section 1983 suit was not a suit for "just compensation *per se* but rather damages for the unconstitutional denial of such compensation"); *First English*, 482 U.S. at 308 (explaining that plaintiffs sued under a California statute and in inverse condemnation and tort). That the Takings Clause guarantees a substantive right to monetary compensation does not mean that it also creates a procedural vehicle to vindicate that right. *Cf. DeVillier*, 144 S. Ct. at 943 ("Texas does not dispute the nature of the substantive right to just compensation[,] . . . only . . . the procedural vehicle by which a property owner may seek to vindicate that right."); *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("[S]ome remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create *substantive* private rights." (emphasis added)).

"[I]n all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Egbert*, 142 S. Ct. at 1800. The Supreme Court, in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, "held that it had authority to create 'a cause of action under the Fourth Amendment.'" *Id.* at 1802 (quoting 403 U.S. 388, 397 (1971)). But since then, the judicial creativity used to imply causes of action has fallen out of favor. *See id.*; *Hernández v. Mesa*, 140 S. Ct. 735, 742–43 (2020). Today, "[i]n both statutory and constitutional cases, our watchword is caution."

*Hernández*, 140 S. Ct. at 742. The Court has explained that it has "come 'to appreciate more fully the tension between' judicially created causes of action and 'the Constitution's separation of legislative and judicial power.'" *Egbert*, 142 S. Ct. at 1802 (quoting *Hernández*, 140 S. Ct. at 741–42). As a result, it has declared that "creating a cause of action is a legislative endeavor." *Id.* And we have gotten the message, *Johnson v. Terry*, 119 F.4th 840, 847–52 (11th Cir. 2024) (describing precedents "drastically restrict[ing]" *Bivens*'s "reach")—until today.

The majority contends that the *Bivens* precedents do not bear on the question before us because the Takings Clause is somehow different from other provisions of the Bill of Rights. Majority Op. at 69–72. But the admonition to adhere closely to the text of the Constitution in respect of the separation of powers should give us pause before we construe the Fifth Amendment to create an implied right of action. A constitutional reference to a remedy, without more, does not mean that the Constitution creates a right of action for that remedy.

Keep in mind too that the short-lived experiment of *Bivens* remedies—which the Supreme Court later came to regret, *see Hernández*, 140 S. Ct. at 742–43 ("[I]f the Court's three *Bivens* cases had been decided today, it is doubtful that we would have reached the same result." (alterations adopted) (citation and internal quotation marks omitted)); *Goldey v. Fields*, No. 24-809, slip op. at 3 (U.S. June 30, 2025) ("For the past 45 years, this Court has consistently declined to extend *Bivens* to new contexts. We do the same here."

(citation omitted))—involved civil-rights violations committed by federal, *not* state, officers. *See* 403 U.S at 395. The *Bivens* Court created a damages remedy for federal violations because Congress had not done so. *Id.* at 397. In his dissenting opinion, Justice Black argued that the power to create that remedy belonged to Congress, not the Court, *id.* at 427–28 (Black, J., dissenting), and that section 1983 could serve as "a model" for future legislation should Congress choose to exercise its power, *id.* at 429. Yet, the majority here invents a remedy, under the Fifth Amendment, against a local government even though Congress created a remedy, under section 1983, more than 150 years ago, that remains available to property owners today.

Contrary to the majority's confusion, Majority Op. at 19–20, Supreme Court precedents that describe the Takings Clause as "self-executing" do not suggest that the Clause creates an implied right of action. In *Jacobs v. United States*, for example, the Supreme Court explained that a suit for just compensation under the Tucker Act vindicates a "right to recover . . . guaranteed by the Constitution." 290 U.S. 13, 16 (1933). *Jacobs* considered whether suits under the Tucker Act for just compensation proceeded under a theory of implied contract—where interest would not be allowed—or "rested upon the Fifth Amendment"—where interest would be. *Id.* Because the Tucker Act suits "were based on the right to recover just compensation for property taken by the United States for public use," it did not matter that the United States had not initiated condemnation proceedings in which the plaintiff challenged the taking. *Id.* "The form of the remedy did not qualify the right." *Id.*

The United States had to pay for the taking, including interest, even without an *additional* promise to pay. *Id.* So the Court held that the Fifth Amendment required no further action to impose an obligation on the government. *Id.* The Takings Clause imposed a "self-executing" obligation. *See Self-Executing*, Black's Law Dictionary (12th ed. 2024). Yet the Tucker Act waived sovereign immunity and gave federal courts jurisdiction over an action to enforce that obligation, so the Act, not the Fifth Amendment, supplied the procedural vehicle to enforce the self-executing constitutional right. *Jacobs*, 290 U.S. at 15 (stating that petitioners sued "under the Tucker Act").

In *First English*, the Supreme Court held that a property owner in a *state* judicial proceeding was entitled to pursue compensation for an alleged "temporary" regulatory taking. 482 U.S. at 308, 310 (internal quotation marks omitted). The Court held that, due to the "self-executing character" of the Takings Clause, the property owner was entitled to seek compensation even if the property was no longer burdened by the regulation. *Id.* at 315–19, 322 (citation and internal quotation marks omitted). Compensation was owed when the property was taken. *Id.* at 319, 321. And invalidating the regulation would not provide compensation for any interim violation. *Id.* at 321. But the Court did *not* hold or even hint that the property owner had an implied right of action under the Takings Clause for any temporary taking. The property owner instead proceeded by inverse condemnation under California law and sought relief in tort and under a provision of the California Code. *Id.* at 308.

In *Knick*, a property owner sued a municipality for violating the Takings Clause. 139 S. Ct. at 2168. The Court described how section 1983 also allows property owners to enforce the "self-executing" Takings Clause against state officials in federal court: "[a] property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Id.* at 2167. When the taking occurs, the owner's constitutional right has been violated, and he may use whatever cause of action Congress has provided to vindicate that right. *See id.* at 2168 ("[W]hen the government takes his property without just compensation, [the plaintiff] may bring his claim in federal court under [section] 1983 at that time."). The Court explained that "the existence of the Fifth Amendment right . . . allows the owner to proceed directly to federal court under [section] 1983." *Id.* at 2171. *Knick* held that "because the violation is complete at the time of the taking, pursuit of a remedy in federal court need not await any subsequent state action. Takings claims against local governments should be handled the same as other claims under the Bill of Rights." *Id.* at 2177. But the Court again did not hold or even suggest that the Constitution creates an implied right of action.

None of these decisions held that the "self-executing character" of the Takings Clause creates a right of action. Instead, each precedent makes clear that "self-executing" means only that violations of the Takings Clause occur as soon as the government fails to comply with its obligation of just compensation and that just compensation is the remedy, regardless of the method of its vindication. And the precedents contemplate three procedural vehicles

through which a property owner can vindicate his right to compensation: the Tucker Act, state-law actions, and section 1983.

Indeed, the Supreme Court recently clarified in *DeVillier* that repeated acknowledgments of the Takings Clause's "self-executing character . . . do not cleanly answer the question whether a plaintiff has a cause of action arising directly under the Takings Clause." 144 S. Ct. at 943–44 (citation and internal quotation marks omitted). The Court acknowledged "[i]nstead, constitutional rights are generally invoked defensively in cases arising under other sources of law, or asserted offensively pursuant to an independent cause of action designed for that purpose, see, *e.g.*, 42 U.S.C. § 1983." *Id.* at 943. That is, the constitutional right is self-executing even if the method for remedying its violation is not.

The majority frames the Takings Clause as "a constitutional unicorn," unique in its "damages-type remedy" and "'self-executing'" nature. Majority Op. at 20–21. But there is scarce evidence that a "constitutional unicorn" exists. And it would be odd for us to construe the Takings Clause as so different from its sister provisions as to provide an implied right of action. This unicorn, like others, is a myth.

Notwithstanding the majority's suggestion to the contrary, *see* Majority Op. at 2, 21–25, even the Suspension Clause, the only other explicit reference to a remedy in the Constitution, *see* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 330 (7th ed. 2015), does not *create* a right of action. Instead, it secures the preexisting writ

of *habeas corpus*—a creature of common law that predates and exists independent of the Constitution, *see id.* at 1193 & n.1 (citing 3 WILLIAM BLACKSTONE, COMMENTARIES \*129–32); *see also Boumediene v. Bush*, 553 U.S. 723, 739–42 (2008) (explaining that the writ developed in English common-law courts before Parliament passed the Habeas Corpus Act of 1679 to "establish[] procedures for issuing the writ")—from legislative suspension, *Boumediene*, 553 U.S. at 745. But it does not extend the writ "beyond its scope 'when the Constitution was drafted and ratified.'" *Jones v. Hendrix*, 143 S. Ct. 1857, 1871 (2023) (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1963 (2020)). Because the Founding generation understood that the Constitution did *not* create that remedy for unlawful detention, the First Congress promptly granted federal courts the power to issue writs of habeas corpus in section 14 of the Judiciary Act of 1789. Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 73, 81–82. Although this grant of jurisdiction *also* did not create the writ of *habeas corpus* (it already existed), that Congress empowered inferior federal courts to grant the writ underscores that it did not understand the Constitution to create a new remedy.

The Takings Clause is similar. The Clause conditions the taking of property on compensation for it. It does not *create* a right to sue. Instead, it guarantees the substantive right of compensation that is enforced in a separate form of action, like inverse condemnation, ejectment, or trespass: *if* the government takes property, it *will* provide just compensation, and should it fail to do so, the property owner may use existing forms of action to recover his property or its value. *See* Campbell, *Determining Rights*, *supra*, at 943–44

22-12041        WILLIAM PRYOR, C.J., dissenting        15

(explaining that even "[s]pecificatory enumerations" of rights "usually clarified the content of *existing* rights that were otherwise grounded in natural law or custom").

Construing the Takings Clause to create an implied right of action would offend the structural premise of sovereign immunity. The Framers understood that the very "nature of sovereignty" meant that the United States, though bound by the Constitution, would "not . . . be amenable to the suit of an individual *without its consent*." THE FEDERALIST No. 81, at 486 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *accord* FALLON ET AL., HART AND WECHSLER, *supra*, at 877–78; *see also United States v. Bormes*, 568 U.S. 6, 9–10 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is unequivocally expressed." (citation and internal quotation marks omitted)). Throughout the nineteenth century, this understanding required the pursuit of takings claims through officer suits, tort actions, and private bills. *See, e.g.*, *United States v. Lee*, 106 U.S. 196, 206–08, 219–23 (1882) (holding that although the United States could not be sued, the property owners could sue for ejectment of federal officers). True, a cause of action might exist even if barred by sovereign immunity, *see Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 692–93 (1949), but a cause of action *provided by the Constitution* would be ineffectual without a waiver of that bar by Congress. And it would be odd for us to conclude that the Constitution created an ineffective right of action. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 4, at 63 (2012) ("The

presumption against ineffectiveness ensures that a text's manifest purpose is furthered, not hindered.")

Congress did not generally provide for claims against the federal government based on the Constitution until it passed the Tucker Act in 1887. Fallon et al., Hart and Wechsler, *supra*, at 897–98; *see also Bormes*, 568 U.S. at 12 (citing Act of Mar. 3, 1887, ch. 359, 24 Stat. 505 (codified as amended at 28 U.S.C. § 1491(a)(1))). That Act primarily waived sovereign immunity and vested jurisdiction in the Court of Claims over "any claim against the United States founded . . . upon the Constitution . . . or upon any express or implied contract with the United States . . . or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act was construed to allow claims under any constitutional provision that "c[ould] fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967); *see also United States v. Testan*, 424 U.S. 392, 400 (1976) (adopting that test); *Me. Cmty.*, 140 S. Ct. at 1328 (same). But the Tucker Act does not supply any substantive right; it relies on other provisions imposing duties and obligations on the federal government (like the Takings Clause) to provide the right that can then be enforced under the Act. *See United States v. Navajo Nation*, 556 U.S. 287, 290 (2009).

"[T]here cannot be a right to money damages without a waiver of sovereign immunity, and . . . [not] all substantive rights of necessity create a waiver of sovereign immunity such that

money damages are available to redress their violation." *Testan*, 424 U.S. at 400–01. The Takings Clause provides a substantive right to compensation, but there was not a *judicially enforceable* right to money damages against the United States until the Tucker Act waived sovereign immunity for those claims. *Cf. Me. Cmty.*, 140 S. Ct. at 1328 n.12 (noting that "Congress enacted the Tucker Act to 'supply the missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable'" (alteration adopted) (quoting *Bormes*, 568 U.S. at 12)).

Nor does the acknowledgment that the Takings Clause provides a basis for a damages remedy for an uncompensated taking, *see First English*, 482 U.S. at 316 n.9, undermine the presumption of sovereign immunity. *First English*—like the authorities it cited—did not rely on that basis to serve as the cause of action. *Id.* at 308, 316 322 (concluding that the Takings Clause serves as the basis for awarding damages under state causes of action and determines the scope of those damages); *see also Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 3–7 (1984) (statutory condemnation proceeding); *United States v. Causby*, 328 U.S. 256, 267 (1946) (relying on the Tucker Act); *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 302 & n.2 (1923) (statutory right of action under the Lever Act, ch. 53, § 10, 40 Stat. 276, 279, waiving sovereign immunity); *Monongahela Navigation Co. v. United States*, 148 U.S. 312, 312–14, 324 (1893) (noting appeal from condemnation proceeding). Judicial remedies for takings require a separate right of action, either against an officer or against the government itself based on a clear waiver of

sovereign immunity, to proceed in federal court. *See, e.g.*, *Lee*, 106 U.S. at 219–23 (permitting ejectment suit against federal officers); *see also Larson*, 337 U.S. at 696–97 (explaining that *Lee*'s "constitutional exception to the doctrine of sovereign immunity" involved a suit "against federal officers" based on the theory that their "possession of the land was illegal," so "a suit against them was not a suit against the sovereign"); *PennEast Pipeline Co. v. New Jersey*, 141 S. Ct. 2244, 2254–55, 2258–59 (2021) (holding that states consented to eminent domain actions *by the federal government* or those with delegated federal power "in the plan of the Convention").

Moreover, even if the Takings Clause *had* waived sovereign immunity for suits against the federal government, it did *not* abrogate *state* sovereign immunity. *See Ladd v. Marchbanks*, 971 F.3d 574, 578–80 (6th Cir. 2020) (holding that there was no Eleventh Amendment immunity waiver for a direct Fifth Amendment takings claim or a section 1983 takings claim); *see also Robinson v. Ga. Dep't of Transp.*, 966 F.2d 637, 640 (11th Cir. 1992) (holding that there was no waiver in section 1983 takings suit); *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1214 (10th Cir. 2019) (same); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019) (similar, but not specifying cause of action). A direct action against a state government under the Fifth and Fourteenth Amendments would be barred by the Eleventh Amendment. And the Supreme Court in *DeVillier* embraced the sufficiency of state-law remedies for takings claims against states, *instead of* implying a federal right of action that would silently abrogate state immunity. 144 S. Ct. at 944.

From this textual and structural analysis, we should draw two lessons. First, any direct right of action under the Takings Clause must be implied, not express. Second, the Constitution generally creates no right of action and contemplates structural barriers to suits against the government, which counsel against implying a right of action for takings. In the words of Chief Justice Marshall, "we must never forget, that it is *a constitution* we are expounding." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819). There is no textual or structural reason to think that *we* should create an implied right of action for takings of property.

### B. *The History of the Takings Clause Also Establishes that It Does Not Create an Implied Right of Action.*

The majority focuses on colonial and revolutionary rationales for including the Takings Clause in the Bill of Rights. But even accepting the majority's account of that pre-constitutional history, it fails to answer the question before us. For example, the majority points to statements from John Jay and James Madison suggesting that takings claims should be judicially enforceable. *See* Majority Op. at 29–31, 36–38. But supporting judicial enforceability does not necessarily mean endorsing a *direct* right of action under the Constitution. Nor does it mean that the Founding generation understood the Constitution to create a direct right of action. To the contrary, our constitutional history establishes that takings claims depend on external remedies, such as congressional resolution of private claims against the government and common-law forms of actions to recover taken property. And later changes—like the ratification of the Fourteenth Amendment—did not alter this structure.

In the early days of the republic, "Congress retained sole responsibility for paying takings claims against the federal government." William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 COLUM. L. REV. 782, 794 n.69 (1995). In doing so, Congress did not sit as a pseudo-judicial tribunal but instead considered private bills as part of its "power over the purse." Floyd D. Shimomura, *The History of Claims Against the United States: The Evolution from a Legislative Toward a Judicial Model of Payment*, 45 LA. L. REV. 625, 627–28, 637 (1985) (first discussing the roots of legislative resolutions for claims against the government in English parliamentary practice, then explaining how Congress maintained that power after the Constitution was adopted). *But see* Majority Op. at 34 (describing Congress as "the lawful judicial tribunal to hear damages actions stemming directly under the Clause"). Private bills reflected the early republic's solution to the fundamental tension between an "individual's interest in receiving fair consideration and prompt payment of a meritorious claim" and "society's interest in maintaining democratic control over the allocation of limited public revenue among competing public needs." Shimomura, *supra*, at 626. So as part of its appropriations power, Congress meted out compensation for takings claims on an individual basis. *See* 2 WILSON COWEN, PHILIP NICHOLS, JR. & MARION T. BENNETT, THE UNITED STATES COURT OF CLAIMS: A HISTORY 5 (1978).

When Congress delegated its authority over these claims, it did so to executive and legislative bodies—*not* courts. For example, shortly after the Constitution was ratified, Congress empowered

"the auditors and the Comptroller within the newly established Treasury Department" to review claims against the United States. Shimomura, *supra*, at 637 (citing 2 COWEN, NICHOLS & BENNETT, *supra*, at 4). But Congress retained control over the resolution of those claims through appeals from the Comptroller's decisions and "by simply refusing to appropriate the necessary funds" to satisfy a claim. *Id.* Congress expressly rejected judicial review of the Comptroller's decisions. *See* William M. Wiecek, *The Origin of the United States Court of Claims*, 20 ADMIN. L. REV. 387, 390 (1968) (noting that James Madison's proposal that "appeals from the Comptroller's decisions be allowed to the United States Supreme Court . . . was not adopted"). Indeed, "when Congress enacted the Judiciary Act of 1789 and extended federal court jurisdiction over the federal government," it provided jurisdiction over "only those situations where 'the United States are plaintiffs . . . or petitioners.'" Shimomura, *supra*, at 638 (quoting Act of Sept. 24, 1789, ch. 20, § 11, 1 Stat. 73, 78).

In addition to its delegations to the Treasury, Congress continued to process private bills. The First Congress entertained more than 700 private and public petitions. *Id.* And, in 1794, Congress further entrenched its jurisdiction over claims against the federal government. The House established a Committee of Claims, which "had jurisdiction over all money claims against the United States" and would "report their opinion thereupon" to the House. *Id.* at 644 (citation and internal quotation marks omitted). "By 1832, half of Congress'[s] time was consumed with . . . private business—Fridays and Saturdays being fully set aside for such

purposes." *Id.* (citing 8 MEMOIRS OF JOHN QUINCY ADAMS 479 (Phila., Charles Francis Adams ed., 1876)). And the Supreme Court acquiesced to Congress's authority over claims against the federal government as "[t]he universally received opinion [was], that no suit can be commenced or prosecuted against the United States." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 411–12 (1821). The Court explained that "without . . . an appropriation" from Congress, "no . . . remedy lies against any officer of the Treasury Department" for "claim[s] on the United States." *Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1851) (affirming the denial of a writ of mandamus).

This early commitment to congressional resolution of takings claims establishes that neither Congress nor the federal courts recognized a right of action directly under the Takings Clause. Reliance on private bills continued at least until Congress created the Court of Claims and later vested it with final jurisdiction over most claims against the United States in the Tucker Act. Shimomura, *supra*, at 652, 663–64. The upshot of this history is that although Congress may have been constitutionally compelled to pay just compensation in a way that it was not compelled to pay discretionary claims, *see* Treanor, *supra*, at 794 n.69, the appropriation of those funds lay with *Congress*, not the courts, *see* U.S. CONST. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law . . . ."); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) ("For . . . a claim for money from the Federal Treasury, the [Appropriations] Clause provides an explicit rule of decision. Money may be paid out only . . . [as] authorized by a statute."); *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs.*

*Ass'n of Am., Ltd.*, 144 S. Ct. 1474, 1484 (2024) ("By the time of the Constitutional Convention, the principle of legislative supremacy over fiscal matters engendered little debate and created no disagreement.").

Tellingly, the majority points to *no* decision from the early republic that permitted a suit at law against the government for compensation under the Takings Clause. *See Meigs v. McClung's Lessee*, 13 U.S. (9 Cranch) 11, 16 (1815) (ejectment action); *Lee*, 106 U.S. at 198 (ejectment action); *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821, 831, 834 (C.C.D.N.J. 1830) (No. 1,617) (bill in equity); *see also Gardner v. Trs. of the Vill. of Newburgh*, 2 Johns. Ch. 162, 166–68 (N.Y. Ch. 1816) (bill in equity); *Bradshaw v. Rodgers*, 20 Johns. 103, 105–06 (N.Y. Sup. Ct. 1822) (trespass); *Bos. & Roxbury Mill Corp. v. Gardner*, 19 Mass. (2 Pick.) 33, 40 (1823) (statutory cause of action under an act of incorporation); *Crenshaw v. Slate River Co.*, 27 Va. (6 Rand.) 245, 256 (1828) (opinion of Carr, J.) (bill in equity); *Proprietors of the Piscataqua Bridge v. N.H. Bridge*, 7 N.H. 35, 72 (1834) (bill in equity); *Thayer v. City of Boston*, 36 Mass. (16 Pick.) 511, 514 (1837) (nuisance); *L. C. & C. R.R. Co. v. Chappell*, 24 S.C.L. (Rice) 383, 384, 398 (1838) (eminent domain petition); *Sinnickson v. Johnson*, 17 N.J.L. 129, 129, 144 (1839) (trespass on the case); *State v. Hooker*, 17 Vt. 658, 672 (1845) (indictment for assault on sheriff, and stating that sheriffs acting unlawfully may be sued for taking property); *Young v. McKenzie*, 3 Ga. 31, 37 (1847) (bill in equity "to restrain . . . action of ejectment"); *Hall v. Washington County*, 2 Greene 473, 477 (Iowa 1850) (implied contract based on statute); *State v. Glen*, 52 N.C. (7 Jones) 321, 330 (1859) (defense to indictment).

Takings claims instead proceeded through common-law forms of action against the offending *officers*. The Supreme Court and inferior courts (and state courts) often used proceedings at "common law to provide redress for state and local takings." *See* Ann Woolhandler & Julia D. Mahoney, *Federal Courts and Takings Litigation*, 97 NOTRE DAME L. REV. 679, 684 (2022). In these common-law actions, the property owner would sue the officer or government corporation in trespass or another common-law action. *See, e.g.*, *Thacher v. Dartmouth Bridge Co.*, 35 Mass. (18 Pick.) 501, 501–02 (1836); *see also Knick*, 139 S. Ct. at 2176. The official would respond that "his trespass was lawful because [it was] authorized by statute or ordinance." *Knick*, 139 S. Ct. at 2176. The property owner would in turn attack the constitutionality of that statute or ordinance under the Fifth Amendment. *See id*. Although property owners could bring "various causes of action" for takings violations, *DeVillier*, 63 F.4th at 435 (Oldham, J., dissenting from the denial of rehearing en banc), those causes of action were not created by the Takings Clause. *See, e.g.*, *Monongahela Navigation Co.*, 148 U.S. at 313–14, 324 (condemnation action initiated by United States); *VanHorne's Lessee v. Dorrance*, 2 U.S. (2 Dall.) 304, 310, 316 (C.C.D. Pa. 1795) (claim to title under Pennsylvania law); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 127–28 (1810) (breach of covenant action); *Fairfax's Devisee v. Hunter's Lessee*, 11 U.S. (7 Cranch) 603, 603–04, 607–08 (1813) (ejectment action); *Terrett v. Taylor*, 13 U.S. (9 Cranch) 43, 45, 55 (1815) (quiet title action); *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 3 (1823) (action "to recover certain lands"); *Bonaparte*, 3 F. Cas. at

831 (bill in equity). Common-law forms of action provided the only ways for courts to redress takings.

That states added just compensation guarantees to their constitutions tells us nothing about the existence of a right of action under the federal Takings Clause. *But see* Majority Op. at 39–45 (implying the opposite). Many jurists viewed state constitutional declarations of rights differently than federal declarations of the same rights. *See* Jud Campbell, *Constitutional Rights Before Realism*, 2020 U. ILL. L. REV. 1433, 1441–42 (explaining that "recognizing a *common set* of rights, applicable against the state and federal governments alike, did not necessarily mean that those rights had the same *legal* boundaries"). And the development of common-law remedies under state takings clauses did not alter the structure of the federal Takings Cause. Indeed, contrary to the majority's contention, where state takings clauses predated the ratification of the Fifth Amendment, state courts relied on statutory or common law rights of action to judicially enforce the clauses. *See Bos. & Roxbury Mill Corp.*, 19 Mass. at 40–43, 43 n.2 (discussing a Massachusetts statute that provided a right of action to property owners damaged by the erection of bridges or dams, and explaining that if the government *had not* made such a provision, the state takings clause would permit suits in trespass against the agents perpetrating the taking); *Thayer*, 36 Mass. at 515–16 (embracing tort liability against city where the "act is done by the authority and order of the city government" or its branches); *Hooker*, 17 Vt. at 672–73 (observing that an officer acting unlawfully—such as in violation of the state takings clause—could be sued in trespass). *But see* Majority Op. at 50

n.16 (citing the same decisions but concluding that the constitutions of Massachusetts and Vermont "automatically secured judicial relief for takings"). So the development of these takings remedies under state law reaffirmed that alternative remedial schemes—most often common-law forms of action—were the primary and often sole vehicle for vindicating takings claims at both the state and federal level.

Nor did the Fourteenth Amendment change the scope of the Takings Clause. *See id*. at 1448–50 (explaining the early view of the Fourteenth Amendment as "refer[ing] to" rights, not "creat[ing]" them (citation and internal quotation marks omitted)). Incorporation does not change the fundamental character of the protection extended; it takes prohibitions that operate against the federal government and applies parallel prohibitions against the states. *See McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (plurality opinion) (noting that "incorporated Bill of Rights protections are all to be enforced against the States under the Fourteenth Amendment *according to the same standards* that protect those personal rights against federal encroachment" (emphasis added) (citation and internal quotation marks omitted)). The Fourteenth Amendment did not change the structure of the Takings Clause or imbue it with a previously unknown right of action. And all the textual and structural limitations discussed above apply with equal force to claims against states as they would against the federal government.

The Fourteenth Amendment grants *Congress* the power to enforce its provisions through legislation. U.S. CONST. amend. XIV, § 5; *Katzenbach v. Morgan*, 384 U.S. 641, 648 & n.7 (1966). In other words, the Fourteenth Amendment provides Congress the authority to decide whether to abrogate state immunities and whether to provide a cause of action for constitutional violations and how to define its contours. A direct right of action against the states or local governments, under the Fifth and Fourteenth Amendments, would undermine this textual delegation. *Cf. Cale v. City of Covington*, 586 F.2d 311, 316–17 & n.8 (4th Cir. 1978) (suggesting that implying rights of action under the Fourteenth Amendment flouts Congress's power to create remedies). So although the majority is correct that private congressional bills would be "an ill fit" for takings by local governments, Majority Op. at 51 n.17, the Fourteenth Amendment permits Congress to create statutory causes of action. And as I explain below, Congress did so when it enacted section 1983.

This constitutional history reveals *no* evidence that the Takings Clause impliedly provides a right of action for property owners. History instead establishes that property owners pursued their right to just compensation through alternative means: private bills, common-law forms of action, and suits in equity. And today property owners enjoy more remedies for takings than ever before.

### C.  Section 1983 and Georgia Law Provide Adequate Remedies for Takings.

Even if the text and history of the Takings Clause demanded judicial enforcement, an adequate alternative remedy would still obviate the need to imply a right of action. "[C]onstitutional concerns do not arise when property owners have other ways to seek just compensation." *DeVillier*, 144 S. Ct. at 944. Property owners like Fulton have many remedies for takings under both federal law, *see* 42 U.S.C. § 1983, and state law.

Section 1983 provides a right to sue state officers. *Id.* And in *Monell*, the Supreme Court held that "[l]ocal governing bodies . . . can be sued directly under [section] 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. It also held that this "official policy" rule could be satisfied if a plaintiff proved that a "governmental custom" resulted in the violation. *Id.* at 690–91 (internal quotation marks omitted).

*Monell*'s requirement of a "policy or custom" ensures that the local government, which acts through its officers, is responsible for the alleged violation before liability attaches. *See id.* at 663 n.7, 694 (first clarifying that respondeat superior liability could not serve as the basis for holding local governments liable for employees' constitutional violations, then confirming that local governments may only be sued "when [the] execution of a government's

policy or custom . . . inflicts the injury [such] that the government as an entity is responsible under [section] 1983"). A contrary holding would subject local treasuries to liability for every constitutional violation perpetrated by the police, sheriff's deputies, animal-control officers, parks-and-recreation employees, sanitation workers, clerks, or other officials. *See Owen v. City of Independence*, 445 U.S. 622, 657 (1980) (concluding that *Monell* protects the public, as represented through a local government, from liability for actions not directly caused by its decisions, so local governments did not need the protection of qualified immunity). In other words, *Monell*'s "policy or custom" rule ensures that the plaintiff sues the proper "offending party," not to circumscribe the underlying right. *Id.* at 651.

*Monell* does not limit the constitutional right to just compensation. Indeed, section 1983 *expands* the scope of constitutional remedies against wrongdoers to include "[e]very person" acting "under color of" state law, including both officers and local governments. After *Monell*, there is no reason to imply a right of action against local governments under the Fourteenth Amendment. Thanks to Congress, that cause of action already exists under section 1983. *See Owen v. City of Independence*, 589 F.2d 335, 337 (8th Cir. 1978) ("By enacting section 1983, Congress has provided an appropriate and exclusive remedy for constitutional violations committed by municipalities."), *overruled on other grounds by* 445 U.S. 622; *Turpin v. Mailet*, 591 F.2d 426, 427 (2d Cir. 1979) (en banc) ("[T]here is no place for a cause of action against a municipality

directly under the 14th Amendment, because the plaintiff may proceed . . . under [section] 1983.").

We should respect *Monell*'s rejection of vicarious liability for local governments before fashioning a broader implied right of action for takings. Although the United States may sometimes be held liable for takings violations perpetrated by its officers acting in "the normal scope of [their] duties," *Darby Dev. Co. v. United States*, 112 F.4th 1017, 1024–27 (Fed. Cir. 2024) (discussing *Great Falls Manufacturing. Co. v. Garland*, 124 U.S. 581, 597 (1888), and *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 330 (1922)), local governments are liable only through state action under the Fourteenth Amendment. True, they are creatures of state law. Yet local governments are *separate* entities. That is, a local government is *not* a "state" within the meaning of the Amendment. Local governments are "persons" that act under color of state law, *cf. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 62–64 (1989) (holding that "a State is not a person within the meaning of [section] 1983"), and do not enjoy Eleventh Amendment immunity, *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994). The Amendment does not establish that local governments are vicariously liable for the actions of their employees. *See Kostka v. Hogg*, 560 F.2d 37, 44 (1st Cir. 1977). And it grants *Congress* the discretion to create remedial schemes for its enforcement, "rather than the judiciary." *Katzenbach*, 384 U.S. at 648 & n.7. The constitutional text supplies no reason to undermine the statutory rejection of vicarious liability by creating an end-run around Congress's chosen remedial scheme.

That section 1983 does not abrogate state sovereign immunity is also no bar to the conclusion that an alternative remedial scheme fully vindicates takings claims. Sovereign immunity would protect only the federal government and state governments from suit. *Cf. Owen*, 445 U.S. at 638 ("[T]here is no tradition of immunity for municipal corporations."). The Tucker Act solves any problem posed by the former. And state law solves the latter.

Although we have no occasion to address the adequacy of other states' rights of action today, *but see* Majority Op. at 61–62 (discussing whether a sufficient inverse condemnation action lies for takings of personal property in Indiana, Pennsylvania, Oklahoma, New Hampshire, and Wisconsin), every state in the Union provides a remedy under state law for uncompensated takings. *See Knick*, 139 S. Ct. at 2168 & n.1. In most, including Georgia, property owners may bring inverse-condemnation actions against the state. *See Bray v. Dep't of Transp.*, 750 S.E.2d 391, 393 (Ga. Ct. App. 2013). And the two commonly cited exceptions, Ohio and Louisiana, also provide remedies. In Ohio, plaintiffs may petition by a writ of mandamus to compel a condemnation proceeding. *Knick*, 139 S. Ct. at 2168 n.1. In Louisiana, plaintiffs may bring an inverse-condemnation action and enforce a judgment in their favor through a writ of mandamus. *See Constance v. State through Dep't of Transp. & Dev., Off. of Highways*, 626 So. 2d 1151, 1156 (La. 1993); *Watson Mem'l Spiritual Temple of Christ v. Korban*, 387 So. 3d 499, 512 (La. 2024). The key lesson from these alternative schemes and the history of takings litigation is that although American law has always provided *some* remedial scheme for takings claims—whether petitions to

Congress for private bills, trespass and ejectment actions against in-
dividual federal officers, the Tucker Act and section 1983 actions,
or state inverse-condemnation—the Takings Clause has *never* been
understood as creating an implied right of action.

That some property owners—like Fulton—might be barred
from seeking compensation from a local government under sec-
tion 1983 does not mean that they lack remedies. Fulton could have
sued the officers who seized his horses either under section 1983 or
under state law. Georgia law provides causes of action for both in-
verse condemnation against the government and conversion
against an individual officer. *See Bray*, 750 S.E.2d at 393; *Decatur Auto
Ctr.*, 583 S.E.2d at 7 (defining conversion); *Fla. State Hosp. for the In-
sane*, 21 S.E.2d at 218 (noting that individual-capacity tort suits
against state officials are "generally maintainable" under Georgia
law). If the officers responded that their seizure of Fulton's horses
was lawful, Fulton could have replied that any authority to take the
horses violated the Takings Clause—like centuries of takings liti-
gants before him. Simply put, Fulton's takings claim is not unique,
and we need not create an unprecedented constitutional remedy
for him.

Nor do the procedural rules attendant to each of these alter-
native remedial schemes constitute "limits" on the scope of the
Takings Clause. As renowned legal scholars James Ely and Julia Ma-
honey explain in their *amicus curiae* brief for the Buckeye Institute,
"legislatures may regulate jurisdictional and procedural issues that
govern    how    claimants    seek    and    obtain"    "redress    for

uncompensated takings." That property owners must choose from "a complex network of remedies" does not undermine legislative authority to define and shape those remedies. Woolhandler, Mahoney & Collins, *supra*, at 266.

For example, Georgia's one-year notice requirement for suits against counties does not "narrow" the right to just compensation. Under state law, "[a]ll claims against counties must be presented within 12 months after they accrue or become payable or the same are barred." GA. CODE ANN. § 36-11-1. But holding that this bar "narrow[s]" the scope of the underlying right upsets the role of procedural rules in our judicial system. *See* Majority Op. at 63–64. Nothing would stop that logic from being applied to any statute of limitations, for example. If statutes of limitations and other procedural rules narrow constitutional rights, then none of those rules could ever apply to constitutional claims. *See Seaboard*, 261 U.S. at 304 (explaining that Congress cannot narrow a constitutional right). And if, as the majority contends, the narrowing problem only arises when states are the "exclusive" forum for a claim, then it should give us no pause here. Majority Op. at 63 n.25 (emphasis omitted). Georgia is not the exclusive forum for Fulton's takings claim. He instead failed to sue the right parties at the right time to take advantage of his alternative federal forum.

After reaching the opposite conclusion on each of these points, the majority transgresses the separation of powers to decide yet another novel question of law: what statute of limitations should apply to an implied right of action under the Takings

34          WILLIAM PRYOR, C.J., dissenting          22-12041

Clause? *See* Majority Op. at 12–15. On the one hand, our precedents apply the state statute of limitations for personal-injury torts in actions brought under section 1983. *See, e.g.*, *McNair v. Allen*, 515 F.3d 1168, 1173 (11th Cir. 2008) (citing *Wilson v. Garcia*, 471 U.S. 261, 275–76 (1985)); *Hillcrest Prop., LLC v. Pasco County*, 754 F.3d 1279, 1281 (11th Cir. 2014). And we apply the same statute of limitations to the few *Bivens* claims brought "directly" under the Constitution. *See Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir. 1996). To break with that precedent would allow substantively identical claims to follow dramatically different tracks through the federal courts because, at least in Georgia, personal-injury actions must be brought within two years, and inverse-condemnation and conversion claims must be brought within four years. GA. CODE ANN. §§ 9-3-30, -32, -33; *Wise Bus. Forms, Inc. v. Forsyth County*, 893 S.E.2d 32, 37 (Ga. 2023). On the other hand, takings claims are like inverse-condemnation or conversion claims. And when a federal claim lacks a specific limitations period, we borrow the statute of limitations that applies to the most similar state law. *Vigman v. Cmty. Nat'l Bank & Tr. Co.*, 635 F.2d 455, 459 (5th Cir. Jan. 1981). "At bottom," weighing the costs and benefits of alternative limitation periods "is a legislative endeavor" we have no authority to undertake. *Egbert*, 142 S. Ct. at 1802. And that constitutional principle is especially evident where section 5 of the Fourteenth Amendment expressly delegates enforcement questions to Congress, which has already weighed the costs and benefits to provide an adequate remedy with the shorter borrowed limitations period.

### III. CONCLUSION

Let us survey the constitutional wreckage in the wake of the majority opinion. Contrary to the text and structure of the Fifth Amendment and our history and tradition, the majority creates a new right of action for takings of property by local governments. It flouts recent Supreme Court precedents instructing that we should not imply a right of action whenever statutory and common-law remedies already exist. It ignores Supreme Court precedents that reject vicarious liability for local governments and instead require proof of a municipal policy or custom to establish a constitutional violation. And it borrows a statute of limitations twice as generous as the one we use both for actions under section 1983 and for *Bivens* actions. The resulting destruction from this step-by-step rejection of judicial humility is as unnecessary as it is regrettable.

Georgia law and section 1983—alone or in combination—provide property owners more than adequate alternative remedies against local governments and their officers to vindicate their constitutional right to just compensation. That Fulton failed to bring his claims against the appropriate parties or in a timely manner does not make his otherwise available remedies inadequate. The text, structure, and history of the Takings Clause provide no support for creating an implied right of action. The majority's tale of a "constitutional unicorn" is a fantasy.

Because I would affirm the judgment of the district court, I respectfully dissent.