No. 22-12041

# In the United States Court of Appeals for the Eleventh Circuit

BRANDON FULTON,

*Plaintiff-Appellant*,

v.

FULTON COUNTY BOARD OF COMMISSIONERS,

*Defendant-Appellee*,

PAUL L. HOWARD, JR., Esq.; in his individual capacity, *et al.*,

*Defendants.*

On Appeal from the United States District Court
for the Northern District of Georgia
No. 1:20-cv-01936-SCJ (Hon. Steve C. Jones)

**EN BANC BRIEF FOR APPELLANT**

Allon Kedem
Connor J. Morgan
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-6234

Clare A. Saunders
ARNOLD & PORTER
KAYE SCHOLER LLP
500 Boylston Street, 20th Floor
Boston, MA 02116
Telephone: (617) 351-8050

Brian M. Williams
ARNOLD & PORTER
KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Telephone: (303) 863-2322
brian.williams@arnoldporter.com

Konrad G.W. Ziegler
LEE & ZIEGLER LLP
150 North Street, Suite M
Canton, Georgia 30114
Telephone: (678) 871-0501
kziegler@leeandzieglerlaw.com

*Counsel for Appellant Brandon Fulton*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1(a)(1) and 26.1-2(c), Appellant Brandon Fulton submits this Certificate of Interested Persons and Corporate Disclosure Statement.

Because Fulton is a natural person, no corporate disclosure statement is required under Federal Rule of Appellate Procedure 26.1.

I hereby certify that the following have an interest in the outcome of this appeal:

1. Arnold & Porter Kaye Scholer LLP (Counsel for Appellant)
2. Bowman, Brad (Counsel for Appellee)
3. The Buckeye Institute (Amicus Curiae)
4. Conlan, Bridget F. (Counsel for Amicus)
5. Consovoy McCarthy PLLC (Counsel for Appellee)
6. Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP (Counsel for Appellee)
7. Davis, Stephen F. (Counsel for Amicus)
8. Dickey, Gilbert C. (Counsel for Appellee)
9. Edwards, John C. (Counsel for Appellant)
10. Ely Jr., James W. (Amicus Curiae)

11. Farag, Donna M. (Counsel for Amici)
12. Fulton, Brandon (Appellant)
13. Fulton County Board of Commissioners (Appellee)
14. Gates, Douglas W. (Counsel for Amici)
15. Georgia Department of Law, Solicitor General (Counsel for Amicus)
16. Hebert, Christen Mason (Counsel for Amicus)
17. Hoffer, Michael (Counsel for Appellee)
18. Institute for Justice (Amicus Curiae)
19. John Edwards Law Group, LLC (Counsel for Appellant)
20. Jones, The Honorable Steve C. (United States District Judge)
21. Kedem, Allon (Counsel for Appellant)
22. La Fetra, Deborah F. (Counsel for Amicus)
23. Lee & Ziegler LLP (Counsel for Appellant)
24. Mahoney, Julia D. (Amicus Curiae)
25. Martin, Christina M. (Counsel for Amicus)
26. McNamara, Robert J. (Counsel for Amicus)
27. Morgan, Connor J. (Counsel for Appellant)
28. Norris, Cameron T. (Counsel for Appellee)
29. Office of the Fulton County Attorney (Counsel for Appellee)

30. Pacific Legal Foundation (Amicus Curiae)

31. Petrany, Stephen J. (Counsel for Amicus)

32. Plott, Mathew (Counsel for Appellee)

33. Rodenberg, William D. (Counsel for Amicus)

34. Rosenberg, Steven (Former Counsel for Appellee)

35. Saunders, Clare A. (Counsel for Appellant)

36. Saunders, Thomas G. (Counsel for Amici)

37. Sen, Suranjan M. (Counsel for Amicus)

38. Scalia Law School Supreme Court Clinic (Counsel for Appellee)

39. Solicitor General of the State of Georgia (Amicus Curiae)

40. Venable, Nicholas B. (Counsel for Appellee)

41. Ward, Andrew (Counsel for Amicus)

42. Williams, Brian M. (Counsel for Appellant)

43. Wilmer Cutler Pickering Hale and Dorr LLP (Counsel for Amici)

44. Woodward, Karen E. (Counsel for Appellee)

45. Ziegler, Konrad G.W. (Counsel for Appellant)

Dated: July 20, 2026

Respectfully submitted,

*/s/ Brian M. Williams*
Brian M. Williams
ARNOLD & PORTER
KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Telephone: (303) 863-2322
brian.williams@arnoldporter.com

Allon Kedem
Connor J. Morgan
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-6234

Konrad G.W. Ziegler
LEE & ZIEGLER LLP
150 North Street, Suite M
Canton, Georgia 30114
Telephone: (678) 871-0501
kziegler@leeandzieglerlaw.com

Clare A. Saunders
ARNOLD & PORTER
KAYE SCHOLER LLP
500 Boylston Street, 20th Floor
Boston, MA 02116
Telephone: (617) 351-8050

*Counsel for Appellant Brandon Fulton*

# STATEMENT REGARDING ORAL ARGUMENT

The Court's en banc briefing notice advises that oral argument will be held in Atlanta in October 2026. C.A. Dkt. 86.

# TABLE OF CONTENTS


Page(s)

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ....... C-1

STATEMENT REGARDING ORAL ARGUMENT ....... i

TABLE OF AUTHORITIES ....... iv

JURISDICTIONAL STATEMENT ....... 1

STATEMENT OF THE ISSUE ....... 2

INTRODUCTION ....... 3

STATEMENT OF THE CASE ....... 6

A. Factual Background ....... 6

B. Procedural Background ....... 7

SUMMARY OF ARGUMENT ....... 12

STANDARD OF REVIEW ....... 17

ARGUMENT ....... 18

I. Fulton's Motion to Amend Is Not Futile Because the Fifth Amendment Creates a Direct Cause of Action for Takings Claims ....... 18

A. The Fifth Amendment's Text Supplies a Direct Cause of Action to Assert a Takings Claim ....... 18

B. The History and Tradition of the Fifth and Fourteenth Amendments Confirm the Takings Clause Supplies a Direct Cause of Action ....... 23

II. The Court Cannot Determine at the Motion-to-Dismiss Stage That Fulton's Federal Takings Claim Is Futile as Untimely ....... 35

A. Fulton's Federal Takings Claim Is Not Barred by Georgia's Four-Year Statute of Limitations for Inverse-Condemnation ....... 36

B. Even Under a Two-Year Statute of Limitations, This Court Cannot Conclude Fulton's Federal Takings Claim Is Futile ....... 38

III. The Court Should Not Avoid the "Central Question" of the Case ........47

A. Other, Potentially Overlapping Causes of Action Are Irrelevant to Determining Whether the Takings Clause Supplies a Cause of Action ........48

B. *DeVillier* Does Not Preclude the Court from Deciding the "Central Question" of the Case ........50

IV. If the Court Concludes That the Takings Clause Supplies No Direct Cause of Action, It Should Still Allow Fulton to Amend His Complaint ........52

A. Georgia's Presentment Requirement Would Not Bar Fulton's State-Law Claims ........53

B. The Interests of Justice Support Permitting Liberal Amendment ........58

CONCLUSION ........62

CERTIFICATE OF SERVICE ........63

CERTIFICATE OF COMPLIANCE ........64

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Sherman Operating Co.*,
520 F. Supp. 3d 854 (E.D. Tex. Feb. 18, 2021) ....................46

*Bannum, Inc. v. City of Fort Lauderdale*,
901 F.2d 989 (11th Cir. 1990)....................60

*Barron ex rel. Tieman v. Mayor of Baltimore*,
32 U.S. (7 Pet.) 243 (1833)....................32

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
403 U.S. 388 (1971) ....................49

*Blanchard v. City of Kansas*,
16 F. 444 (W.D. Mo. 1883)....................31

*Boom Co. v. Patterson*,
98 U.S. 403 (1879)....................31

*Brown v. Ga. Bd. of Pardons & Paroles*,
335 F.3d 1259 (11th Cir. 2003)....................39, 41, 43

*Chattanooga-Hamilton Cnty. Hosp. Auth. v. Hosp. Auth. of Walker*,
No. 4:14-cv-0040, 2014 WL 12489763 (N.D. Ga. Aug. 28, 2014)....................55

*Chicago, B. & Q. R. Co. v. Chicago*,
166 U.S. 226 (1897)....................33

*City of Elgin v. Eaton*,
83 Ill. 535 (1876) .................... 30-31

*Clayburg v. City of Chicago*,
25 Ill. 535 (1861) .................... 30-31

*Corsello v. Lincare, Inc.*,
428 F.3d 1008 (11th Cir. 2005)....................58

*Cuyahoga River Power Co. v. City of Akron*,
240 U.S. 462 (1916)....................................................................................33

*Czerwienski v. Harvard Univ.*,
666 F. Supp. 3d 49 (D. Mass. 2023).............................................................46

*Del., Lackawanna & W. R.R. Co. v. Town of Morristown*,
276 U.S. 182 (1928)....................................................................................33

*DeVillier v. State*,
63 F.4th 416 (5th Cir. 2023) .....................................................19, 26, 29, 49-50

*DeVillier v. Texas*,
601 U.S. 285 (2024)....................................................................10, 19, 50, 51

*Dillow v. Va. Polytechnic Inst. and State Univ.*, No. 7:22-cv-00280,
2023 WL 2320765 (W.D. Va. Mar. 2, 2023) ...................................................46

*Diversified Holdings, LLP v. City of Suwanee*,
807 S.E.2d 876 (Ga. 2017)........................................................... 36-37, 54

*Dohany v. Rogers*,
281 U.S. 362 (1930)....................................................................................33

*Eaton v. Bos. Concord & Montreal R.R.*,
51 N.H. 504 (1872)......................................................................................30

*Egbert v. Boule*,
596 U.S. 482 (2022).............................................................................37, 49

*Ex parte Young*,
209 U.S. 123 (1908)............................................................................... 19-20

*First Eng. Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*,
482 U.S. 304 (1987)........................................................................... 3-4, 19

*Frein v. Pa. State Police*,
47 F.4th 247 (3d Cir. 2022)...................................................................3, 61

*Fulton v. Fulton Cnty. Bd. of Comm'rs*,
148 F.4th 1224 (11th Cir. 2025) ..... 10, 11, 12, 35, 36, 37, 47, 48, 50, 52, 53, 60

*Golden v. Floyd Healthcare Mgmt., Inc.*,
904 S.E.2d 359 (Ga. 2024) .......... 44-45

*Gordy Const. Co. v. KHM Dev. Co.*,
197 S.E.2d 426 (Ga. Ct. App. 1973) .......... 54-55, 57, 58

*Hall v. United Ins. Co. of Am.*,
367 F.3d 1255 (11th Cir. 2004) .......... 18

*Hardy v. Regions Mortg., Inc.*,
449 F.3d 1357 (11th Cir. 2006) .......... 6

*Harman v. City of Omaha*,
23 N.W. 503 (Neb. 1885) .......... 30

*Hollingsworth v. Parish of Tensas*,
17 F. 109 (C.C.W.D. La. 1883) .......... 31

*Horne v. Dep't of Agric.*,
576 U.S. 350 (2015) .......... 23

*Jacobs v. United States*,
290 U.S. 13 (1933) .......... 34

*John R. Sand & Gravel Co. v. United States*,
457 F.3d 1345 (Fed. Cir. 2006) .......... 38-39, 41

*Knick v. Twp. of Scott*,
588 U.S. 180 (2019) .......... 5, 29-30, 36, 49

*Knight v. Columbus*,
19 F.3d 579 (11th Cir. 1994) .......... 40, 41

*La Grasta v. First Union Sec., Inc.*,
358 F.3d 840 (11th Cir. 2004) .......... 36, 38, 42

*Lewis v. DeKalb Cnty.*,
303 S.E.2d 112 (Ga. 1983) .......... 56

*M.T.V. v. DeKalb Cnty. Sch. Dist.*,
446 F.3d 1153 (11th Cir. 2006) .......... 6

*Macri v. Brower*, No. 1:21-cv-03240,
2022 WL 4587847 (N.D. Ga. Sept. 29, 2022) ........................................ 54, 56-57

*Maron v. Chief Fin. Officer of Fla.*,
136 F.4th 1322 (11th Cir. 2025) ............................................18, 20, 21, 22, 40

*Mendez v. Moats*,
852 S.E.2d 816 (Ga. 2020)..........................................................................53

*Mitchell v. City of Atlanta*,
121 S.E.2d 764 (Ga. 1961)......................................................................54, 56

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)......................................................................................18

*O'Connor v. Eubanks*,
83 F.4th 1018 (6th Cir. 2023) ....................................................................26

*Pac. R.R. Removal Cases*,
115 U.S. 1 (1885)......................................................................................31

*Pembaur v. City of Cincinnati*,
475 U.S. 469 (1986)...................................................................................59

*Pritchard v. State*,
788 P.2d 1178 (Ariz. 1990) .......................................................................57

*Pumpelly v. Green Bay Co.*,
80 U.S. (13 Wall.) 166 (1872)....................................................................31

*Reardon v. City & Cnty. of San Francisco*,
6 P. 317 (Cal. 1885)..................................................................................30

*Schepers v. Comm'r*,
691 F.3d 909 (7th Cir. 2012).....................................................................61

*Seaboard Air Line Ry. Co. v. United States*,
261 U.S. 299 (1923)........................................................................ 13, 33-34

*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
600 F.3d 1334 (11th Cir. 2010)................................................................ 17-18

*Silva v. City of New Bedford*,
602 F. Supp. 3d 186 (D. Mass. 2022)....................46

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
376 F.3d 1065 (11th Cir. 2004)....................17

*Speedway Motorsports, Inc. v. Pinnacle Bank*,
727 S.E.2d 151 (Ga. Ct. App. 2012)....................55

*Sumner v. Philadelphia* (No. 13,611),
23 F. Cas. 392 (C.C.E.D. Pa. 1873)....................31

*Thomas v. Town of Davie*,
847 F.2d 771 (11th Cir. 1988)....................58

*Transp. Co. v. Chicago*,
99 U.S. 635 (1879)....................31

*United States v. Causby*,
328 U.S. 256 (1946)....................34

*United States v. Linville*,
228 F.3d 1330 (11th Cir. 2000)....................60

*Vasquez-Garcia v. Centurion, LLC*,
172 F.4th 1150 (10th Cir. 2026)....................35

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002).................... 20, 21-22

*Vigman v. Cmty. Nat'l Bank & Tr. Co.*,
635 F.2d 455 (5th Cir. Jan. 1981)....................36, 37

*Vill. of Euclid v. Ambler Realty Co.*,
272 U.S. 365 (1926)....................33

*Vill. of Norwood v. Baker*,
172 U.S. 269 (1898)....................33

*Wainberg v. Mellichamp*,
93 F.4th 1221 (11th Cir. 2024)....................36, 38

**Constitutional Provisions and Statutes**

U.S. Const. amend. V.... 3-5, 7, 9-13, 15-16, 18-20, 22, 25-29, 34, 38, 47-48, 50-51

U.S. Const. amend. XIV .................................................. 12, 13, 23, 29, 31, 32, 33

42 U.S.C. § 1983 .......................................................... 7, 12, 39, 49, 50, 59, 60

Northwest Ordinance of 1787, art. 2 .......................................................... 25

OCGA § 9-3-30 .......................................................................................... 37

OCGA § 17-5-54(c)(2) ........................................................................... 7, 47

OCGA § 36-11-1 ...................................................................... 11, 53, 54, 57

**Other Authorities**

Cong. Globe, 39th Cong., 1st Sess. 1065 (1866) .............................................. 32

Cong. Globe, 39th Cong., 2d Sess. 811 (1867) ................................................. 32

Cong. Globe, 42d Cong., 1st Sess. App. 84 (1871) ........................................... 32

Douglas Laycock, *How Remedies Became a Field: A History*,
27 Rev. Litig. 161 (2008) ........................................................................... 30

Douglas W. Kmiec, *The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse*, 88 Colum. L. Rev. 1630 (1988) ..................... 26

Hon. Chief Justice Harold D. Melton, Supreme Court of Georgia, *Order Declaring Statewide Judicial Emergency*,
https://perma.cc/YA8V-BDS7 ..................................................................... 44

James Madison, *Amendments to the Constitution* (June 8, 1789),
Founders Online, https://perma.cc/3VQW-6DXG ........................................ 27

James Madison, *For the National Gazette: Property* (Mar. 27, 1792),
Founders Online, https://perma.cc/CQ9G-CYG3 ................................... 27-28

John Jay (A Freeholder), *A Hint to the Legislature of the State of New York*, Founders Online, https://perma.cc/32NL-432K ............. 24, 25

Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and The Federal System* (7th ed. 2015) ....................................28, 29

Robert Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 57 (1999) ............................................................27, 30

Transcript of Oral Argument, *DeVillier v. Texas*, 601 U.S. 285 (2024) (No. 22-913) ...................................................................40

William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782 (1995) .................................................24, 25, 26, 28, 29

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. On February 24, 2021, the district court granted Appellee Fulton County Board of Commissioners' motion to dismiss and denied Appellant Brandon Fulton's motion to amend his complaint. C.A. Dkt. 15-1 at 74-85 (Doc. 39).[1] On May 10, 2022, the district court granted Defendant Paul Howard's motion to dismiss, Doc. 55, thereby resolving all pending matters in the case below. On May 11, 2022, the district court clerk entered the judgment. Doc. 56. Appellant timely noticed this appeal on June 9, 2022. C.A. Dkt. 15-1 at 86-90 (Doc. 57). This Court's jurisdiction rests on 28 U.S.C. § 1291.

The Court granted rehearing en banc on May 8, 2026, and vacated the panel's July 31, 2025 opinion. C.A. Dkt. 84-1.

[1] "C.A. Dkt. ##" references are to this Court's appellate docket. Specifically, cites to C.A. Dkt. 15-1 are to Appellant's Appendix. "Doc. ##" references are to the district court docket below, No. 1:20-cv-01936 (SCJ) (N.D. Ga.).

## STATEMENT OF THE ISSUE

The Court granted rehearing en banc to decide the following question:

> Whether the district court's judgment in this case should be affirmed, and why or why not that is so.

C.A. Dkt. 86.

## INTRODUCTION

"Although police may seize potential evidence using a warrant, they may not keep it forever. Yet they did that here." *Frein v. Pa. State Police*, 47 F.4th 247, 250 (3d Cir. 2022) (Bibas, J.). Nearly a decade ago, Georgia officials seized seven of Brandon Fulton's horses based on charges the State dropped a year later. Despite the case being over, Fulton County kept the horses—even *after* a state court rejected the County's post-dismissal claim that the horses had been civilly forfeited. Under hornbook Fifth Amendment law, that is a taking, and Fulton is therefore entitled to just compensation. But for nearly a decade, Fulton County has refused to pay.

The Founders drafted the Fifth Amendment to address exactly this kind of constitutional violation (likely with horses in mind, no less). Relying on the Constitution alone, state and federal courts have for more than a century guarded the Fifth Amendment's promise of just compensation, holding that—statutory vehicle or not—the self-executing Takings Clause itself supplies a direct cause of action to vindicate takings claims. The Supreme Court has reaffirmed that principle again and again, rejecting the notion that "the Constitution does not, of its own force, furnish a basis for a court to award money damages against the government." *First Eng. Evangelical Lutheran*

*Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 316 n.9 (1987) (citation omitted). The district court thus erred in denying as "futile" Fulton's motion to amend to assert a takings claim directly under the Fifth Amendment.

The other supposed procedural bars to Fulton's claims, based on the statute of limitations or Georgia's presentment statute, are a red herring. Those are affirmative defenses. At this early stage of the case, Fulton's claims cannot be deemed "futile" unless those affirmative defenses were clear from the face of the complaint. They were not. Numerous facts outside the complaint confirm that any potential state or federal claims by Fulton did not accrue until *after* Georgia's courts resolved the County's assertion that, despite the State's dismissal of the charges, Fulton had civilly forfeited his horses.

Finally, Fulton's cause of action directly under the Fifth Amendment remains available *regardless* of any alternative remedies under state or federal law. Both the panel majority and the dissent devoted significant attention to whether Fulton could have asserted his takings claim through some *other* state or federal procedural vehicle, apparently based on the mistaken premise that whether the Takings Clause supplies a direct cause of action turns on whether all other avenues are closed to him. But the potential existence of alternative,

overlapping causes of action is irrelevant. The Fifth Amendment's text and history confirm that the Takings Clause provides a direct cause of action, full stop. As the Supreme Court has explained, that is all that matters: "The availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim." *Knick v. Twp. of Scott*, 588 U.S. 180, 191 (2019).

The contrary notion—that the Takings Clause supplies only a break-glass-in-case-of-emergency cause of action—would unduly narrow the Fifth Amendment's guarantee of just compensation, thereby "relegat[ing] the Takings Clause to the status of a poor relation among the provisions of the Bill of Rights." *Id.* at 189 (quotation marks and citation omitted). Fulton's motion to amend, seeking to assert a direct cause of action under the Takings Clause, thus would not be "futile" *even if* this Court concluded that other state or federal procedural vehicles are available to him—whether theoretically or in fact.

This Court should reverse and allow Fulton to amend his complaint as necessary to vindicate the Fifth Amendment's promise of just compensation.

## STATEMENT OF THE CASE

### A. Factual Background

The complaint alleges that on April 22, 2017, Fulton County Animal Services officers arrested Fulton for felony cruelty to animals. C.A. Dkt. 15-1 at 5 (Doc. 1 at 3).[2] That same day, the officers seized seven horses from Fulton's property. *Id.* As a condition of Fulton's bond related to the charges, a Georgia superior court required Fulton to "turn over any animals owned to Fulton County Animal Control." C.A. Dkt. 15-1 at 6 (Doc. 1 at 4). Pursuant to the bond order, "the horses remained in the custody of Fulton County Animal Services" while the State pursued the charges. *Id.*

On April 5, 2018, the State voluntarily dismissed the charges. *Id.* But the County kept Fulton's horses. *Id.* "Despite Mr. Fulton's repeated post-dismissal efforts and requests [that the County] return the horses or their

[2] Documents in the record below suggest that the arrest and seizure of the horses may instead have occurred on July 19, 2016. *See* Doc. 50-3 at 4; Doc. 50-4 at 2. The specific date is immaterial for two reasons. Neither the panel majority nor the dissent found the date of seizure relevant to its analysis; and it is not, because none of the applicable limitation periods runs from that date. *See* Parts II and IV, *infra*. Regardless, as the County previously acknowledged, any "potential inaccuracy" regarding this date in the complaint is immaterial at the motion-to-dismiss stage. C.A. Dkt. 15-1 at 16 n.1; Doc. 18-1 at 2 n.1 (citing *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006); *M.T.V. v. DeKalb Cnty. Sch. Dist.*, 446 F.3d 1153, 1156 (11th Cir. 2006)).

equivalent value, Fulton County Animal Services … refused to return the horses" or pay just compensation. *Id.* When Fulton brought this lawsuit, his understanding was that "Fulton County Animal Services placed one or more of the horses for adoption and/or sale." *Id.*

### B. Procedural Background

**1.** On May 5, 2020, Fulton filed this lawsuit against the Fulton County Board of Commissioners; Paul Howard, the former District Attorney of Fulton County; and Rebecca Guinn, the then-CEO of Lifeline Animal Project, Inc., which "manag[ed]" Fulton County Animal Services. C.A. Dkt. 15-1 at 7-8 (Doc. 1 at 5-6); Doc. 55 at 1 n.2.

As to the Fulton County Board of Commissioners, Fulton asserted a federal takings claim under 42 U.S.C. § 1983, alleging that "by retaining" Fulton's horses past May 5, 2018—30 days after the State dismissed the charges against him—"Fulton County ha[d] taken the horses or their equivalent value without providing any just compensation in violation of the Fifth Amendment to the United States Constitution." C.A. Dkt. 15-1 at 7 (Doc. 1 at 5); *cf.* OCGA § 17-5-54(c)(2) (giving government 30 days following guilty verdict to return property taken as part of an investigation).

As to Howard and Guinn, Fulton asserted procedural due process claims. C.A. Dkt. 15-1 at 7-9 (Doc. 1 at 5-6). Fulton alleged that each of them had a duty to "return or direct to be returned … [his] horses or their equivalent value," and that their failure to do so "deprived Mr. Fulton of procedural due process as guaranteed by the United States Constitution and other federal law." *Id.*

The Fulton County Board of Commissioners and Guinn separately moved to dismiss the complaint. *See* C.A. Dkt. 15-1 at 15-32 (Doc. 18-1); Doc. 24-1. The Fulton County Board of Commissioners argued that Fulton had sued the wrong entity, emphasizing that while the "Fulton County Board of Commissioners is the governing authority of Fulton County," Georgia law "has long drawn a distinction between the county as an entity, and the officials who represent it," and that "[a]ll suits by or against a county shall be in the name of the county." C.A. Dkt. 15-1 at 21, 22 n.2 (Doc. 18-1 at 7, 8 n.2) (quotation marks and citations omitted). The Fulton County Board of Commissioners also argued that Fulton failed to state a claim because he identified no policy or custom that caused the unlawful taking; and that, even if he had, his claim was barred by Georgia's two-year statute of limitations for personal-injury torts. *See* C.A. Dkt. 15-1 at 25-29 (Doc. 18-1 at 11-15).

Fulton simultaneously opposed the motion to dismiss and moved to amend the complaint. *See* C.A. Dkt. 15-1 at 33-53 (Doc. 25); C.A. Dkt. 15-1 at 54-60 (Doc. 26).[3] Fulton's motion to amend confirmed that his takings claim "is against Fulton County, however named" and sought to correct the complaint's technical misidentification of the Fulton County Board of Commissioners rather than Fulton County, Georgia. C.A. Dkt. 15-1 at 55-56 (Doc. 26 at 2-3). The motion also sought to assert an "additional alternative claim": a takings claim brought directly under the Fifth Amendment. C.A. Dkt. 15-1 at 57-58 (Doc. 26 at 4-5).

The district court granted the motion to dismiss Fulton's takings claim and denied Fulton's motion to amend. C.A. Dkt. 15-1 at 85 (Doc. 39 at 12). Though the court found "there is no undue delay or prejudice in Plaintiff seeking leave to amend his Complaint," the court concluded that amendment would be "futile" because the complaint contained insufficient allegations that a Fulton County policy or custom caused Fulton's constitutional deprivation, and the additional claim that Fulton sought to add would not change that. C.A. Dkt. 15-1 at 81-84 (Doc. 39 at 8-11). The court further concluded that "a

[3] Fulton voluntarily dismissed his claim against Guinn without prejudice. Doc. 35.

takings claim can be brought directly under the Fifth Amendment" only "against ***federal*** officers." C.A. Dkt. 15-1 at 83 (Doc. 39 at 10) (citations omitted). And, according to the court, Fulton's alternative claim "would necessarily be brought under § 1983," so he could not "escape Monell's policy-or-practice requirement for municipal liability." *Id.*

The district court's order left only Fulton's procedural due process claim against Howard, who had failed to respond to the complaint. C.A. Dkt. 15-1 at 84 (Doc. 39 at 11). After Fulton moved for default judgment, Howard ultimately moved to dismiss the claim against him, Doc. 47, which the district court granted, Doc. 55.

**2.** On appeal, after briefing and oral argument were completed, the U.S. Supreme Court decided *DeVillier v. Texas*, 601 U.S. 285 (2024), which considered—but ultimately declined to decide—whether a plaintiff has a cause of action arising directly under the Takings Clause. In response, this Court requested supplemental briefing, C.A. Dkt. 31, which the parties and several amici provided, *see* C.A. Dkt. 46, 48, 49, 58, 59.

A panel of this Court vacated the district court's order. *Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224, 1265 (11th Cir. 2025), *reh'g en banc granted, opinion vacated*, 174 F.4th 1350 (11th Cir. 2026). Before reaching the

"central question of the case," the panel majority considered whether the Court "need[ed] to answer it all." *Id.* at 1235. According to the majority, the Court could possibly "avoid the issue" if it could "remand the case to allow Fulton to press an action under *state law* to recover the value of his horses." *Id.* But the majority concluded that that was not an option because Georgia's presentment statute requires that a plaintiff provide notice of all claims against counties "within 12 months after they accrue or become payable," and the record purportedly "contain[ed] no evidence showing Fulton satisfied this requirement." *Id.* at 1236 (quoting OCGA § 36-11-1).

The majority further considered whether Fulton's direct Takings Clause claim might be time-barred. *Id.* It held that "Georgia's [four-year] statute of limitations that governs inverse-condemnation actions" applied because "the right to 'just compensation' is most analogous" to that state-law cause of action. *Id.* at 1237-38. Under that statute of limitations, "Fulton's action directly under the Takings Clause would be timely." *Id.* at 1238.

On the merits, the majority extensively reviewed the Constitution's text, structure, and history. *See id.* at 1238-55. Based on that review, the majority held that a litigant may sue a state county "directly under the Takings Clause to obtain 'just compensation' for a taking." *Id.* at 1238.

Chief Judge Pryor dissented. In his view, the text and history of the Takings Clause and Supreme Court precedent counsel against "imply[ing] a right of action." *Id.* at 1265. According to the dissent, because "the statutory action for federal civil-rights violations, 42 U.S.C. § 1983, and state law provide adequate remedies for takings by local governments," this Court "ha[s] no business creating a constitutional remedy" for Fulton. *Id.*

The County[4] petitioned for rehearing en banc. C.A. Dkt. 74. This Court granted the petition and ordered the parties to address "[w]hether the district court's judgment in this case should be affirmed, and why or why not that is so." C.A. Dkt. 84-1.

## SUMMARY OF ARGUMENT

**I.** Both the text and history of the Fifth and Fourteenth Amendments confirm that the Takings Clause itself creates a judicially enforceable cause of action.

**A.** The text of the Takings Clause is unique in the Bill of Rights. It is the only clause that specifies a *monetary* remedy. And it is the only clause that, rather than purely prohibiting some government action (taking private

[4] For simplicity, like the panel majority, Fulton refers to the Fulton County Board of Commissioners as the County.

property), affirmatively dictates what the government must *do* when it acts (pay just compensation). The Fifth Amendment's text alone is sufficient for a plaintiff to obtain *Ex parte Young*-style injunctive relief ordering an official to pay just compensation for a taking. That same text affords Fulton the same ultimate relief here: an order requiring the County to do its duty under the Constitution to pay just compensation for the property it took.

**B.** The Fifth and Fourteenth Amendments' history—as expounded by the drafters themselves—and more than a century of federal and state court litigation confirm what the text says. In proposing the Fifth Amendment, James Madison stressed that courts—not legislatures—would ensure that its promises were honored. And he was right. Even as States abolished the rigid separation between forms of action (law and equity), both state and federal courts repeatedly reaffirmed what those procedural forms had obscured: The Fifth Amendment itself supplies the cause of action. Indeed, the Supreme Court has repeatedly confirmed that "[j]ust compensation is provided for by the Constitution and the right to it cannot be taken away by statute." *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923). Whatever the era, and whatever the procedural vehicle, the conclusion has never wavered: The

Constitution's guarantee of just compensation carries with it the right to enforce that guarantee in court.

**II.** The County's fallback argument—that Fulton's claim is untimely—does not support affirmance. At the motion-to-dismiss stage, a claim may be dismissed under an affirmative defense like the statute of limitations *only* if the defense appears on the face of the complaint. Here, it does not, so Fulton's claim cannot be dismissed as untimely.

**A.** The panel majority rightly concluded that Georgia's four-year limitations period for inverse-condemnation claims applies. That is because claims for inverse-condemnation under Georgia law most closely resemble the federal cause of action for direct claims under the Takings Clause, as even the dissent acknowledged. All agree Fulton's claim is timely under that four-year limitations period.

**B.** Even under Georgia's two-year statute of limitations for personal-injury actions, the result would be the same. Fulton filed his complaint on May 5, 2020; his claims would be barred by a two-year limitations period, then, only if it were clear from the face of the complaint that his claims accrued before May 5, 2018. It is not, for three independent reasons. First, the County's continued refusal to pay just compensation for its taking is an ongoing

violation; each time the County has refused to return the horses, and each day it refuses to pay just compensation, begins a new limitations period. Second, even if not an ongoing violation, Fulton's claim accrued at the earliest in May 2019, after a Georgia court rejected the County's *post-dismissal* effort to have the horses declared civilly forfeited and confirmed that the court would take no further action in the case. Third, the Georgia Supreme Court's emergency orders related to the COVID-19 pandemic separately tolled the limitations period during the relevant timeframe.

**III.** The Court cannot avoid the central question of the case even if it concludes that Fulton has other state or federal remedies he could pursue on remand.

**A.** As the Supreme Court held in *Knick*, whether the Fifth Amendment itself supplies a cause of action does not turn on whether *other* causes of action exist. Just as a state-law battery claim does not bar a Fourth Amendment excessive-force claim, an overlapping state or federal takings remedy cannot bar Fulton's direct claim under the Takings Clause. The County agrees.

**B.** *DeVillier* does not say otherwise. The Supreme Court declined to decide the question there only because the premise on which it had discretionarily granted certiorari—that the petitioner had no state-law

remedy—proved false. In this direct appeal, the question is inescapable: The district court's judgment now on review *is* a holding that the Fifth Amendment supplies no cause of action against a county, so affirming or reversing that judgment necessarily requires this Court to decide the key question.

**IV.** If the Court concludes that the Takings Clause creates no direct cause of action, remand is still warranted to permit Fulton to amend his complaint.

**A.** Allowing Fulton to assert state-law claims for inverse condemnation and conversion would not be futile. The panel majority suggested that Georgia's statutory presentment requirement—that any claims against a county must be presented to it within 12 months of the claim accruing—would bar Fulton from asserting state-law claims. But like the statute of limitations, that presentment requirement is an affirmative defense. And like federal law, Georgia law confirms that a claim may not be dismissed based on an affirmative defense unless it is clear from the face of the complaint. Here, the complaint alleges no facts regarding the presentment requirement—and in fact, Fulton *did* timely present his claims to the County. And anyway, the County has waived any argument regarding the requirement by never raising it in the district court or on appeal.

**B.** The interests of justice strongly support allowing Fulton to amend his complaint as necessary to vindicate his right to just compensation. The County has never seriously denied that its actions constitute a textbook taking. Nor has it ever explained its staunch refusal—going on a decade now—to pay just compensation. This Court generally requires that plaintiffs be given at least one opportunity to amend their complaint. Fulton got none, even though amendments to his complaint could cure the deficiencies that the district court identified in his § 1983 takings and procedural-due-process claims. *DeVillier* indicates that plaintiffs should be given opportunities to liberally amend their complaint when a colorable takings claim would otherwise be foreclosed. At minimum, this Court should give Fulton one chance to amend his complaint to hold the County accountable for its unjustified—and unjustifiable—refusal to provide just compensation.

## STANDARD OF REVIEW

This Court reviews for abuse of discretion the district court's denial of a motion for leave to amend a complaint. *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004). But the Court reviews de novo the district court's legal conclusion that amendment would be futile. *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334,

1336 (11th Cir. 2010). An amended complaint is futile if the claims, as amended, would be subject to dismissal as a matter of law. *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004).

"Because the district court dismissed this case at the pleadings stage," the Court takes Fulton's "well-pleaded allegations as true and draw[s] all reasonable inferences in [his] favor." *Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1327 (11th Cir. 2025) (quotation omitted).

## ARGUMENT

### I. Fulton's Motion to Amend Is Not Futile Because the Fifth Amendment Creates a Direct Cause of Action for Takings Claims

In determining the scope of a constitutional right, courts consider both "text" and "history." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 25 (2022). Both demonstrate the same: The Takings Clause supplies its own cause of action.

#### A. The Fifth Amendment's Text Supplies a Direct Cause of Action to Assert a Takings Claim

The Takings Clause provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. That Clause, along with the Suspension Clause, are the only two provisions in the Constitution that identify a remedy. And the Takings Clause is the *only*

provision that specifies a *monetary* remedy. That singular feature alone supports the notion that the right to just compensation has "special protections against congressional abrogation or dereliction." *DeVillier v. State*, 63 F.4th 416, 439 (5th Cir. 2023) (*DeVillier CA5*) (Oldham, J., dissenting from the denial of rehearing en banc), *denying reh'g from*, 53 F.4th 904 (5th Cir. 2023) (per curiam), *vacated*, 601 U.S. 285 (2024).

The guarantee of just compensation is unique in another respect. The text of the Takings Clause sets it apart from the rest of the Bill of Rights because it "does not prohibit the taking of private property [for public use], but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 314 (1987). Unlike other, purely prohibitory parts of the Constitution, the Fifth Amendment dictates what must happen when property is taken: Just compensation must be paid. And if the government must pay just compensation, it follows that courts of competent jurisdiction may *order* it to pay when it has failed to do so, irrespective of whether Congress or the States have established specific procedural vehicles.

That is undoubtedly true of claims for equitable relief brought directly under the Fifth Amendment. Under *Ex parte Young*, 209 U.S. 123 (1908),

federal courts may enjoin state officials "from enforcing an order in contravention of controlling federal law." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). That doctrine applies where the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* (citation omitted).

This Court recently held that *Ex parte Young*-style injunctive relief is available to enforce the Fifth Amendment's guarantee of just compensation. *See Maron v. Chief Fin. Officer of Fla.*, 136 F.4th 1322, 1333-34 (11th Cir. 2025). In *Maron*, the Court considered Florida's "Disposition of Unclaimed Property Act," under which "private property unclaimed for several years enters the State's custody, where it then accrues certain earnings that the State keeps and spends." *Id.* at 1326. The plaintiffs sued the State of Florida directly "under the Takings Clause of the Fifth Amendment" to enjoin Florida from enforcing the statute, alleging that Florida's refusal to pay interest that had accrued on plaintiffs' "unclaimed" funds constituted a taking. *Id.* at 1328. Specifically, the plaintiffs sought "an injunction requiring the State to pay" the accrued earnings. *Id.* The district court dismissed the claim "to the extent it sought retrospective and not prospective relief." *Id.*

This Court reversed. It held that the "*Ex parte Young* exception applie[d]" because the plaintiffs' takings claim satisfied both prongs of the "straightforward inquiry." *Id.* at 1333. "The [plaintiffs] alleged an ongoing violation of federal law—that the State has appropriated their refund and failed to give them just compensation. And they sought prospective relief—that the district court declare a part of the Act unconstitutional for precluding recovery of just compensation and that it order the State to pay just compensation when they later file a claim." *Id.* Rejecting Florida's argument that the plaintiffs' claim was really "nothing more than a prospective request for retroactive monetary damages," *id.*, the Court emphasized that the Takings Clause "prohibits not takings, but takings *without just compensation*," meaning that "[t]he lack of compensation is a part of an ongoing tort," *id.* at 1334.

That feature of the Clause—commanding payment rather than forbidding the taking—is what makes the guarantee judicially enforceable. A government that takes without paying is not violating the Constitution once, in a single completed act; it is violating the Constitution continuously, for as long as the compensation goes unpaid. That ongoing violation is precisely what *Ex parte Young* empowers courts to halt. *Verizon Md.*, 535 U.S. at 645. When

a court issues an order directing the government to pay the compensation that the Fifth Amendment already mandates, the court does nothing more than require government officials to follow the law going forward.

The same logic controls here. As in *Maron*, the County took Fulton's property and has refused to pay the just compensation the Fifth Amendment commands—an ongoing violation that persists to this day. And as in *Maron*, what Fulton seeks is not a remedy for a past completed act, but an order requiring the County to do what the Constitution requires going forward: pay for what it took. Whether that order is framed as prospective relief compelling future payment, or as a judgment for compensation already due, its premise is identical to the one this Court embraced in *Maron*—that the Takings Clause prohibits the "ongoing tort" of failing to pay just compensation. 136 F.4th at 1334. Just as the Court ordered Florida to pay just compensation to cure that ongoing violation in *Maron*, the Court should order the County to do the same here.

### B. The History and Tradition of the Fifth and Fourteenth Amendments Confirm the Takings Clause Supplies a Direct Cause of Action

#### 1. Before the Fifth Amendment, the Right to Just Compensation Became Increasingly Entrenched in Early American Law

The principle that private property may not be taken for public use absent just compensation dates at least to the signing of Magna Carta in 1215. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015). Most notably, Clause 28 "forbade any 'constable or other bailiff' from taking 'corn or other provisions from any one without immediately tendering money therefor.'" *Id.* (quoting Magna Carta, cl. 28 (1215), *in* William Sharp McKechnie, *Magna Carta: A Commentary on the Great Charter of King John* 329 (2d ed. 1914)).

Two early adoptions of this principle show that the colonists carried this right with them across the Atlantic. In 1641, the Massachusetts Body of Liberties imposed a compensation requirement for public takings of personal property:

> No mans Cattel or goods of what kinde soever shall be pressed or taken for any publique use or service, unlesse it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford. And if his Cattle or goods shall perish or suffer damage in such service, the owner shall be suffitiently recompenced.

William Michael Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 785 (1995) (citation omitted). The 1669 Fundamental Constitutions of Carolina, though "never fully implemented," similarly provided compensation for the seizure of real property: "The damage the owner of such lands (on or through which any such public things shall be made) shall receive thereby shall be valued, and satisfaction made by such ways as the grand council shall appoint." *Id.* at 785-86 (citations omitted).

From those early roots, the right to just compensation continued to strengthen over time. "Uncompensated seizures by the military" during the Revolutionary War—including of horses—led to calls for greater guarantees of just compensation for public takings. *Id.* at 831-32. In 1778, John Jay wrote to the New York legislature to denounce "the Practice of impressing Horses, Teems, & Carriages by the military, without the Intervention of a civil Magistrate, and without any Authority from the Law of the Land." John Jay (A Freeholder), *A Hint to the Legislature of the State of New York*, Founders

Online, https://perma.cc/32NL-432K (emphasis omitted).[5] The solution, Jay proposed, was to allow those "who … severely feel this kind of oppression" to "*bring Actions* and recover Damages." *Id.* (emphasis added). In other words, even before the Fifth Amendment was drafted, the Founders recognized that the right to just compensation would need to be vindicated by the courts.

Jay's early call to action was answered nearly a decade later. In the Northwest Ordinance of 1787, the Confederation Congress included a predecessor to the Takings Clause: "[S]hould the public exigencies make it necessary, for the common preservation, to take any persons property … full compensation shall be made for the same." Northwest Ordinance of 1787, art. 2. The 1787 Ordinance thus built on the growing determination to ensure just compensation for public takings, which would carry over to the Constitutional Convention later that year.

[5] Jay's views captured the prevailing sentiment at the Founding. In 1803, St. George Tucker, "the first legal scholar to offer an interpretation" of the Takings Clause, wrote that the Clause "was probably intended to restrain the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war." Treanor, *supra*, at 791-92 (citations omitted).

### 2. The Fifth Amendment Itself Secured Just Compensation as a Judicially Enforceable Guarantee

"[I]t was clear" at the Founding "that the Takings Clause afforded a remedy for uncompensated takings *separate and apart from any statute*." *DeVillier (CA5)*, 63 F.4th at 434 (emphasis added) (Oldham, J., dissenting); *cf. O'Connor v. Eubanks*, 83 F.4th 1018, 1029 (6th Cir. 2023) (Thapar, J., concurring) (noting Judge Oldham's "thoughtful opinion … collecting over a century of Supreme Court cases suggesting plaintiffs have a cause of action directly under the Takings Clause"). Nothing illustrates this better than the writings of James Madison, who *drafted* the Fifth Amendment.[6]

In drafting the Takings Clause, Madison did not write from a blank slate. He would have been familiar with "the Vermont Constitution of 1777, the Massachusetts Constitution of 1780 and the Northwest Ordinance of 1787, each of which provided for an affirmative right to compensation once property was taken." Douglas W. Kmiec, *The Original Understanding of the Taking Clause Is Neither Weak Nor Obtuse*, 88 Colum. L. Rev. 1630, 1661 n.161 (1988). Doubts remained, though, whether legislatures could be trusted to effect the

[6] Madison's statements offer "unusually significant evidence" about what the Takings Clause "was originally understood to mean," given that "[t]here are apparently no records of discussion about the meaning of the clause in either Congress or, after its proposal, in the states." Treanor, *supra*, at 791.

just-compensation remedy. *See* Robert Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 57, 107 n.220 (1999) ("[T]he proliferation of just compensation clauses may have been due to a … general loss of faith in legislatures.").

Madison was not neutral on that question. In proposing the Takings Clause, Madison stressed that federal courts would enforce the Bill of Rights—if need be, *in spite of* legislatures:

> If [these rights] are incorporated into the constitution, *independent tribunals of justice* will consider themselves in a peculiar manner the guardians of those rights; they will be an impenetrable bulwark *against every assumption of power in the legislative or executive*; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the constitution by the declaration of rights.

James Madison, *Amendments to the Constitution* (June 8, 1789), Founders Online, https://perma.cc/3VQW-6DXG (emphases added).

Shortly after the Fifth Amendment was ratified, moreover, Madison reaffirmed that the constitutional protection against uncompensated takings was essential to the constitutional order:

> Government is instituted to protect property of every sort . . . . If there be a government then which prides itself in maintaining the inviolability of property; which provides that none shall be taken directly even for public use without indemnification to the owner,

> and yet directly violates the property which individuals have in their opinions, their religion, their persons, and their faculties; nay more, which indirectly violates their property, in their actual possessions, … such a government is not a pattern for the United States.

James Madison, *For the National Gazette: Property* (Mar. 27, 1792), Founders Online, https://perma.cc/CQ9G-CYG3. Taken together, Madison's writings confirm that he viewed the right to compensation as foundational to the constitutional order, and he viewed the federal judiciary as essential to protecting that right.

To be sure, "[b]efore 1855, no statute gave consent to suit against the United States on claims for money damages," so "such claims were disposed of … by 'private' acts of Congress." Richard H. Fallon, Jr. et al., *Hart and Wechsler's The Federal Courts and The Federal System* 897 (7th ed. 2015). And that is how early takings claims against the federal government were handled. *See* Treanor, *supra*, at 794 n.69. But that did not mean such compensation was discretionary: "While Congress was the forum for takings claims, it did not have discretion to deny takings claims mandated by the Takings Clause." *Id.* Nor does the early-American practice of legislative compensation suggest that the Fifth Amendment did not supply a cause of action. It simply reflected uncertainty at the time about the federal

government's sovereign immunity; in light of such uncertainty, Congress initially resolved takings claims itself, leaving dormant the issue of whether a direct cause of action existed. *See DeVillier (CA5)*, 63 F.4th at 434-45 (Oldham, J., dissenting) ("[E]arly Congresses' approach to paying for taken property apparently derived from their views about sovereign immunity rather than any doubt that the Fifth Amendment, standing alone, required a just-compensation remedy for takings." (citation omitted)); Treanor, *supra*, at 794 n.69 (acknowledging that the early preference for legislative rather than judicial resolution of takings claims may not reflect the original understanding of the Fifth Amendment).[7]

### 3. After the Forms of Action Were Abolished and the Fourteenth Amendment Was Ratified, Courts Enforced the Takings Clause Directly Under the Constitution

**a.** In the early 1800s, property owners could vindicate their right to just compensation through two paths. A suit in equity could enjoin the uncompensated taking, while a suit at law invoking one of the common-law forms of action (usually trespass) provided for damages. *Cf. Knick*, 588 U.S. at

[7] Notably, "[b]ecause reliance on private acts [of Congress] had proved burdensome and inequitable, Congress created the Court of Claims" to adjudicate claims against the federal government. *Hart and Wechsler, supra,* at 897.

199-200. But "over roughly a century from 1848 … to 1937," states "merged the courts of law and equity" and abolished the forms of action. Douglas Laycock, *How Remedies Became a Field: A History*, 27 Rev. Litig. 161, 171 (2008).

As the forms were abolished, many state courts began acknowledging that "just compensation provisions *were themselves* the source of property owners' rights of action for damages." Brauneis, *The First Constitutional Tort, supra,* at 109 (emphasis added). The New Hampshire Supreme Court, for example, held that a property owner whose land was flooded by a railroad project could recover damages even though no statute provided him with a just-compensation remedy. *Eaton v. Bos. Concord & Montreal R.R.*, 51 N.H. 504, 517 (1872). The *Eaton* court expressly rejected the idea that any suit for damages had to be framed as a trespass. Takings claims did not need to fit into "the old forms of action" that had been abolished. *Id.* at 520-21; *see, e.g.*, *Reardon v. City & Cnty. of San Francisco*, 6 P. 317, 325 (Cal. 1885); *Harman v. City of Omaha*, 23 N.W. 503, 503 (Neb. 1885). Likewise, in *City of Elgin v. Eaton*, the Illinois Supreme Court confirmed that, by "[f]ailing to provide compensation for the damages, the city became liable to an action," because "the right to recover damages *was given by the constitution*." 83 Ill. 535, 536-

37 (1876) (emphasis added) (citing *Clayburg v. City of Chicago*, 25 Ill. 535 (1861)).

Federal courts were no different. In *Pumpelly v. Green Bay Co.*, the Supreme Court explained the "settled principle of universal law that the right to compensation is an incident to the exercise of [the] power" to take private property. 80 U.S. (13 Wall.) 166, 178 (1872). *Pumpelly* was no outlier. As the court explained in *Blanchard v. City of Kansas*, "since the positive declaration of the constitution is that private property shall not be taken or damaged for public use without just compensation, [the constitution] is bound in some way to make that just compensation, and … the law shall compel it to do it." 16 F. 444, 446 (W.D. Mo. 1883) (Miller, J.); *see, e.g.*, *Pac. R.R. Removal Cases*, 115 U.S. 1, 5-6 (1885); *Boom Co. v. Patterson*, 98 U.S. 403, 407-08 (1879); *Transp. Co. v. Chicago*, 99 U.S. 635, 642 (1879); *Hollingsworth v. Parish of Tensas*, 17 F. 109, 116-18 (C.C.W.D. La. 1883); *Sumner v. Philadelphia*, 23 F. Cas. 392, 395-97 (C.C.E.D. Pa. 1873) (No. 13,611). The upshot: the right to just compensation was not dependent on a statutory right of action.

**b.** The gradual abolition of the forms of action overlapped with the ratification of the Fourteenth Amendment (1868) and the incorporation of the Takings Clause against the States (1897). Like the Fifth Amendment, the

history of the ratification of the Fourteenth Amendment and subsequent takings litigation reinforces that the Takings Clause supplies a judicially enforceable cause of action.

The Takings Clause was front of mind for the drafters of the Fourteenth Amendment. Over thirty years earlier, the Supreme Court had rejected a plaintiff's attempt "to recover damages for injuries to [his] wharf-property … arising from the acts" of the City of Baltimore. *Barron ex rel. Tieman v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243, 243 (1833). The Court held that the Takings Clause "is not applicable to the legislation of the states." *Id.* at 250-51.

John Bingham, the author of Section One of the Fourteenth Amendment, "had read" *Barron*, Cong. Globe, 42d Cong., 1st Sess. App. 84 (1871); Bingham thus understood that the Takings Clause was not a "limitation[] upon the States as can be enforced by Congress *and the judgment of the United States courts*," Cong. Globe, 39th Cong., 2d Sess. 811 (1867) (emphasis added). Section One was thus proposed in part "to protect the thousands and tens of thousands and hundreds of thousands of loyal … citizens of the United States whose property, by State legislation, has been wrested from them under confiscation." *Id.* 1st Sess. 1065 (1866) (statement of Rep.

Bingham). Put simply, one of the avowed purposes of the Fourteenth Amendment, as identified by its primary architect, was to ensure that States and local governments could not take property for public use without just compensation.

Following incorporation of the Takings Clause against the States, *see Chicago, B. & Q. R. Co. v. Chicago*, 166 U.S. 226, 238-41 (1897), federal courts adjudicated takings claims directly under the Constitution: "The plaintiff's suit proceeded upon the ground, distinctly stated, that the assessment in question was in violation of the fourteenth amendment . . . . It has been adjudged that the due process of law prescribed by that amendment requires compensation to be made or secured to the owner when private property is taken by a state, or under its authority, for public use." *Vill. of Norwood v. Baker*, 172 U.S. 269, 277 (1898); *accord Dohany v. Rogers*, 281 U.S. 362, 366 (1930); *Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926); *Del., Lackawanna & W. R.R. Co. v. Town of Morristown*, 276 U.S. 182, 194 (1928); *Cuyahoga River Power Co. v. City of Akron*, 240 U.S. 462, 464 (1916).

Indeed, in the decades that followed, the Supreme Court repeatedly clarified that the right to compensation flowed from the Constitution itself, not legislative grace: "Just compensation is provided for by the Constitution *and*

*the right to it cannot be taken away by statute.*" *Seaboard Air Line Ry. Co. v. United States*, 261 U.S. 299, 304 (1923) (emphasis added). "[T]he right to recover just compensation for property taken by the United States for public use … rest[s] upon the Fifth Amendment." *Jacobs v. United States*, 290 U.S. 13, 16 (1933); *see United States v. Causby*, 328 U.S. 256, 267 (1946) ("If there is a taking, the claim is founded upon the Constitution.") (cleaned up). The constitutional guarantee of a remedy thus meant that "[s]tatutory recognition was not necessary." *Jacobs*, 290 U.S. at 16.

* * *

Text and history point to a single conclusion: The Takings Clause is not an empty promise awaiting legislative implementation, but a self-executing guarantee that Fulton may assert directly under the Constitution. From Magna Carta through the Founding, and from the abolition of the forms of action through incorporation against the States, the right to just compensation has always carried with it the right to obtain that compensation in court. Fulton's proposed amendment asserting a direct cause of action under the Fifth Amendment therefore is not futile, and the district court erred in holding otherwise.

## II. The Court Cannot Determine at the Motion-to-Dismiss Stage That Fulton's Federal Takings Claim Is Futile as Untimely

This Court cannot affirm the district court on the County's alternative argument that Fulton's federal Takings Clause claim is futile because it would be barred by the statute of limitations.[8] As the majority and dissent agreed, one of two statutes of limitations would apply to a direct cause of action brought under the Takings Clause: Georgia's four-year statute of limitations for inverse-condemnation actions, or its two-year statute of limitations for personal-injury actions. *Fulton*, 148 F.4th at 1237, 1281. In the current procedural posture, this Court cannot determine that Fulton's claim would be futile under either.

All agree that Fulton's claim would be timely if the Court applies Georgia's four-year statute of limitations for inverse-condemnation actions (as the Court should). But even if the Court determined that the two-year statute of limitations applies, the Court could not conclude in this procedural posture that Fulton's claim would be futile. At this stage, Rule 12(b)(6) dismissal based

[8] While the Court could reverse solely on the ground that Fulton's federal Takings Clause claim would not be futile, it should also resolve the parties' dispute over the applicable statute of limitations. *See Vasquez-Garcia v. Centurion, LLC*, 172 F.4th 1150, 1162 (10th Cir. 2026) (reaching potential alternative ground for affirmance because "it is not only possible but likely that arguments concerning the [limitations period] will recur on remand").

on a statute of limitations is proper *only* where it is "apparent from the face of the complaint that the claim is time-barred." *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004)). Here, it is not—for multiple, independent reasons.

### A. Fulton's Federal Takings Claim Is Not Barred by Georgia's Four-Year Statute of Limitations for Inverse-Condemnation

**1.** The panel majority correctly determined that Georgia's four-year statute of limitations for inverse-condemnation claims should apply to Fulton's federal takings claim. *Fulton*, 148 F.4th at 1237-38. When a federal claim lacks an express statute of limitations, this Court applies "the forum state's limitations period applicable to the state cause of action that bears the closest substantive resemblance to the federal cause of action." *Vigman v. Cmty. Nat'l Bank & Tr. Co.*, 635 F.2d 455, 459 (5th Cir. Jan. 1981) (citations omitted).

Here, that is not a close call. Fulton's federal Takings Clause claim is, in effect, a federal inverse-condemnation claim because he seeks to recover the value of his horses that were taken by the County. *See Knick*, 588 U.S. at 186 (an inverse-condemnation action seeks to recover the value of property a government defendant took). Georgia provides a cause of action for inverse-condemnation actions. *See Diversified Holdings, LLP v. City of Suwanee*, 807

S.E.2d 876, 884 (Ga. 2017). It is difficult to imagine a state cause of action that bears a *closer* "substantive resemblance" to Fulton's federal inverse-condemnation claim. This Court should accordingly apply Georgia's four-year statute of limitations. *See* OCGA § 9-3-30.

At the panel stage, the dissent agreed that "takings claims are like inverse-condemnation or conversion claims." *Fulton*, 148 F.4th at 1281 (Pryor, C.J., dissenting). But quoting *Egbert v. Boule*, 596 U.S. 482 (2022), the dissent suggested that it would be improper for this Court to decide which statute of limitation applies because "weighing the costs and benefits of alternative limitation periods 'is a legislative endeavor.'" *Fulton*, 148 F.4th at 1281. Yet *Egbert* nowhere addresses—let alone holds—that legislatures, not courts, must determine which statute of limitation applies to a federal claim that lacks an express statute of limitations. And, indeed, in the immediately preceding sentence, the dissent expressly acknowledged binding precedent that *directs* this Court to answer this precise question. *See id.* (citing *Vigman*, 635 F.2d at 459). The panel majority therefore did not "transgress[] the separation of powers" by fulfilling its mandate under this Court's precedent. *Contra id.*

**2.** As all agree, Fulton's federal Takings Clause claim is not futile under Georgia's four-year statute of limitations. Regardless of whether Fulton's

claim accrued on April 5, 2018, when Georgia dropped its charges, or—as Fulton argues below—at some later date, Fulton's May 5, 2020, complaint was filed well within the statute of limitations.

### B. Even Under a Two-Year Statute of Limitations, This Court Cannot Conclude Fulton's Federal Takings Claim Is Futile

If the Court determines that Georgia's two-year statute of limitations for personal-injury claims applies, it still cannot affirm the district court's judgment on the alternative grounds that Fulton's claim is futile as untimely. "A statute of limitations bar is an affirmative defense, and plaintiffs are not required to negate an affirmative defense in their complaint." *La Grasta*, 358 F.3d at 845 (cleaned up). For that reason, dismissal on statute-of-limitations grounds at the motion-to-dismiss stage is appropriate only if it is "apparent from the face of the complaint that the claim is time-barred." *Wainberg*, 93 F.4th at 1224 (citation omitted).

Here, the County cannot make that showing because the face of the complaint does not establish that Fulton's claim accrued before May 5, 2018—the date that would render his May 5, 2020, complaint untimely under a two-year limitations period. "A [Fifth Amendment] takings claim accrues when *all* the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *John R. Sand & Gravel Co. v. United*

*States*, 457 F.3d 1345, 1355-56 (Fed. Cir. 2006) (emphasis added; quotation marks and citation omitted), *aff'd*, 552 U.S. 130 (2008). But a claim "only accrues if the plaintiff knew or should have known of the existence of the events fixing the government's liability." *Id.*; *cf. Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (under Section 1983, "the statute of limitations begins to run from the date the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights" (cleaned up)).

Under that standard, the face of the complaint does not establish that Fulton's claim accrued before May 5, 2018, for three reasons: (1) The County's continued failure to pay just compensation is an ongoing violation, meaning that Fulton's claim is still accruing; (2) even if not an ongoing violation, Fulton's claim accrued at the earliest on May 30, 2019, when a Georgia court declined to act on Fulton's petition for the return of his horses; (3) and, regardless, the Georgia Supreme Court tolled the statute of limitations for all claims during the relevant period due to the COVID-19 pandemic.

#### 1. Because the County's Failure to Pay Just Compensation Is an Ongoing Violation, Fulton's Claim Is Still Accruing

This Court explained in *Maron* that "the difference at root between a takings claim and other constitutional claims" is that "the Takings Clause … prohibits not takings, but takings *without just compensation*." 136 F.4th at 1334 (citation omitted). That means that a government's failure to pay compensation following a taking "is part of an ongoing tort." *Id.*; *see* Tr. of Oral Argument 47, *DeVillier v. Texas*, 601 U.S. 285 (2024) (No. 22-913) (Kagan, J.) (government's failure to pay just compensation following a taking is an "ongoing violation" because "[e]very day" the government fails to pay, it is "violating the Constitution"). And where, as here, a case "involves a series of repeated violations of an identical nature … each violation gives rise to a new cause of action" and therefore "begins a new statute of limitations period as to that particular event." *Knight v. Columbus*, 19 F.3d 579, 582 (11th Cir. 1994).

Here, the face of the complaint confirms that the County's repeated failures to pay just compensation constitute an "ongoing tort." *Maron*, 136 F.4th at 1334. Fulton alleged that, at the time he filed the complaint, the County "continue[d] to hold the horses," "[d]espite the … dismissal" of the criminal charges. C.A. Dkt. 15-1 at 6 (Doc. 1 at 4). And Fulton further alleged

that he made "repeated … requests" for the "return [of] the horses or their equivalent value," but the County refused each time. *Id.* To this day, Fulton County has paid Fulton nothing for the horses it took. Because "each violation gives rise to a new cause of action," every day Fulton County refuses to pay just compensation "begins a new statute of limitations period." *Knight*, 19 F.3d at 582. The complaint thus does not establish on its face that Fulton's claim accrued before May 5, 2018, because the claim continues to accrue *each day* the County refuses to pay the compensation that Fulton is owed.

#### 2. If Not an Ongoing Violation, the Claim Accrued at the Earliest on May 30, 2019

The Court also cannot conclude from the face of the complaint that the claim accrued before May 5, 2018, because the complaint does not plead sufficient facts to determine when *all* the events fixing the County's liability occurred, *John R. Sand*, 457 F.3d at 1355; nor does it plead the date that facts supporting a cause of action were "apparent or should be apparent to a person with a reasonably prudent regard for his rights," *Brown*, 335 F.3d at 1261 (citation omitted). And regardless, the earliest it would have been apparent to Fulton that he had an actionable takings claim was on May 30, 2019, when a Georgia court declined to act on his petition for the return of his horses.

To start, the complaint pleads no facts regarding the County's assertion—*after* the State dismissed the charges on April 5, 2018—that the horses had been civilly forfeited. *See La Grasta*, 358 F.3d at 845-46 ("[T]he Federal Rules of Civil Procedure do not permit district courts to impose upon plaintiffs the burden to plead with the greatest specificity they can." (cleaned up)). Soon after the charges were dismissed, Fulton's counsel filed multiple open record requests to locate the horses. Doc. 50-3 at 5. Counsel also emailed employees of the offices of the Fulton County District Attorney and the Fulton County Attorney to locate the horses. *Id.* at 12. Plainly, it was not yet apparent to Fulton that the County would not be returning his property.

Counsel's email prompted the County to act, but *not* to rectify its continued retention of Fulton's property. In July 2018, following Fulton's outreach, the Fulton County Attorney, Patrise Perkins-Hooker, filed a "Motion for Clarification" requesting that the court "clarify[]" whether the seized horses "were properly forfeited … and ownership of those animals transferred to Fulton County Animal Services." *Id.* at 14-15. As this motion makes clear, at this point not even *the County* knew whether it had taken Fulton's property without just compensation. In September 2018, the Superior Court of Fulton County denied the County's motion, explaining that "[t]he

bond order was extinguished upon the State's filing of its notice of non-prosecution," and there was accordingly "nothing for the Court to clarify." *Id.* at 24.

In light of the court's order, Fulton again sought the return of his horses. In April 2019, Fulton's counsel filed a "Petition for Return of Property" with the same superior court that had denied the County's motion for clarification. *Id.* at 4. After explaining that the County had "refused to return Petitioner's horses, or consent to an order returning the horses, despite multiple requests," the petition requested "an order requiring defendants to return the property seized immediately." *Id.* at 6. But on May 30, 2019, an attorney for the court responded via email that the court would not make any further rulings in the case. *See* Doc. 50-4 at 2. Fulton then notified the County of his claims *that same day*. *Id.* at 1.

On this record, Fulton's claim could not have accrued before the superior court confirmed on May 30, 2019, that it would issue no further rulings in the case. Before that time, it would not have been "apparent to a person with a reasonably prudent regard for his rights" that his property would not be returned, such that his takings claim had accrued. *Brown*, 335 F.3d at 1261. Indeed, given the court's order rejecting *the County's* claim that the horses

had been forfeited, Fulton would not have understood that he had a takings claim; he reasonably believed he would soon have his horses back. And because Fulton's claim did not accrue until, at the earliest, May 30, 2019, the Court cannot conclude from the face of the complaint that Fulton's claim accrued before May 5, 2018.

#### 3. Regardless, Fulton's Claim Was Sufficiently Tolled by the Georgia Supreme Court's COVID-19 Order

On March 14, 2020, in response to the COVID-19 pandemic, the Georgia Supreme Court entered an emergency order broadly tolling all deadlines in civil and criminal cases throughout the State. Hon. Chief Justice Harold D. Melton, Supreme Court of Georgia, *Order Declaring Statewide Judicial Emergency* 2, https://perma.cc/YA8V-BDS7. The order provided that, "during the period of this Order, the undersigned hereby suspends, tolls, extends, and otherwise grants relief from any deadlines or other time schedules or filing requirements imposed by otherwise applicable statutes, rules, regulations, or court orders, whether in civil or criminal cases or administrative matters, *including, but not limited to any … statute of limitation.*" *Id.* (emphasis added).

Extended several times, the emergency order was in effect from March 14, 2020, until July 14, 2020. *Golden v. Floyd Healthcare Mgmt., Inc.*, 904

S.E.2d 359, 362-63 (Ga. 2024). Thus, even assuming Fulton's federal Takings Clause claim accrued on April 5, 2018, the statute of limitations was tolled from March 14, 2020, until Fulton filed his complaint on May 5, 2020. Fulton's claim was thus timely even under a two-year statute of limitations, which the County conceded at oral argument. Oral Argument at 24:45-26:14, *Fulton v. Fulton Cnty. Bd. of Comm'rs*, No. 22-12041 (11th Cir. Dec. 12, 2023) ("If the . . . April 2018 date is what governs and then the two-year statute of limitations in Georgia [applies], [Fulton] would have filed [the complaint] during the period in which the statute of limitations was tolled.").

In its amicus curiae brief at the panel stage, Georgia's Solicitor General argued that the County's "tentative view" on the effect of the emergency order "should not be well-taken." C.A. Dkt. 59 at 34. According to Georgia, only "generally applicable *principles* that apply to the state statute of limitations might also apply in federal court," not "*discretionary* state decisions that merely suspend ordinary legal rules in state court." *Id.* at 35. Yet Georgia cites nothing for that principle, relying instead on counsel's failure to find "any example of a federal court applying a discretionary executive (or judicial) decision on tolling to federal courts." *Id.*

Examples abound. Like Georgia, many States promulgated similar emergency orders, including the supreme courts of Massachusetts, Virginia, and Texas. Federal courts interpretating those states' materially similar emergency orders have uniformly concluded that, for claims—state or federal—that look to the *state*'s statute of limitations, the emergency order tolled the statute of limitations. *See Silva v. City of New Bedford*, 602 F. Supp. 3d 186, 198 (D. Mass. 2022) (Massachusetts Supreme Judicial Court's emergency order tolled statute of limitations for § 1983 actions because those claims require courts to apply state statute of limitations); *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 78 (D. Mass. 2023) (same for Title IX claims); *Dillow v. Va. Polytechnic Inst. and State Univ.*, No. 7:22-cv-00280, 2023 WL 2320765, at *10 (W.D. Va. Mar. 2, 2023) (Virginia Supreme Court's emergency order tolled statute of limitations for Title IX claim); *Allen v. Sherman Operating Co.*, 520 F. Supp. 3d 854, 865-70 (E.D. Tex. Feb. 18, 2021) (Texas Supreme Court's emergency order applied in federal courts and tolled the statute of limitations for Texas loss-of-consortium claim). Because Fulton's

federal Takings Clause claim borrows Georgia's statute of limitations, Georgia's emergency order applies here.[9]

## III. The Court Should Not Avoid the "Central Question" of the Case

The panel majority suggested that if Fulton has alternative remedies available to him to vindicate his takings claim, the Court "might avoid" the "central question of the case." *Fulton*, 148 F.4th at 1235. But the availability of those alternative remedies is irrelevant.[10] And even if the Court *could* avoid the question—and it is not clear the Court can—it should not, and *DeVillier* does not command otherwise.

---

[9] Fulton's claim is not untimely for yet another reason. As the panel majority noted, OCGA § 17-5-54(c)(2) gives the government 30 days following a guilty verdict to return property taken as part of an investigation. *Fulton*, 148 F.4th at 1236. While there was no guilty verdict here, it is reasonable that the government would have the same amount of time to return Fulton's property following the *dismissal* of the charges. And if the County's retention of Fulton's horses did not become wrongful until that 30-day period expired, his claim would not have accrued until May 5, 2018, meaning his May 5, 2020 complaint would have been timely.

[10] As discussed below, even if the Court concludes that the Fifth Amendment supplies no direct cause of action (or declines to answer the question), Fulton has other viable claims he could pursue to remedy the County's unconstitutional taking if the Court permits amendment. *See* Part IV, *infra*.

### A. Other, Potentially Overlapping Causes of Action Are Irrelevant to Determining Whether the Takings Clause Supplies a Cause of Action

The majority and dissent devoted significant discussion to whether the Court "*need[s]* to address the existence of [a] theoretical cause of action" under the Takings Clause, given the potential availability of other state and federal causes of action to vindicate a takings claim. *Id.* at 1236; *see also id.* at 1265 (Pryor, C.J., dissenting) (contending that "property owners today have more ways to vindicate their constitutional right to just compensation than ever before" and that those "ample alternatives undermine any need to imply a constitutional right of action"). But "need" is not the correct standard: The panel's reasoning rests on the mistaken premise that the existence of one cause of action precludes a plaintiff from simultaneously pursuing a separate, albeit overlapping cause of action.

Fulton has asserted a takings claim directly under the federal Constitution. The Fifth Amendment's Takings Clause either provides a direct cause of action to assert such a claim, or it does not. The existence of *other*, alternative causes of action under *other* sources of law for vindicating the taking has no bearing on the validity of Fulton's constitutional claim.

That conclusion holds true even as to overlapping federal claims: While "many of the defendants that take property are suable under § 1983," the "popularity of § 1983 claims does not imply that § 1983 is plaintiffs' *only* avenue for relief." *DeVillier (CA5)*, 63 F.4th at 438 (Oldham, J., dissenting). And as the Supreme Court has expressly held, it holds true as to overlapping state claims as well: "[J]ust as the existence of a state action for battery does not bar a Fourth Amendment claim of excessive force," "[t]he availability of any particular compensation remedy, such as an inverse condemnation claim under state law, cannot infringe or restrict the property owner's federal constitutional claim." *Knick*, 588 U.S. at 191. Indeed, the County itself put it well: "[I]f the panel were right that the Takings Clause *itself* creates a cause of action, then it shouldn't matter whether Fulton has other remedies. He should always be able to use the Constitution's 'express' cause of action, no questions asked." C.A. Dkt. 74 at 14 (citations and brackets omitted).

To be sure, alternative remedies are relevant under the framework established in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for determining whether a court should *imply* a cause of action under the Constitution. *See Egbert*, 596 U.S. at 497. But that is a completely different question—one not posed here. *DeVillier (CA5)*, 63

F.4th at 439 (Oldham, J., dissenting) ("[T]he fact that the Fourth Amendment does not specify a remedy for the illegal search-and-seizure of Webster Bivens doesn't say anything about the Fifth Amendment's very specific remedy for the unconstitutional taking of plaintiffs' land."). Fulton contends not that he has a cause of action under the Fifth Amendment because he otherwise has no recourse, but that the Fifth Amendment *itself* guarantees just compensation for public takings. Either his argument is correct or it is not (it is). But whether other remedies also exist is irrelevant.

### B. *DeVillier* Does Not Preclude the Court from Deciding the "Central Question" of the Case

The panel majority cites *DeVillier* for the proposition that this Court could avoid deciding the Takings Clause question if Fulton could pursue a state-law takings claim on remand. *Fulton*, 148 F.4th at 1235. But nothing in *DeVillier* bars this Court from resolving the "central question" before it, regardless of Fulton's alternative remedies.

In *DeVillier*, the Supreme Court granted certiorari to decide whether "a person whose property is taken without compensation may seek redress under the self-executing Takings Clause even if the legislature has not affirmatively provided them with a cause of action." 601 U.S. at 287-88 (cleaned up). But the Court ultimately concluded that "[t]he premise" underlying its

discretionary grant of certiorari—that the petitioner lacked a state-law cause of action—"d[id] not hold." *Id.* at 293. And because the Court could not "satisfy[] [itself]" of that premise, the Court found it "imprudent to decide" the question presented. *Id.* at 292.

*This* case comes to the Court in a different posture, on a different "question presented," and under a markedly different premise. Fulton exercised his statutory right to appeal the judgment below. And the Court granted the County's en banc petition to decide "[w]hether the district court's judgment in this case should be affirmed, and why or why not that is so." C.A. Dkt. 86. That question necessarily requires this Court to decide whether the Takings Clause creates a direct cause of action. That is because the district court's judgment denied as futile Fulton's motion to amend precisely because, it determined, a takings claim could not be brought directly under the Fifth Amendment. C.A. Dkt. 15-1 at 83 (Doc. 39 at 10). Thus, unlike *DeVillier*, the question here is not premised on whether alternative causes of action exist, but whether it would be futile for Fulton to amend his complaint to add an independent claim brought directly under the Fifth Amendment. The Court must answer that question to decide this case.

## IV. If the Court Concludes That the Takings Clause Supplies No Direct Cause of Action, It Should Still Allow Fulton to Amend His Complaint

Contrary to the panel majority's conclusion, Georgia's statutory presentment requirement would not foreclose Fulton on remand from asserting state-law claims to vindicate his right to just compensation.[11] The face of the complaint does not establish that Fulton failed to provide the requisite notice, and he indeed provided it.

If necessary, therefore, the Court should accordingly give Fulton an opportunity to amend his complaint. Whatever this Court concludes about the best *vehicle* for pursuing Fulton's takings claim, there can be no serious question that he *has* a viable claim—as even the County does not seriously dispute. And on at least this much, *DeVillier* is clear: Plaintiffs with colorable takings claims should not be denied access to the courts when alternative avenues remain available to them. So even if this Court concludes that the Takings Clause does not create a direct cause of action, it should allow Fulton

[11] The panel majority rightly determined that Georgia's four-year statute of limitations would not preclude a state-law takings claim on remand because "any claim added to his complaint would relate back to its original filing date, as though he had brought it on that date, May 5, 2020." *Fulton*, 148 F.4th at 1236 (citations omitted).

to amend his complaint as necessary to add additional state and federal claims to pursue his takings claim.

### A. Georgia's Presentment Requirement Would Not Bar Fulton's State-Law Claims

Under OCGA § 36-11-1, "[a]ll claims against counties must be presented within 12 months after they accrue or become payable or the same are barred."[12] The panel majority concluded that because "no evidence" established that Fulton had satisfied this requirement, the requirement "bars Fulton's state-law claim," *Fulton*, 148 F.4th at 1236. That is incorrect.

As explained below, Fulton's state-law claims accrued on September 24, 2018 (or later), when a Georgia court rejected the County's claim that the horses had been civilly forfeited. He was thus required to present his claims to the County by September 24, 2019. The face of the complaint does not establish that Fulton failed to satisfy that requirement, and he in fact notified the County of his claims on May 30, 2019. In any event, the County has waived any argument that Fulton did not provide the requisite notice.

[12] Though Georgia courts sometimes suggest this statute requires "ante litem" notice, "§ 36-11-1's mandate is properly termed 'presentment,' because a plaintiff may satisfy the statute either by providing pre-litigation (ante-litem) notice of his claim or by filing and serving his complaint within the 12-month time limit." *Mendez v. Moats*, 852 S.E.2d 816, 817 n.1 (Ga. 2020) (Nahmias, J., concurring) (citations omitted).

### 1. The Complaint Does Not Establish That Fulton Failed to Timely Notify the County of His Claims

At least two state-law claims are available to Fulton on remand to vindicate his right to just compensation: an inverse-condemnation claim, *see Diversified Holdings*, 807 S.E.2d at 884, and a claim for conversion under OCGA § 51-10-1, *see Macri v. Brower*, No. 1:21-cv-03240, 2022 WL 4587847, at *5 (N.D. Ga. Sept. 29, 2022). Whether Fulton provided timely notice of these claims under § 36-11-1 turns on when the claims accrued.

An inverse-condemnation claim accrues at the time the taking occurs. *Mitchell v. City of Atlanta*, 121 S.E.2d 764, 765 (Ga. 1961). A claim for conversion does not accrue until "the allegedly wrongful refusal to return the[] property occur[s]." *Macri*, 2022 WL 4587847, at *5. Here, the Court cannot conclude from the face of Fulton's complaint that his state-law claims would be barred by § 36-11-1 because the complaint does not establish that he failed to provide notice within 12 months of his claims accruing. And if the Court looks outside the complaint, documents in the record below show that Fulton provided notice of his claims on May 30, 2019, well before the one-year deadline.

**a.** An assertion that a plaintiff has failed to provide a county with the requisite notice under § 36-11-1 is an affirmative defense. *See Gordy Const. Co.*

*v. KHM Dev. Co.*, 197 S.E.2d 426, 429 (Ga. Ct. App. 1973) (presentment requirement "is a defense which must be specially pleaded"); *Chattanooga-Hamilton Cnty. Hosp. Auth. v. Hosp. Auth. of Walker*, No. 4:14-cv-0040, 2014 WL 12489763, at *3 (N.D. Ga. Aug. 28, 2014) (analyzing "affirmative defense" that "Plaintiff failed to show that it sufficiently presented its claim(s) to the … Counties prior to filing this action"). And like federal law, Georgia law is explicit that "[a] motion to dismiss for failure to state a claim can properly be granted upon an affirmative defense only when the elements of the defense are admitted by the plaintiff or completely disclosed on the face of the pleadings." *Speedway Motorsports, Inc. v. Pinnacle Bank*, 727 S.E.2d 151, 154 (Ga. Ct. App. 2012) (citation omitted). "Consequently, … if the facts alleged in the complaint merely fail to affirmatively disprove a defense, no dismissal is warranted." *Id.*

Here, at most "the facts alleged in the complaint merely fail to affirmatively disprove" a presentment defense, so "no dismissal [would be] warranted." *Id.* The complaint does not allege any facts about the presentment requirement. This Court therefore could not conclude in this early procedural posture that amending the complaint to add state-law claims related to the taking would be futile.

**b.** In any event, Fulton in fact timely notified the County of his state-law claims. Fulton presented his claims to the County on May 30, 2019—the same day that the Georgia superior court informed him that it would not act on his petition for the return of his horses. Doc. 50-4 at 1-2. Fulton's letter—titled "Ante Litem Demand for the Return of Evidence/Property"—notified the County that it had "illegally retained" Fulton's horses in violation of state and federal law. *Id.* That notice would be untimely only if Fulton's claims accrued before May 30, 2018. They did not.

Fulton's inverse-condemnation claim accrued at the time of the taking. *Mitchell*, 121 S.E.2d at 765. Here, that was September 24, 2018, when the Georgia superior court rejected the County's civil-forfeiture claim. Though the horses were *seized* in 2017, property confiscated under a state's police power is not a taking, *see Lewis v. DeKalb Cnty.*, 303 S.E.2d 112, 115 (Ga. 1983), and therefore no taking could occur until the County was no longer justified in retaining the horses. Once the Georgia superior court clarified that the horses had *not* been civilly forfeited, the County lacked any justification for refusing to return them.

Fulton's conversion claim accrued shortly thereafter. A claim for conversion accrues when "the allegedly wrongful refusal to return the[]

property occur[s].” *Macri*, 2022 WL 4587847, at *5. The County’s refusal to return Fulton’s horses became “wrongful” following the superior court’s September 24, 2018, order. Though the record does not identify the precise date of Fulton’s first request for the return of the horses following the September 24, 2018, order, his May 30, 2019, notice would be timely even if the County refused return of the horses the day the order was issued. Thus, Fulton also provided timely notice of his conversion claim.

### 2. The County Has Waived Any Argument That Fulton Failed to Comply with OCGA § 36-11-1

Even if the County could theoretically assert an argument that Fulton failed to comply with § 36-11-1 (it cannot), the County waived any such argument by failing to raise it. *See Gordy Const.*, 197 S.E.2d at 429 (“Since [the county defendants] failed to raise [their presentment] defense they have waived said requirement.”); *accord Pritchard v. State,* 788 P.2d 1178, 1183 & n.4 (Ariz. 1990) (“Like a statute of limitations, this procedural requirement is subject to waiver.” (citing *Gordy Const.*)).

The County has never argued that Fulton failed to comply with § 36-11-1’s presentment requirement. Not in its motion to dismiss. *See* C.A. Dkt. 15-1 at 15-30 (Doc. 18-1). Not in its principal brief on appeal. *See* C.A. Dkt. 17. Not in its supplemental brief requested by this Court. *See* C.A. Dkt. 58. Not even

in its petition for rehearing after the panel raised the issue for the first time in its decision. C.A. Dkt. 74. Having "failed to raise" the argument four times over, the County "ha[s] waived [the] requirement." *Gordy Const.*, 197 S.E.2d at 429.

### B. The Interests of Justice Support Permitting Liberal Amendment

Federal Rule of Civil Procedure 15(a) "directs that leave to amend 'shall be freely given when justice so requires.'" *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988) (citation omitted). So "unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.* (cleaned up). This Court has also repeatedly held that a party ordinarily "*must* be given at least one opportunity to amend before the district court dismisses the complaint." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (emphasis added). Here, the interests of justice strongly support amendment because Fulton has several facially valid bases for relief, and refusal to permit amendment would leave Fulton without recourse for the County's significant constitutional violations.

**1.** Amendment could cure the deficiencies the district court identified in Fulton's § 1983 takings and procedural due process claims.[13]

The district court dismissed Fulton's § 1983 takings claim for failing to plead facts sufficient to show that his "constitutional deprivation is the result of an official policy or practice of Fulton County." C.A. Dkt. 15-1 at 82 (Doc. 39 at 9). But Fulton could amend his § 1983 takings claim to allege a municipal custom or policy under two theories.

First, Fulton can allege a custom or policy based on the "decision by a final policymaker." C.A. Dkt. 15-1 at 79-80 (Doc. 39 at 6-7) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)). For purposes of *Monell*, a county prosecutor can constitute a final policymaker. *See Pembaur*, 475 U.S. at 483-84. Here, the taking of Fulton's horses was effected by the decisions of the Fulton County Attorney, Patrise Perkins-Hooker, who filed the post-dismissal motion for clarification claiming that Fulton's horses had somehow been civilly forfeited. Doc. 50-3 at 14-15. And it was presumably Perkins-Hooker who determined that the County was not required to return the horses or pay just

[13] If the Court concludes that the Takings Clause does not create a direct cause of action but that Fulton has viable state-law claims, failure to allow Fulton to amend his complaint to revise at least one of his other federal claims could call into question the district court's supplemental jurisdiction over any potential state-law takings claim.

compensation *even after* the court *denied* the County's motion for clarification. Second, as evidenced by the record catalogued above, *see* Part II, *supra*, at the very least, the County ratified any decision its officials made not to pay Fulton. *See Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998 (11th Cir. 1990).[14]

Besides amending his allegations as to the County, Fulton could also sue *the officers* and "any other persons acting under color of law" who effected the taking, as the panel dissent acknowledged. *Fulton*, 148 F.4th at 1266. Thus, Fulton could amend the complaint to add a § 1983 claim against Perkins-Hooker in her individual capacity for her actions.

---

[14] The panel dissent asserted that "Fulton appeals *only* the denial of his motion for leave to amend." *Fulton*, 148 F.4th at 1266. Not so. Fulton's notice of appeal identifies the district court's "February 24, 2021 Order and Final Judgment entered on May 11, 2022 (only as to Defendant Fulton County Board of Commissioners)," C.A. Dkt. 15-1 at 86-87; Doc. 57 at 1-2, which encompasses the district court's order dismissing Fulton's takings claim under § 1983, Doc. 56 at 1. The dissent cited Fulton's statement in his opening brief that the district court "was right" that *Monell* bars his § 1983 takings claim. *Fulton*, 148 F.4th at 1266. But in granting rehearing en banc, this Court vacated the panel opinion and asked that the parties broadly address whether the district court's judgment "should be affirmed." C.A. Dkt. 86. Fulton therefore is not limited to arguments raised in his opening brief before the panel. Regardless, this Court is "not required to accept … a concession when the law and record do not justify it." *United States v. Linville*, 228 F.3d 1330, 1331 n.2 (11th Cir. 2000) (citation omitted). As explained above, neither the law nor the record justifies a concession here.

Fulton could also remedy the deficiencies that the district court identified in his procedural due process claim, which were generally based on the court's view that Fulton sued the wrong person—not that his claims were futile on the merits. *See, e.g.*, Doc. 55 at 9 (noting Fulton failed to allege that Defendant Howard was involved in the taking). Fulton could amend the claim to add allegations regarding the County's determination that his horses had been civilly forfeited. By ignoring the Georgia superior court's order *rejecting* the County's civil-forfeiture claim, the County essentially granted its own motion for clarification. Then, without notice or a hearing, the County apparently determined that, notwithstanding the court's order, the horses had in fact been civilly forfeited, and it was not required to return them or pay just compensation. By "provid[ing] *no process* whatsoever," the County's actions created "a glaring [due process] problem." *Schepers v. Comm'r*, 691 F.3d 909, 915 (7th Cir. 2012).

**2.** Denying Fulton even a single opportunity to amend would result in a grave miscarriage of justice. The County has never seriously disputed that its actions here constitute a taking. Nor could it. While a government may seize evidence, it may not "keep it forever." *Frein*, 47 F.4th at 250. Whatever justification the County had for initially seizing the horses, that basis

evaporated when a Georgia court determined the horses had not been civilly forfeited. The County's actions in ignoring the court's order and in determining the horses had been forfeited without notice or a hearing also raise serious procedural due process concerns. Denying leave to amend would let the County escape liability for those constitutional violations. Nothing in this Court's precedent or practice requires that unjust result.

## CONCLUSION

The Court should reverse the district court's judgment.

Dated: July 20, 2026

Respectfully submitted,

*/s/ Brian M. Williams*
Brian M. Williams
ARNOLD & PORTER
KAYE SCHOLER LLP
1144 Fifteenth Street, Suite 3100
Denver, CO 80202
Telephone: (303) 863-2322
brian.williams@arnoldporter.com

Allon Kedem
Connor J. Morgan
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: (202) 942-6234

Konrad G.W. Ziegler
LEE & ZIEGLER LLP
150 North Street, Suite M
Canton, Georgia 30114
Telephone: (678) 871-0501
kziegler@leeandzieglerlaw.com

Clare A. Saunders
ARNOLD & PORTER
KAYE SCHOLER LLP
500 Boylston Street, 20th Floor
Boston, MA 02116
Telephone: (617) 351-8050

*Counsel for Appellant Brandon Fulton*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing brief was filed electronically on July 20, 2026, and will therefore be served electronically upon all counsel.

*/s/ Brian M. Williams*
Brian M. Williams

*Counsel for Appellant*
*Brandon Fulton*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7) and Eleventh Circuit Rule 32-4 because it contains 12,991 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word Century Expanded BT 14-point font.

*/s/ Brian M. Williams*
Brian M. Williams

*Counsel for Appellant*
*Brandon Fulton*