No. 22-12041

In the

# United States Court of Appeals
## for the Eleventh Circuit

Brandon Fulton,

*Plaintiff-Appellant*,

v.

Fulton County Board of Commissioners,

*Defendant-Appellee*.

On Appeal from the United States District Court for the Northern District of Georgia, Atlanta Division
No. 1:20-cv-01936-SCJ — Hon. Steve C. Jones, *District Judge*

# BRIEF OF *AMICI CURIAE* STATES OF GEORGIA, ALABAMA, AND FLORIDA IN SUPPORT OF DEFENDANT-APPELLEE

Christopher M. Carr
*Attorney General of Georgia*
John Henry Thompson
*Solicitor General*
Elijah J. O'Kelley
*Principal Deputy Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov

*Counsel for Amicus Curiae State of Georgia*

*Additional amici curiae listed on signature page.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1, I certify that in addition to the persons identified in the Certificate of Interested Persons and Corporate Disclosure Statement filed by Plaintiff-Appellant in his brief, the persons listed below are known to have an interest in the outcome of this case:

1. Arnold & Porter Kaye Scholer LLP, Counsel for Appellant
2. Bowman, Brad, Counsel for Appellee
3. Carr, Christopher, Georgia Attorney General
4. Conlan, Bridget F., Counsel for *Amicus Curiae* Pacific Legal Foundation
5. Consovoy McCarthy PLLC, Counsel for Appellee
6. Cruser, Mitchell, Novitz, Sanchez, Gaston & Zimet, LLP, Counsel for Appellee
7. Davis, Stephen S., Counsel for Amicus Curiae Pacific Legal Foundation
8. Dickey, Gilbert C., Counsel for Appellee
9. Edwards, John C., Counsel for Appellant
10. Ely, James W., Jr., *Amicus Curiae*

11. Farag, Donna M., Counsel for *Amicus Curiae* James W. Ely Jr., Julia D. Mahoney, and The Buckeye Institute

12. Fulton, Brandon, Appellant

13. Fulton County Board of Commissioners, Appellee

14. Gates, Douglas W., Former Counsel for *Amicus Curiae* James W. Ely, Jr., Julia D. Mahoney, and The Buckeye Institute

15. Georgia Department of Law, Counsel for *Amicus Curiae* State of Georgia

16. Hoffer, Michael D., Counsel for Appellee

17. Herbert, Christen M., Counsel for *Amicus Curiae* Institute for Justice

18. Institute for Justice, *Amicus Curiae*

19. John Edwards Law Group, LLC, Counsel for Appellant

20. Jones, The Honorable Steve C., District Court Judge, United States District Court for the Northern District of Georgia

21. Kedem, Allon, Counsel for Appellant

22. La Fetra, Deborah J., Counsel for *Amicus Curiae* Pacific Legal Foundation

23. Lee & Ziegler, LLP, Counsel for Appellant

24. Mahoney, Julia D., *Amicus Curiae*

25. Marshall, Steve, Alabama Attorney General

26. Martin, Christina M., Counsel for *Amicus Curiae* Pacific Legal Foundation

27. McNamara, Robert J., Counsel for *Amicus Curiae* Institute of Justice

28. Morgan, Connor, Counsel for Appellant

29. Norris, Cameron T., Counsel for Appellee

30. O'Kelley, Elijah J., Counsel for *Amicus Curiae* State of Georgia

31. Office of the Fulton County Attorney, Counsel for Appellee

32. Pacific Legal Foundation, *Amicus Curiae*

33. Petrany, Stephen J., Former Counsel for *Amicus Curiae* State of Georgia

34. Plott, Mathew, Counsel for Appellee

35. Rodenberg, William D., Former Counsel for *Amicus Curiae* State of Georgia

36. Rosenberg, Steven, Counsel for Appellee

37. Saunders, Clare A., Counsel for Appellant

38. Saunders, Thomas G., Counsel for *Amicus Curiae* James W. Ely, Jr., Julia D. Mahoney, and The Buckeye Institute

39. Scalia Law School Supreme Court Clinic, Counsel for Appellee

40. Sen, Suranjan M., Counsel for *Amicus Curiae* Institute of Justice

41. State of Alabama, *Amicus Curiae*

42. State of Georgia, *Amicus Curiae*

43. State of Florida, *Amicus Curiae*

44. The Buckeye Institute, *Amicus Curiae*

45. Thompson, John Henry, Solicitor General of Georgia, Counsel for *Amicus Curiae* State of Georgia

46. Uthmeier, James, Florida Attorney General

47. Venable, Nicholas B., Counsel for Appellee

48. Ward, Andrew, Counsel for *Amicus Curiae* Institute of Justice

49. Williams, Brian M., Counsel for Appellant

50. Wilmer Cutler Pickering Hale and Dorr LLP, Counsel for *Amicus Curiae* James W. Ely, Jr., Julia D. Mahoney, and The Buckeye Institute

51. Woodward, Karen E., Counsel for Appellee

52. Ziegler, Konrad G.W., Counsel for Appellant

/s/ *John Henry Thompson*
John Henry Thompson

## TABLE OF CONTENTS

**Page**

Table of Authorities ..... ii

Statement of the Issue ..... 1

Introduction and Interest of *Amici* ..... 1

Summary of Argument ..... 3

Argument ..... 4

I. State and federal law facilitate the vindication of takings claims. ..... 5

II. These avenues to relief preclude—and render unnecessary—the panel's implied cause of action. ..... 8

A. Courts cannot infer private rights of action when alternative remedial schemes exist. ..... 9

B. Assuming the Clause imposes an "adequacy" floor, state and federal procedures satisfy it. ..... 11

III. Abandoning time-tested methods for a novel implied right of action would destabilize the law. ..... 19

Conclusion ..... 23

Additional *Amici Curiae* ..... 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bay Point Props., Inc. v. Miss. Transp. Comm'n*,
937 F.3d 454 (5th Cir. 2019) .......... 21

*Bush v. Lucas*,
462 U.S. 367 (1983) .......... 9

*Ex parte Carter*,
395 So.2d 65 (Ala. 1980) .......... 7

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) .......... 3, 17, 19

*Columbia Cnty. v. Doolittle*,
512 S.E.2d 236 (Ga. 1999) .......... 6

*Corr. Servs. Corp. v. Malesko*,
534 U.S. 61 (2001) .......... 9

*Customer Co. v. City of Sacramento*,
895 P.2d 900 (Cal. 1995) .......... 17

*Dep't of Transp. v. Mixon*,
864 S.E.2d 67 (Ga. 2021) .......... 6, 7

*DeVillier v. Texas*,
601 U.S. 285 (2024) .......... 3, 4, 7, 8, 14

*Diversified Holdings, LLP v. City of Suwanee*,
807 S.E.2d 876 (Ga. 2017) .......... 6, 14

*Duffield v. DeKalb Cnty.*,
249 S.E.2d 235 (Ga. 1978) .......... 6

*Egbert v. Boule*,
596 U.S. 482 (2022) .......... 3, 4, 8, 9, 22

*Fletcher v. Peck*,
10 U.S. (6 Cranch) 87 (1810) .................................................... 17

*Franchise Tax Bd. of Cal. v. Hyatt*,
587 U.S. 230 (2019) ..................................................................... 2

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
146 S. Ct. 1546 (2026) ........................................................ 4, 22

*Fulton v. Fulton Cnty. Bd. of Comm'rs*,
148 F.4th 1224 (11th Cir. 2025) .. 2, 4, 5, 8, 10, 11, 12, 14, 15, 16, 18, 20, 21, 22

*Joint Ventures, Inc. v. Dep't of Transp.*,
563 So.2d 622 (Fla. 1990) ........................................................... 7

*Jones v. Fulton Cnty.*,
427 S.E.2d 802 (Ga. Ct. App. 1993) ............................................ 7

*Knick v. Twp. of Scott, Pa.*,
588 U.S. 180 (2019) ............................ 3, 4, 5, 8, 11, 12, 13, 14, 15

*Ladd v. Marchbanks*,
971 F.3d 574 (6th Cir. 2020) ...................................................... 21

*Lech v. Jackson*,
791 F. App'x 711 (10th Cir. 2019) .............................................. 17

*Lewis v. DeKalb Cnty.*,
303 S.E.2d 112 (Ga. 1983) .......................................................... 18

*Markham v. Brown*,
37 Ga. 277 (1867) ......................................................................... 6

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ..................................................................... 9

*Meigs v. McClung's Lessee*,
13 U.S. (9 Cranch) 11 (1815) ...................................................... 13

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
436 U.S. 658 (1978) ........................................................8, 18, 22

*Mugler v. Kansas*,
123 U.S. 623 (1887) ................................................................ 17

*O'Connor v. Eubanks*,
83 F.4th 1018 (6th Cir. 2023)................................................... 15

*Parham v. Justs. of Inferior Ct. of Decatur Cnty.*,
9 Ga. 341 (1851)........................................................................ 6

*Pumpelly v. Green Bay Co.*,
80 U.S. 166 (1871) .................................................................. 13

*Schweiker v. Chilicky*,
487 U.S. 412 (1988) .............................................................. 9, 22

*Seila Law LLC v. CFPB*,
591 U.S. 197 (2020) ................................................................ 19

*Smith v. Floyd Cnty.*,
85 Ga. 420 (1890)...................................................................... 6

*Stroud v. McIntosh*,
722 F.3d 1294 (11th Cir. 2013) ................................................ 21

*United States v. Lee*,
106 U.S. 196 (1882) ................................................................ 13

*Williams v. Bennett*,
689 F.2d 1370 (11th Cir. 1982) ............................................. 8, 21

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ................................................................ 22

**Statutes and Constitutional Provisions**

42 U.S.C. § 1988.................................................................... 8, 15

Ala. Code § 18-1A-32................................................................ 7

Fla. Stat. § 70.001 .......... 7

Ga. Const. art. I, § III, para. I .......... 14

O.C.G.A. § 9-3-30 .......... 7

O.C.G.A. § 36-11-1 .......... 7

O.C.G.A. § 50-21-20 .......... 7

U.S. Const. amend. V .......... 17

**Other Authorities**

A. Woolhandler & J. Mahoney, *Federal Courts and Takings Litigation*, 97 Notre Dame L. Rev. 679 (2022) .......... 15

A. Woolhandler, et al., *Takings and Implied Causes of Action*, 2024 Cato Sup. Ct. Rev. 249 .......... 10

H. Mills & A. Abbott, *On the Law of Eminent Domain* (2d ed. 1888) .......... 17, 18

P. Potter, *Sir Fortunatus Dwarris's A General Treatise on Statutes* (1875) .......... 18

R. Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 67 (1999) .......... 12

T. Lindley & E. West, *The Takings Clause Cause of Action*, 79 Stan. L. Rev. (forthcoming 2027) .......... 10, 11, 12, 13, 15, 19, 20, 21

W. M. Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782 (1995) .......... 11

W.P. Prentice, *Police Powers Arising Under the Law of Overruling Necessity* (1894) .......... 18

## STATEMENT OF THE ISSUE

Whether the Takings Clause of the Fifth Amendment implicitly creates a direct cause of action for just compensation in federal court, despite the availability of constitutionally adequate remedial schemes under federal and state law.

## INTRODUCTION AND INTEREST OF *AMICI*

Because *Amici* States value and seek to defend the property rights of our citizens, we are committed to compliance with just-compensation requirements—including the Takings Clause and its state constitutional counterparts. *Amici* States also share a powerful interest in the efficient completion of vital infrastructure projects. And, of course, taxpayers depend on States—together with local governments—to responsibly steward public finances. The best way to vindicate these interwoven interests is often to avoid litigation altogether. But when disputes do arise, state and local governments (and plaintiffs, too) depend on predictable, procedurally balanced, long-established methods for adjudicating takings claims. *Amici* States recognize many such methods, which enable individuals and businesses who believe they are owed "just compensation" to sue for judicial relief. On top of that, Congress has long authorized federal suits against state officials and municipalities under 42 U.S.C. § 1983.

To be sure, these structures come with familiar procedural components—statutes of limitations, notice requirements, etc.—common to nearly all civil litigation. And they operate against the constitutional backdrop of sovereign immunity and the Eleventh Amendment. *See, e.g.*, *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 243–44 (2019). But these structures, like their historical forerunners, have long facilitated reliable judicial enforcement of federal and state just-compensation guarantees. And they have channeled that litigation into sensible procedural frameworks informed by common-law experience and legislative compromise.

That longstanding arrangement is constitutional. The panel's view that the Takings Clause *itself* confers an implied right of action is wrong as a matter of text, history, and precedent. *See Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224, 1265–78 (11th Cir. 2025) (Pryor, C.J., dissenting). Most relevant to *Amici* States, it paves over well-trodden, reliable paths to the resolution of takings claims—replacing time-tested procedures with a novel and undefined form of adjudication over which judges necessarily enjoy plenary control. At best, the panel's approach is a solution in search of a problem. Worse, by supplanting existing solutions, the panel's approach creates myriad *new* problems for litigants and courts—and arrogates authority to solve them.

## SUMMARY OF ARGUMENT

As the Supreme Court recognized when the issue presented here last reached its doorstep, the existence of a constitutional right is distinct from the availability of a judicial remedy for its violation. *DeVillier v. Texas*, 601 U.S. 285, 291 (2024). And the availability of other remedies is typically reason enough to avoid risking the separation-of-powers violation inherent in "almost every … judicially created cause[] of action." *Cisco Sys., Inc. v. Doe I*, 146 S. Ct. 1882, 1891 (2026).

State and federal law *do* provide robust private remedies for uncompensated takings. *Knick v. Twp. of Scott, Pa.,* 588 U.S. 180, 187, 194 (2019). Whether those remedies will satisfy any given litigant is beside the point. *Egbert v. Boule*, 596 U.S. 482, 493 (2022). But thanks to a combination of common-law experience and legislative compromise, today's routes to relief are wider than those available for much of American history. So, if the Clause imposes an "adequacy" floor, available remedies easily clear it.

Finally, trading those longstanding and procedurally balanced remedial schemes for the panel's implied right of action would throw just-compensation litigation into chaos and enlist unelected judges in a sprawling legislative effort. This Court should not venture down that path.

## ARGUMENT

"Constitutional rights do not typically come with a built-in cause of action to allow for private enforcement in courts." *DeVillier*, 601 U.S. at 291. Instead, citizens must channel constitutional claims against governments and their officials through "independent cause[s] of action designed for that purpose." *Id.* And while courts have at times allowed plaintiffs to sue directly under the Constitution, such "[h]ome-grown causes of action are difficult to reconcile with 'the Constitution's separation of legislative and judicial power.'" *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1553 (2026) (quoting *Egbert*, 596 U.S. at 491).

For that reason, the Supreme Court has clarified that the existence of a legislated "remedial structure" for the violation of a right "is reason enough to limit the power of the Judiciary to infer a new … cause of action." *Egbert,* 596 U.S. at 493 (citation modified). And when it comes to property takings, Congress and the States have done just that. Congress has empowered litigants to sue state officers and localities under 42 U.S.C. § 1983. *See Knick,* 588 U.S. at 194. And "every state in the Union provides a remedy under state law for uncompensated takings." *Fulton*, 148 F.4th at 1279–80 (Pryor, C.J., dissenting).

Undeterred, the panel fashioned a cause of action directly under the Takings Clause—one that seemingly kicks in whenever a plaintiff encounters an obstacle under an existing remedial scheme. *See id.* at 1242; *id.* at 1236 (statute of limitations), *id.* at 1256 (limits on § 1983 liability). In doing so, it ignored the Supreme Court's admonition to respect legislative choices. But even if the Clause imposes some remedial "adequacy" threshold, a historical comparison confirms that today's remedies clear it. Jettisoning those time-tested procedures for judicially legislated ones would disrupt just-compensation litigation nationwide.

## I. State and federal law facilitate the vindication of takings claims.

Although a reader of the panel opinion wouldn't know it, the States uniformly provide judicial avenues to vindicate federal and state just-compensation guarantees. Forty-nine states authorize inverse-condemnation actions against the state, while Ohio routes a similar procedure through mandamus. *Knick*, 588 U.S. at 186 & n.1. And state tort law has long facilitated judicial remedies for uncompensated takings by government officials. *See Fulton*, 148 F.4th at 1266–67 (Pryor, C.J., dissenting). Of course, Georgia is the most relevant State here. And like other states, Georgia offers a clear path to judicial relief for uncompensated takings.

Most prominently, Georgia property owners may secure injunctions or recover damages against the State or its political subdivisions through inverse condemnation. *See Diversified Holdings, LLP v. City of Suwanee*, 807 S.E.2d 876, 884 (Ga. 2017), *Duffield v. DeKalb Cnty.*, 249 S.E.2d 235, 237 (Ga. 1978); *Smith v. Floyd Cnty.*, 85 Ga. 420, 423–24 (1890). Such claims are "brought by a private landowner … alleging the taking or damaging of the private property for public purposes without the initiation of eminent domain proceedings." *Dep't of Transp. v. Mixon*, 864 S.E.2d 67, 69 n.1 (Ga. 2021).

Inverse condemnation grew out of Georgias's tradition of tort remedies for unlawful takings. *See Diversified Holdings*, 807 S.E.2d at 886 (inverse condemnation lies where "a county took some affirmative action for public purposes causing a nuisance or trespass that, in turn, resulted in the diminished utility and functionality of a private owner's land"); *Markham v. Brown*, 37 Ga. 277, 280 (1867) (trespass action for taking); *Parham v. Justs. of Inferior Ct. of Decatur Cnty.*, 9 Ga. 341, 355 (1851) (injunction). And while inverse condemnation is not itself a tort, Georgia courts rule for plaintiffs in such cases where, for example, they establish a trespass or continuing nuisance. *See Columbia Cnty. v. Doolittle*, 512 S.E.2d 236, 237 (Ga. 1999).

To be sure, limits apply: A plaintiff has four years to sue, *see* O.C.G.A. § 9-3-30(a); if he sues a county, he must act "within 12 months," *id.* § 36-11-1; *Jones v. Fulton Cnty.*, 427 S.E.2d 802, 803 (Ga. Ct. App. 1993). But because Georgia's Constitution itself "waives sovereign immunity for damages claims premised on a taking or damaging of private property," *Mixon*, 864 S.E.2d at 69, these claims are not subject to the many procedural rules, exceptions, and damages caps that limit the statutory immunity waiver in the Georgia Tort Claims Act, O.C.G.A. § 50-21-20, *et seq*.

Elsewhere in this Circuit, Alabama has codified an inverse-condemnation cause of action. *See* Ala. Code § 18-1A-32; *Ex parte Carter*, 395 So.2d 65, 67 (Ala. 1980). Florida recognizes inverse condemnation, *see Joint Ventures, Inc. v. Dep't of Transp.,* 563 So.2d 622, 627 (Fla. 1990), in addition to a broader property-rights statute, *see* Fla. Stat. § 70.001, *et seq*. Of course, various procedural requirements and immunities may apply. But federal courts cannot "assume the States will refuse to honor the Constitution, including the Takings Clause, because States and their officers are also bound by … the Constitution." *DeVillier*, 601 U.S. at 293 (cleaned up). And in fact, the States have proven capable of *expanding* property rights and associated remedies, balanced by commonsense procedural limits.

The panel brushed aside centuries of practice by deeming state remedies all but irrelevant and demanding a federal one. But setting aside the historical problems plaguing that approach, *see id.* at 1276 (Pryor, C.J., dissenting), it fails on its own terms: Congress *has* provided a comprehensive remedial scheme for Takings claims against state and local officials in the form of 42 U.S.C. § 1983. *See Knick*, 588 U.S. at 202; *cf. Williams v. Bennett*, 689 F.2d 1370, 1390 (11th Cir. 1982). To be sure, statutes of limitations and immunity doctrines may frustrate individual plaintiffs, but in some ways § 1983 is more generous than other options. *See* 42 U.S.C. § 1988(b) (authorizing attorney's fees); *Fulton*, 148 F.4th at 1264. And while § 1983 does not abrogate sovereign immunity, it does authorize suits against the States' political subdivisions. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

## II. These avenues to relief preclude—and render unnecessary—the panel's implied cause of action.

Just as "constitutional concerns do not arise when property owners have other ways to seek just compensation," *DeVillier*, 601 U.S. at 292, such remedies preclude new judicially created causes of action, *see Egbert,* 596 U.S. at 493. And regardless, existing options are constitutionally adequate by any measure.

### A. Courts cannot infer private rights of action when alternative remedial schemes exist.

Because the Takings Clause does "not expressly create … a right of action" to seek money damages in federal court, *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 323 n.12 (2020), any such right must be judicially implied. As such, the next question is whether an "alternative remedial structure" exists—and because it does, the inquiry should stop there. *Egbert,* 596 U.S. at 493. Whether a court deems existing remedies sufficient is beside the point. *See, e.g.*, *id.* at 497–98 (no implied Fourth Amendment claim against federal officer for assault even though judicial review was unavailable under alternative grievance procedures); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69, 74 (2001) (no implied damages action because prisoners could file administrative grievances); *Bush v. Lucas*, 462 U.S. 367, 372 n.8, 390 (1983) (no implied First Amendment wrongful-termination claim even though jury trials and punitive damages were unavailable); *Schweiker v. Chilicky,* 487 U.S. 412, 429 (1988) (no implied due-process claim for disability benefits where certain damages were unavailable). Like creating a cause of action in the first place, evaluating the policy merits of alternative procedures "is in every meaningful sense an act of legislation." *Egbert*, 596 U.S. at 503 (Gorsuch, J., concurring in judgment).

Fulton's all-purpose response is that the Takings Clause—unlike many other constitutional provisions—references a remedy. *Amici* States will not rehash the many flaws in that argument. *Fulton*, 148 F.4th at 1270–72 (Pryor, C.J., dissenting). Suffice it to say that the historical record does not show that the Clause *itself* (rather than statutory or common-law sources) was understood to provide a *judicial* remedy (atop a legislative one) against *governments* (not merely officers). *See id.* at 1274–77; *see also* T. Lindley & E. West, *The Takings Clause Cause of Action*, 79 Stan. L. Rev. (forthcoming 2027) (manuscript at 9–14, 27–31), https://ssrn.com/abstract=6790158.

In short, § 1983 is reason enough to reject the panel's errors and affirm. But the robust tradition of state-law remedies offers yet another. For one thing, modern state-law remedies match—and *exceed*—the historical takings litigation that thrived for generations before the panel's needless rescue mission. *See* Part II.B.1, *infra*. For another, creating a direct constitutional cause of action—one defined and administered solely by federal judges—could short-circuit the trend toward expanded state-law takings remedies. *See* A. Woolhandler, et al., *Takings and Implied Causes of Action*, 2024 Cato Sup. Ct. Rev. 249, 256–57 & nn. 44–48, 261. Thankfully, there is no reason to venture down that road.

### B. Assuming the Clause imposes an "adequacy" floor, state and federal procedures satisfy it.

Scholars have suggested that even if the Takings Clause does not create its own cause of action, it might impose an adequacy threshold on other remedial schemes. *See* Lindley & West, *supra*, at 32–37. Existing procedures would clear any such threshold, not least because they are more generous than modes of enforcement that obtained for most of American history.

**1.** Just-compensation remedies were a matter of legislative policy—not judicial compulsion—in the early Republic. *See, e.g.*, *Knick*, 588 U.S. at 199. "Congress retained sole responsibility for paying takings claims against the federal government." W. M. Treanor, *The Original Understanding of the Takings Clause and the Political Process*, 95 Colum. L. Rev. 782, 794 n.69 (1995). "Private bills reflected the early republic's solution to the fundamental tension between an 'individual's interest in receiving fair consideration and prompt payment of a meritorious claim' and 'society's interest in maintaining democratic control over the allocation of limited public revenue among competing public needs.'" *Fulton*, 148 F.4th at 1274 (Pryor, C.J., dissenting) (quoting F. Shimomura, *The History of Claims Against the United States: The Evolution from a Legislative Toward a Judicial Model of Payment*, 45 La. L. Rev. 625, 626 (1985)).

The availability of judicial remedies was generally a question of state law. "At the Founding, litigants had to bring state actions for damages like 'just compensation' in statutorily prescribed vehicles or rigid common-law forms like trespass." *Id.* at 1251 n.14. The statutory route was generally more plaintiff-friendly than tort law, Lindley & West, *supra*, at 12 n.61, but less so than the modern inverse-condemnation regime. Today, every State authorizes such claims, often by statute, whereas 19th Century legislatures rarely "provided a general owner-initiated procedure for obtaining just compensation from takings." R. Brauneis, *The First Constitutional Tort: The Remedial Revolution in Nineteenth-Century State Just Compensation Law*, 52 Vand. L. Rev. 57, 69 n.33 (1999). Instead, they might empower "property owners to bring claims against [private] entities that the government authorized to take [their] property," Lindley & West, *supra*, at 10, in connection with "particular public works," Brauneis, *supra*, at 83; *Knick*, 588 U.S. at 199 ("On occasion, when a legislature authorized a particular government action that took private property, it might also create a special owner-initiated procedure for obtaining compensation."). And unlike many modern inverse-condemnation regimes, these laws "did not necessarily permit a claim against a government." Lindley & West, *supra*, at 11 n.49.

Absent a statutory remedy, a property owner had to turn to tort law—typically, "a common law trespass action against the responsible corporation or government official," *Knick*, 588 U.S. at 199; *see also, e.g.*, *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 175 (1871), often seeking ejectment, *see, e.g.*, *United States v. Lee*, 106 U.S. 196, 219–23 (1882); *Meigs v. McClung's Lessee*, 13 U.S. (9 Cranch) 11, 16 (1815). The constitutional question arose when a defendant justified his actions as legally authorized, prompting a response that the federal or state constitution trumped. *See Knick*, 588 U.S. at 199; Lindley & West, *supra*, at 11 ("If a government attempted to effectuate a taking … [its] failure to provide just compensation would have nullified the purported property transfer.").

The rigid common-law writs that undergirded this structure were not designed for constitutional litigation—a wholly modern construct. Plaintiffs encountered myriad restrictions on forms of action, defendants, and remedies—plus a range of defenses and immunities. *See id.* at 12. The risk of procedural error was high, especially before reforms like the Field Code and modern rules of civil procedure. *See id.* at 12–13. In short, today's state-law remedies are more accessible by any measure than those enjoyed by Fulton's forebears—and thus constitutionally adequate.

The panel suggested that certain state-law remedies might be inadequate because some states might not ensure compensation for loss of *personal* property. *See Fulton*, 148 F.4th at 1259–60. But that conflates the remedial vehicle with the substantive right: State just-compensation guarantees might differ from the Takings Clause, but that is distinct from whether a state-law *remedy* can be used to vindicate a federal *claim*. *See, e.g.*, *DeVillier*, 601 U.S. at 293 (Texas's "state-law inverse-condemnation cause of action provides a vehicle for takings claims based on both the Texas Constitution and the Takings Clause"). In any event, Georgia's analogous provision is arguably broader than the Takings Clause. *See* Ga. Const. art. I, § III, para. I; *Diversified Holdings*, 807 S.E.2d at 891 (Peterson, J. concurring).

The panel also reasoned that state procedural rules requiring plaintiffs to seek timely judicial relief "'infringe or restrict the property owner's federal constitutional claim.'" *Fulton*, 148 F.4th at 1260 (quoting *Knick*, 588 U.S. at 191). But such rules do not restrict the underlying right, and *Knick* does not hold otherwise. *Knick* merely recognized that a Takings Clause violation occurs—and a § 1983 claim accrues—at the time of the uncompensated taking. 588 U.S. at 193–94. Nothing in *Knick* suggests that a plaintiff can circumvent statutes of limitations. And *Knick*'s

holding that § 1983 does not require a plaintiff to first utilize state-law vehicles was not a Takings Clause-specific rule about the just-compensation *right*—it was a general observation about the federal *remedy*. *See id.* at 194 (Section 1983's non-exhaustion rule "is as true for takings claims as for any other claim grounded in the Bill of Rights"). The panel's reliance on *Knick* thus assumes its own disputed conclusion that a Takings Clause cause of action exists in the first place. *See Fulton*, 148 F.4th at 1260 n.25.

**2.** Alongside those robust state-law avenues to relief lies a major federal one: Today's plaintiff "whose property has been taken by a local government has a claim under § 1983." *Knick,* 588 U.S. at 194; *see also O'Connor v. Eubanks*, 83 F.4th 1018, 1028 (6th Cir. 2023) (Thapar, J., concurring); A. Woolhandler & J. Mahoney, *Federal Courts and Takings Litigation*, 97 Notre Dame L. Rev. 679, 689–701 (2022). And here, the parties agree that a claimant can recover at least as much under § 1983 as under an implied cause of action, *see* Oral Arg. Rec. 4:30–50, 14:54–15:40, plus attorney's fees, *see* 42 U.S.C. § 1988(b). In short, "§ 1983 provides a further federal backdrop" even if state-law remedial schemes are assumed constitutionally "inadequate for any reason." Lindley & West, *supra*, at 37.

The panel tried to sidestep § 1983 by reasoning that, even if *generally* adequate, that remedy cannot help *this* plaintiff because he needs to sue a municipality. Setting aside that Fulton "could have sued the officers" instead, *Fulton*, 148 F.4th at 1266 (Pryor, C.J., dissenting), the gist of the panel's argument is that *Monell* "wholesale bar[s] a class of litigants"—those with claims against local governments—from obtaining judicial relief to which they are "entitled," *id.* at 1260 n.25. But *Monell*'s recognition that local governments "are [not] vicariously liable for the actions of their employees" under § 1983 "does not limit the constitutional right to just compensation," it merely "ensures that the plaintiff sues the proper" defendant. *Id.* at 1278–79 (Pryor, C.J., dissenting). And just because *this* plaintiff failed to allege the requisite custom or policy does not mean *every* plaintiff cannot do so.

Despite gesturing at a purportedly disfavored "class of litigants," *id.* at 1260 n.25, the panel's approach boils down to a plaintiff-specific one: The Takings Clause *must* provide an implied cause of action for Fulton because he failed to timely pursue state remedies or to bring a federal claim within § 1983's broad scope. But one man's struggle to secure judicial remedies—amplified by his own litigation choices—cannot justify the conclusion that all existing remedies are so plainly inadequate that courts must defy

the Supreme Court's insistence that implying new causes of action is off-limits "in almost every circumstance." *Cisco Sys.*, 146 S. Ct. at 1891.

The panel's reliance on *Monell*'s purported barrier to relief for plaintiffs like Fulton may suffer from an even deeper flaw. The Takings Clause imposes a just-compensation condition on government efforts to "tak[e]" private property "*for public use*." U.S. Const. amend. V (emphasis added). It does not automatically compel compensation merely because a government official has seized or damaged property; it imposes a limit on the state's specific "power to oblige [someone] to sell and convey, when the public necessities require it." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 145 (1810) (Johnson, J., dissenting); *see also* H. Mills & A. Abbott, *On the Law of Eminent Domain* § 1 (2d ed. 1888). Other exercises of government authority may not trigger the Clause's compensation guarantee. For example, and most relevant here, an application of the state's police power to protect the "health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit." *Mugler v. Kansas*, 123 U.S. 623, 668–69 (1887).[1]

[1] *See also, e.g.*, *Lech v. Jackson*, 791 F. App'x 711, 715–17 (10th Cir. 2019); *Customer Co. v. City of Sacramento*, 895 P.2d 900, 913

Here, Fulton alleges that county officials "arrested [him] for felony cruelty to animals and seized seven [of his] horses." *Fulton*, 148 F.4th at 1233. On its face, that certainly sounds more like an alleged abuse of the police power to "restrain[] injurious private use" than a claim that the county requisitioned Fulton's horses for a public use. *See* Mills, *supra*, at § 7, 88. So, if some plaintiffs cannot secure relief against counties under § 1983, the reason *might* be that what they've labeled "takings" are really allegations that municipal employees abused the State's police power—a basic mismatch for *both* the Takings Clause and *Monell*. A bona fide public-use taking, by comparison, is far more likely to involve the requisite municipal "policy or custom." *Monell*, 436 U.S. at 694. In sum, the panel's feared "wholesale bar[ ]" to relief, *Fulton*, 148 F.4th at 1260 n.25, is less likely to arise when a local government actually takes private property for public use—and thus triggers the Clause's just-compensation requirement.

---

(Cal. 1995); *Lewis v. DeKalb Cnty.*, 303 S.E.2d 112, 115 (Ga. 1983); W.P. Prentice, *Police Powers Arising Under the Law of Overruling Necessity* 6 (1894) ("police power … is not controlled by the constitutional limitation that private property shall not be taken for public use without compensation"); P. Potter, *Sir Fortunatus Dwarris's A General Treatise on Statutes* 454 (1875) ("police power" is "subject to no such [compensation] condition").

**3.** Finally, even if the only judicial just-compensation remedy available to a plaintiff violates an (as-yet unidentified) adequacy standard, the panel's solution—wholesale judicial arrogation of the legislative "power to create causes of action," *Cisco Sys.*, 146 S. Ct. at 1890—would remain inappropriate. Instead, a court might simply decline to enforce the specific procedural rule that renders the existing remedy inadequate (*e.g.*, some unreasonable statute of limitation period that exists solely to thwart the underlying right). *See* Lindley & West, *supra*, at 35. If nothing else, that approach would less obviously "offend the separation of powers," *Cisco Sys.*, 146 S. Ct. at 1891, because federal courts *do* possess "the negative power to disregard an unconstitutional enactment," *Seila Law LLC v. CFPB*, 591 U.S. 197, 237–38 (2020) (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923)).

## III. Abandoning time-tested methods for a novel implied right of action would destabilize the law.

As the facts here illustrate, a judicially implied "alternative to other avenues for takings claims (inverse condemnation, § 1983, common-law claims) would invite litigants to circumvent those other avenues whenever the constitutional cause of action provides some litigation advantage." Lindley & West, *supra*, at 29. A plaintiff will reach for the implied right of action whenever

he "prefers a government defendant over a judgment-proof official; prefers a federal forum; prefers to avoid procedural constraints on inverse-condemnation proceeding (*e.g.*, statutes of limitations or exhaustion of administrative remedies); or prefers the remedies available for a takings claim." *Id.* Indeed, the panel effectively created a *right* to such advantages. *See Fulton*, 148 F.4th at 1242. No one should feign surprise when plaintiffs eschew time-tested remedial paths for a freeway freshly paved by judicial fiat.

Down that new road lies a host of difficult, policy-infused follow-up questions—and with them, dramatic changes to just-compensation litigation. To start, courts will need to "devise gap-filling and procedural rules as constitutional law." Lindley & West, *supra*, at 30. For example: "what statute of limitations should apply to an implied right of action under the Takings Clause?" *Fulton*, 148 F.4th at 1281 (Pryor, C.J., dissenting). The panel here opted for Georgia's four-year window for personal-property and inverse-condemnation claims over its two-year window for personal-injury actions applicable in § 1983 suits. *Id.* at 1237. As a result, even "substantively identical [Takings] claims [will] follow dramatically different tracks through the federal courts." *Id.* at 1281 (Pryor, C.J., dissenting).

Of course, statutes of limitations are the tip of the iceberg. The next case might require this Court to decide "the availability of attorney's fees, the scope of immunity for officials, and whether plaintiffs must exhaust available state procedures"—all "without the aid of state or federal legislation." Lindley & West, *supra*, at 31. For example, § 1983 allows state officials to raise a good-faith defense. *See Williams*, 689 F.2d at 1390 n.20. Is that defense available to a claim directly under the Takings Clause? *See* CA11 Doc. 49 at 29 (*amicus* suggesting "no").

There's more. Until now, courts had not recognized a waiver of Eleventh Amendment immunity for Takings claims against the States. *See Ladd v. Marchbanks*, 971 F.3d 574, 578–80 (6th Cir. 2020); *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 456–57 (5th Cir. 2019). But if the Clause creates its own cause of action, does it follow that sovereign immunity falls away? *See Fulton*, 148 F.4th at 1262 (dicta answering "yes"). States have traditionally enjoyed latitude to waive sovereign immunity layer by layer—for example, by consenting to suit in a federal *forum* but not to their liability "for particular *claims*." *Stroud v. McIntosh*, 722 F.3d 1294, 1302 (11th Cir. 2013) (emphasis added). Would an action against the States under the Takings Clause remove that distinction? And what would the *scope* of state liability look like?

A State's political subdivisions are not always liable for the acts of their employees under § 1983, *Monell*, 436 U.S. at 694, but would the States be liable for the actions of their political subdivisions? Or suppose a property owner seeks to recover the full value of his property even though the State has offered to return it. Would state-sovereignty concerns compel courts to treat the taking as temporary and limit damages to rental value?

The core problem is not simply that these questions are difficult ones (though that certainly ought to raise judicial alarm bells). Many of them are not fit for courts at all: They involve "inevitable compromises" between competing interests, *Schweiker,* 487 U.S. at 429, and are properly the province of Congress and the States. At best, federal courts are "ill suited" for that "legislative endeavor." *Egbert*, 596 U.S. at 491, 495. At worst, courts' "uninvited intrusion" violates the separation of powers. *Ziglar v. Abbasi,* 582 U.S. 120, 143 (2017). And given the range of options available under federal and state law, *see* Part I, *supra*, there is no reason to embark on this "mission impossible," *FS Credit*, 146 S. Ct. at 1557. Certainly, one plaintiff's litigation choices cannot justify the "constitutional wreckage" that would follow bulldozing time-tested avenues of takings litigation. *Fulton*, 148 F.4th at 1281 (Pryor, C.J., dissenting).

## CONCLUSION

For the reasons set out above, this Court should affirm the district court.

Respectfully submitted.

/s/ *John Henry Thompson*
Christopher M. Carr
*Attorney General of Georgia*
John Henry Thompson
*Solicitor General*
Elijah J. O'Kelley
*Principal Deputy Solicitor General*
Office of the Georgia Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3373
jhthompson@law.ga.gov

*Counsel for Amicus Curiae State of Georgia*

## ADDITIONAL *AMICI CURIAE*

STEVE MARSHALL

Attorney General of Alabama

JAMES UTHMEIER

Attorney General of Florida

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 29(a)(5) of the Federal Rules of Appellate Procedure because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and 11th Cir. R. 32-4, it contains 4,705 words as counted by the word-processing system used to prepare the document.

/s/ *John Henry Thompson*
John Henry Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2026, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *John Henry Thompson*
John Henry Thompson